PJ lt

# FILED

530

## JUL - 3 2008

**RICHARD W. WIEKING**
**CLERK, U.S. DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

E.

Name _____ VALDIVIA _____ NOEL SR. _____
　　　　　　(Last)　　　　　　　　　(First)　　　　　　　　(Initial)

Prisoner Number __C-29917_____

Institutional Address ___SAN QUENTIN STATE PRISON, SAN QUENTIN, CA 94964___

---

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

**(PR)**

**CV 08** **3225** **PJH**

NOEL VALDIVIA SR.
Full Name of Petitioner

vs.

ROBERT L. AYERS JR., WARDEN
　　　Name of Respondent
　　　(Warden or jailor)

Case No.(To be provided by the clerk of court)

PETITION FOR A WRIT OF HABEAS CORPUS

---

Read Comments Carefully Before Filling In

When and Where to File

　　You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

　　If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your

petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1.    What sentence are you challenging in this petition? DENIAL OF PAROLE
                                                                    SEE ATTACHED EXHIBIT

      (a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland): BOARD OF PAROLE HEARINGS

PETITIONER IS APPEALING A PAROLE DENIAL, NOT A COURT HEARING.

_____        _____
          Court                                                    Location

      (b)    Case number, if known _____
      (c)    Date and terms of sentence _____
      (d)    Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) Yes    No

Where? __SAN QUENTIN STATE PRISON; SAN QUENTIN, CA 94964_____
          (Name of Institution)                          (Address)

      2.    For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

FIRST DEGREE MURDER, P.C. 187 _____

_____

_____

      3.    Did you have any of the following?

Arraignment: Yes _x No __   Preliminary Hearing: Yes _x No __Motion to Suppress: Yes __ No __

3

4.    How did you plead?

Guilty __X__    Not Guilty _____    Nolo Contendere _____

Any other plea (specify) _____

5    If you went to trial, what kind of trial did you have?

Jury _____    Judge alone _____    Judge alone on a transcript _____

6.    Did you testify at your trial?  Yes __ No __

7.    Did you have an attorney at the following proceedings:

(a)    Arraignment   Yes __X__        No __
(b)    Preliminary hearing        Yes  χ        No __
(c)    Time of plea   Yex __χ χ     No __
(d)    Trial   Yes __      No __
(e)    Sentencing    Yes __χ     No __
(f)    Appeal        Yes ____     No
(g)    Other post-conviction proceeding    Yes __        No __

8.    Did you appeal your conviction?   Yes __ No χ

(a)    If you did, to what court(s) did you appeal?

Court of Appeal      Yes __      No __      _____
                                             (Year)                    (Result)
Supreme Court of
California            Yes __      No __      _____
                                             (Year)                    (Result)

Any other court      Yes __      No __      _____
                                             (Year)                    (Result)

(b)    If you appealed, were the grounds the same as those that you are raising in this
petition?                                Yes __ No __

(c)    Was there an opinion?      Yes      No

(d)    Did you seek permission to file a late appeal under Rule 31(a)?
                                    Yes          No

If you did, give the name of the court and the result:

_____

9.    Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?    Yes    No x

5

Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. § 2244(b).

        (a)     If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.   **PETITIONER IS NOT APPEALING ANY COURT DECISION,**
Name of Court _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result _____ Date of Result _____

II.   Name of Court _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result _____ Date of Result _____

III.   Name of Court _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result _____ Date of Result _____

      (b)   Is any petition, appeal or other post-conviction proceeding now pending in any

court?    Yes <u>x</u>  No <u>I HAVE TWO FEDERAL HABEAS PETITIONS, ONE IN THIS COURT AND ONE IN THE NINTH CIRCUIT.</u>

<u>  U.S. DISTRICT COURT, NORTHERN DISTRICT; U.S. COURT OF APPEALS  </u>
NINTH CIRCUIT COURT OF APPEALS.

(Name and location of court)

## B. GROUNDS FOR RELIEF

    State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you need more space. Answer the same questions for each claim.

    <u>Note:</u> You must present ALL your claims in your first federal habeas petition. Subsequent petitions may be dismissed without review on the merits. 28 U.S.C. § 2244(b); <u>McCleskey v. Zant</u>, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

    Claim One: <u>  SEE ATTACHED PAGES 1-12  </u>

Supporting Facts: SEE ATTACHED

Claim Two: SEE ATTACHED PAGES 12-21

Supporting Facts: SEE ATTACHED

Claim Three: SEEAATTACHED PAGES 22-24; CLAIM FOUR: SEE PAGES

24-27; CLAIM FIVE: SEE PAGES 27-31; CLAIMS SIX: SEE PAGES 31-33

Supporting Facts: SEE ATTACHED PAGES

If any of these grounds was not previously presented to any other court, state briefly which

grounds were not presented and why:

ALL CLAIMS WERE PRESENTED IN ALL LOWWER COURTS AND DENIED
SEE EXHIBIT "G"

8

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

**SEE ATTACHED PAGES**

Do you have an attorney for this petition?    Yes ___ No**XXX** PETITIONER REQUEST
                                                                         APPOINTMENT OF COUNSEL
If you do, give the name and address of your attorney:

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on ___June 22, 2008___    _Noel Valduvia Sr._
                    Date                                Signature of Petitioner

( rev. 5/96)

9

**CONTENTION**

**I.**

**THE BOARD OF PRISON HEARINGS VIOLATED PETITIONER'S
STATE AND FEDERAL DUE PROCESS WHEN IT MADE
A DETERMINATION OF UNSUITABILITY WITHOUT
"SOME EVIDENCE."**

Petitioner appeared before the Board of Prison Hearings (Board) on August 1, 2007 for

his seventh subsequent parole consideration hearing and was denied parole for two years. The

Board stated: "And, sir the Panel has reviewed all information received from the public and have

relied on the following circumstances in concluding that you're not yet suitable for parole and

would pose an unreasonable risk of danger to society or a threat to public safety if released from

prison." (Exhibit "A" p. 109)

The Board then stated the following reasons for denial:

1.  This offense was carried out in an especially cruel and callous manner.

2.  Multiple victims were attacked or killed in the same incident.

3.  This offense was carried out dispassionately Decker died shortly
    And this was a calculated offense.

4.  Sir, you suffered prior criminality.

5.  You had an escalating pattern of criminal conduct, including violence.

(Exhibit "A" p. 109-110)

The Board then noted the positive findings, stating:

1. Your institutional behavior has been commendable.

2. You're currently working in vocational Sheet Metal.

3. You have achieved your AA through Patton University
   in 2007; you're to be commended for that.

4. You, obviously, have a lot on board, and far in educational...
   As to vocations, we rarely see three vocational certifications

1

that you've achieved: the HVAC, the Mechanical Drafting, the sheet metal. And you also have 1,500 hours in Electronic Data Processing. So, that is certainly to be commended.

5. As to your AA, you've participated in AA on a regular basis' from 1990 until 2006. We have chronos up to through much of that period. And you were able, immediately, to give up your clean and sober date, which you stated was July

6. You are to be commended, also, for saving an inmate's life who was choking in 1997. And most recently, you have completed some large programs in the last two years, including No More Tears, the TRUST (Acronym for "Teaching Responsibility Utilizing Sociological Training) Program, Impact, Real Choices, and the No More Tears is the employability program. You are to be commended for your self-help.

7. As to your misconduct in prison, you have seven 115's. The most recent, in 2000, for disobeying medical lay-in. That has been explained, but you so have six **115's but you showed that you are now displaying positive behavior in prison.**

8. As to the psychological report dated March 20th 2006 by Dr. Michelle Inaba, basically it supports your parole; assessing you as having a low-risk of dangerous and a global assessment of functioning of 90, which is high.

9. Your parole plans are reasonable. You have three residential offers from your extended family. And you have acceptable employment plans. You have two job offers and one offer of an interview. You clearly do have marketable skills.

(Exhibit "A" p. 110-111)

The Board made a separate (another) decision and used the same factors that it

commended Petitioner for fulfilling, and then denied Petitioner parole for two years. The Board

stated:

1. This offense was cruel and callous.

2. Multiple victims were attacked or killed in the same incident.

3. This offense was carrier out dispassionately and in a calculated manner.

4. Moreover, this offense was carried out in a manner demonstrating exceptionally callous regard for human suffering.

5. Public safety was at risk.

2

6. You had a clear opportunity to cease.

7. The motive for this crime was very trivial in relation to the offense.

8. It was a robbery and it was gang-related.

9. You were an unpredictable, dangerous gangster, sir You were a community's worst nightmare. This was, basically, domestic terrorist activity, that you and your crime partner were carrying out.

(Exhibit "A" p. 112-113)

The Board's decisions are governed by the California Penal Code § 3041 (a) states that the Board "shall normally set a parole release date" when a prisoner approaches her minimum parole eligibility release date. However, the Supreme Court has held that the Board must first consider under section 3041, (b) whether a prisoner's commitment offense and or past offenses require further delay in setting a release date because of public safety concerns. The overarching factor regarding parole is whether a prisoner still poses a threat to public safety.(In re Barker, 59 Cal.Rptr.3d746, 760).

The California Supreme Court has formulated a standard of review in parole denial cases, a "some evidence" test, based on the due process requirements of the California Constitution. The Ninth Circuit has constructed a standard of review in such cases based on the due process clause of the U.S. Constitution. This federal standard applied by district courts in the Ninth Circuit also uses the "some evidence" language--requiring affirmance of the decision denying parole. The Ninth Circuit further adds that the Board's decision must have "some indicia of reliability." McQuillion v. Duncan, 306 F.3d 895, 94 (9th Cir. 2002.

In the first part of its decision, the Board relied on the only two immutable factors for which the statute under § 2402 (c), (1), allows for the denial of parole. However, these immutable factors are non-exclusive, and cannot be continuously used where there is no

3

evidence to support them. In In re Rosenkrantz, the Supreme Court explained that denial of parole could be based upon the nature of the commitment offense. The court cautioned, however, that "a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation--for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense. Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set 'in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public....' [Citation.] 'The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is "normally" to be granted. Otherwise, the Board's case-by-case rulings could destroy the proportionality contemplated by Penal Code section 3041, subdivision (a), and also by the murder statute, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (Pen. Code, § 190 et. seq.) [□] Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date.'" In re Rosenkrantz, (2002) 616, 683, 128 Cal.Rptr.2d 104, 59 p.3d 174 (italics added).

The California Supreme Court in In re Dannenberg, supra, at 1095, has provided additional explanation as to when a commitment offense alone is sufficient to deny parole. Specifically, the Dannenberg court explained when a commitment offense is "particularly egregious" under Rosenkrantz to deny parole. The Dannenberg court stated: "Our discussion [in Rosenkrantz], including our use of the phrase 'particularly egregious,' conveyed only that the violence or viciousness of the inmate's crime must be more than minimally necessary to convict him of the offense for which he is confined."

4

In the instant action Petitioner, was convicted for first-degree murder as a result of a robbery gone bad, Petitioner pled guilty to first degree murder, the robbery charge was dismissed. At Petitioner's 2006 parole consideration hearing the Board acknowledged that the offense was a robbery gone bad an unfortunate accident. Commissioner Garner stated: "**[a]nd the motive, it was for a robbery, a robbery that went bad, and unfortunately,...**" (Exhibit "B" Decision Pages p. 96). Petitioner's offense was not intentional.  The first-degree murder plea was a felony murder rule conviction. The deputy district attorney at the 2006 parole suitability hearing agreed that Petitioner's plea was a felony murder first degree - **"I don't think he pled to premeditated first degree, I don't see any indication that he did..."** (Exhibit "B" p. 85).

Petitioner's offense as stated by the district attorney's office was that Petitioner was sentenced under felony murder rule. Although the California legislature has found that a killing in the perpetration of robbery can be classified a s first degree murder, the purpose behind the felony murder rule is to deter risk-taking criminal behavior that might result in death. People v. Robertson, 34 Cal.4th 156, 165 (2004). "The felony murder rule eliminates the need for proof of malice in connection with a charge of murder, thereby rendering irrelevant the presence of absence of actual malice, both with regard to first degree murder and second degree felony murder. Id. "In such cases, the intent to commit a dangerous felony that actually results in death is substituted for malice, thus establishing the extent of culpability appropriate to murder." People v. Rios, (2000) 23 Cal.4th 450, 460, fn. 6 (2000).

As stated above that the overarching consideration is public safety. As stated above, the test is not whether there is some evidence that supports the Board's reasons for denying parole, but whether there is some evidence that Petitioner's release poses a threat to public safety. Petitioner has consistently been found not to pose a threat to public safety by professional psychologists (See Exhibits "C", "C-1", "C-2", "C-3", "C-4" ,"C-5", "C-6").

5

In comparison to other first degree murder cases Petitioner's use of force to commit his

crime, fails in gravity to the minimum force found (by the courts) to have been used by the

prisoners mentioned below.

In In re Elkins, 50 Cal.Rptr.3d 503 (Cal.App.1 Dist. 2006) that court held that the beating

of the victim with a baseball bat in order to rob him did not constitute a particularly egregious

murder. The appellate court held:

> The robbery drew a concurrent determinate term. Needlessly striking a robbery
> victim may, of course, show an especially heinous, atrocious or cruel robbery, but
> does not necessarily show an especially brutal first-degree murder.

(In re Elkins 50, Cal.Rptr. 3d at p. 518).

The Elkins court further stated that:

> We also have no jury instructions from the trial. Thus, while a conviction for first
> degree murder might ordinarily suggest malice from, perhaps, a suddenly formed
> intent to kill (People v. Saille (1991) 54 Cal.3d 1103, 1114-1115, 2 Cal.Rptr.2d
> 364, 820 P.2d 588), the killing in this case having occurred during the
> commission of robbery strongly suggests felony murder instructions that allowed
> a first degree murder verdict without any finding of malice (People v. Dillon
> (1983) 34 Cal.3d 441, 462-465, 475-477 & fn. 24, 194 Cal.Rptr. 390, 668 P.2d
> 697).

(In re Elkins, surpa, at p. 519 fn. 9.).

In another decision, a California Supreme Court Justice, (Justice Moreno) wrote in a

separate decision:

> Other than felony murders, first degree murders by definition involve
> premeditation and deliberation. Moreover, there was sufficient doubt over
> whether premeditation and deliberation existed to persuade a jury to acquit
> petitioner of first degree murder... **Furthermore, petitioner's offense did not
> appear to partake of any of those characteristics that make an offense
> particularly egregious under the Board of Prison Terms' parole eligibility
> matrix for first degree murder, e.g., torture, the infliction of severe trauma
> not involving immediate death, or murder for hire...** Once petitioner reaches
> that point, it is appropriate to consider whether his offense would still be
> considered especially egregious for a first degree murder in order to promote the
> parole statute's goal of proportionality between the length of sentence and the
> seriousness of the offense (See In re Ramirez (2001) Cal.App.4th 549, 570-571

6

[114 Cal.Rptr.2d 381] [in conducting parole proportionality analysis, the court considers the gravity of the offense in relation to the time in prison already served]) Under this circumstance, the justification for denying his parole would become less clear, even under the deferential "some evidence" standard. Thus, future denials of petitioner's parole may warrant judicial

(In re Rosenkrantz, supra at pp. 689-690.).

The Board's focus must be upon how the inmate actually committed his crime not the incorporeal realm of legal constructs. (In re Lee, (2006) 49 Cal.Rptr.3d 931) When Petitioner's commitment offense is compared to Elkins, or Rosenkrantz, Petitioner's offense fails in comparison to being more egregious or vicious. Petitioner shot his victim in an attempted robbery after the victim attempted to grab the gun. Elkins beat a sleeping victim to death in order to immobilize him to rob him, then took his body and dumped it over a hill (Donner Pass). When compared to Rosenkrantz, (although Rosenkrantz was a second-degree murder conviction) which the Supreme Court allowed the Governor to make his determination as if Rosenkrantz's offense was a first-degree murder. Petitioner's offense is not as grave as Rosenkrantz's offense, who bought an Uzi (automatic weapon) and practiced with it for a week before stalking his victim and then shooting him 10 times (atleast once in the back of the head) because his victim would not recant his statement, outing Rosenkrantz as a homosexual.

There are several other cases decided by the state and federal district courts that are disproportionate to the degree of viciousness used to commit their offense compared to Petitioner's offense.

In In re Barker, (2007) 59 Cal.Rptr.3d 746 (Cal.App.1 Dist. 2007) Barker was convicted of two counts of second-degree murder and one count of first-degree murder for his role in the killing of his friends' parents and grandfather. His friend shot his parents and Barker shot the grandfather, after first hitting him several times on the head with a chisel. Barker had been incarcerated for 29 years.

7

In <u>In re Lawrence</u>, 59 Cal.Rptr.3d 537 (Cal.App. 2d Dist. 2007), Lawrence was convicted of first-degree murder after shooting her lover's wife five times, then stabbing her multiple times with a potato peeler. The appellate court found that the evidence did not support the parole denial finding Lawrence's offense was 'particularly egregious'. (Although Lawrence is under review the Supreme Court rejected the appeal the stay her release.) Lawrence had been incarcerated for 24 years.

In <u>In re Smith</u>, (2003) 109 Cal.App.4th 489, the petitioner was convicted of second degree murder, kidnapping, and robbery for his role in the shooting, beating and drowning of a man who was believed to have sold bad cocaine. Smith had been incarcerated for 18 years. (<u>Id.</u>, 492-493.)

The petitioner in <u>In re Lee</u>, (2006) 49 Cal.Rptr.3d 931 (Cal.App. 2 Dist. 2006) brought a gun and a box of bullets with him to collect an overdue business debt. When the debtor refused to pay, that petitioner fired five shots, injuring the debtor and killing his wife. The court further held that, had <u>Lee</u> been convicted of two counts of second degree murder, which is plainly a worse set of crimes than what he convicted. Lee's argument that his conduct involved no more than the minimum acts needed to commit his offense would strengthen. "As such, he would have a stronger, not weaker, claim to parole on two murder charges than he would for his actual crimes of attempted premeditated murder and murder." (In re Lee, supra, at p. 936)

In <u>Martin v. Marshall</u>, (N.D. Cal. 2006) 431 F.Supp.2d 1038, Marshall killed two people and injured another in 1979 but was only convicted of second-degree murder. Martin was a drug dealer who owed the dealer money not only for drugs, but also for damage sustained to the dealer's car which Martin had wrecked. The district court held: "Because petitioner cannot change the past, denying petitioner parole based only on the facts surrounding the crime itself effectively changes his sentence from twenty years-to-life into life imprisonment without the

8

possibility of parole." (Martin, supra at p. 1046).

Aside from again using the commitment offense and past criminal history to deny Petitioner parole the Board contradicted itself when, in a separate decision, the Board used the same factors to deny Petitioner parole that it had just commended Petitioner for fulfilling. Since Petitioner did not use more than the minimum force necessary to convict him of that offense, California's Penal Code's § 3041 (a) must be applied, which demands a comparison and proportionality analysis with other like crimes of first degree murder.

In addition to finding factors of unsuitability the Board commended the instant Petitioner for his institutional behavior; the psychological evaluation's support of parole; and Petitioner's parole plans. The Board further noted that Petitioner had continued self-help, (AA), and vocational training and realistic parole plans.

In Rosenkrantz, supra, the Supreme Court's standard of review requires that the Board's decisions be based on the specified factors. "If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." (Rosenkrantz, supra, at p. 29 Cal.4th p. 658, 128 Cal.Rptr.2d 104, 59 P.3d 174.) The Rosenkrantz court further stated that it is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence-demonstrating unsuitability for parole, however that decision had to reflect individualized consideration of the specified criteria and could not be arbitrary and capricious.

## A. CONTINUED RELIANCE ON IMMUTABLE FACTORS TO DENY PAROLE VIOLATES PETITIONER'S DUE PROCESS.

Furthermore, the Board's continued reliance on the commitment offense to deny parole violates Petitioner's due process rights. The Board may rely on the commitment offense alone to

9

deny parole, but the proposition must be understood. The commitment offense and previous record of violence are two factors indicative of unsuitability Petitioner cannot change. In a recent decision the Board recognized that the "[e]vents and circumstances surrounding petitioner's crime are unchanging... (I want to explain to you that no matter what happens in your lifetime, the crime is never going to change. **You understand that.... That's always going to be there, period.... [T]he crime is never going to change....)**" Sanchez v. Kane, 444 F.Supp.2d 1049, 1062. Reliance on such an immutable factor "without regard to or consideration of subsequent circumstances" may be unfair (In re Smith (2003) 114 Cal.App.4th 343, 372, 7 Cal.Rptr.3d 655), and "runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." In re Scott, 133 Cal.App.4th 573, 595, (quoting Biggs v. Terhune ((9th Cir. 2003) 334 F.3d 910, 917). The Scott court further stated; "The commitment offense can negate suitability only if circumstances of the crime reliably established by the evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet the predictive value of the commitment offense may be very questionable after a long period of time." (Scott, supra, at 595) (quoting Irons v. Warden of California State Prison--Solano (E.D.Cal.2005) 358 F.Supp.2d 936, 947, fn. 2.). Our Supreme Court has noted that studies by psychiatrist have erred in predicting certain individuals as potentially violent, "thus branding as 'dangerous' many persons who are in reality totally harmless. [Citation]" (People v. Burnick (1975) 14 Cal.3d 306, 327, 121 Cal.Rptr. 488, 535 P.2d 352.) A review of the statistics or recidivism rate of term to life prisoners who have been granted release is less than one percent.

The Board relied on the commitment offense and previous history of violence. At this point, the underlying offense is no longer "some evidence" that will rationally support a finding that the public safety requires that he be found unsuitable for parole. Recently, the California

10

Court of Appeals (Sixth District in its decision in In re Weider, 52 Cal.Rptr.3d 147 (Cal.App.6th

Dist. 2006) quoted Weider I., stating:

> The court noted that Weider "has served so much time that, with custody credits, he is within the matrix for first degree murder... [I]t should be self evident that after an inmate has served the equivalent of 25 years, whether his actions were more than minimally necessary for a second degree conviction ... is no longer the appropriate question. [The Board's] position, that inmates who were only convicted of second degree may forever be denied parole based on some modicum of evidence that their acts rose to the level of a first, without acknowledging that fact that they have already served the time for a first, should be seen as so ridiculous that simply to state it is to refute it.

In Irons v Carey, (9th Cir. 2007) 479 F.3d 658 the Ninth Circuit held that "indefinite

detention based solely on an inmate's commitment offense, regardless of the extent of his

rehabilitation, will at some point violate due process given the liberty interest that flows from the

relevant California statutes." In Biggs v. Terhune, 334 F.3d 910, 916 (9th Cir. 2003) the Ninth

Circuit held that a continued reliance in the future on an unchanging factor, the circumstances of

the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused

by the prison system and could result in a due process violation." The Court in Rosenkrantz v.

Marshall, 444 F.Supp.2d 1063 (C.D. Cal. 2006), the Rosenkrantz Court held:

> While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances--after nearly two decades of incarceration and half a dozen parole suitability hearings--violates due process because petitioner's commitment offense has become such a an unreliable predictor of his present and future dangerousness that it does not satisfy the 'some evidence' standard. After nearly 20 years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil."

(Rosenkrantz v. Marshall, Supra, at 1084.).

In Martin v. Marshall, supra at p. 1048 that court also found that the aging commitment

conviction fell short of providing "some evidence" sufficient to justify a denial of parole. This

prisoner shot and killed one person and injured two others.  The district court held:

11

Because petitioner cannot change the past, denying petitioner parole based only on the facts surrounding the crime itself effectively changes his sentence from twenty years-to-life into life imprisonment without the possibility of parole.

(Martin, supra at p. 1046).

Petitioner would like to point out to this Court that the Board's other reasons for denial

provided no evidence to support its decision. The Board has not proven any of its findings

because in its two findings it contradicted itself. First by commending Petitioner for all his

progress by again, getting beyond any prison disciplinary infractions, as well as completing self-

help. (which was the Board's previous recommendations) There is no evidence of the Board's

findings under the state's "some evidence" standard, nor under the federal "some evidence"

standard. (which must have some "indicia of reliability.")

## CONTENTION

## II.

## THE BOARD VIOLATED PETITIONER'S STATE AND FEDERAL CONSTITUTIONAL DUE PROCESS RIGHT NOT TO BE SUBJECTED TO CRUEL AND UNUSUAL PUNISHMENT, WHEN IT USED PETITIONER'S COMMITMENT OFFENSE TWICE IN THE SAME ACTION TO DENY PAROLE; THEREBY, DISREGARDING ITS OWN GUIDELINES AND INSTEAD USED THE SAME FACTORS THAT WENT INTO FORMULATING THE GUIDELINES, TO DENY PETITIONER PAROLE

Petitioner appeared before the Board on August 1, 2007 and was not only denied parole,

but in a separate decision, Petitioner was denied for two more years.

The Board then noted the positive findings, stating:

1. Your institutional behavior has been commendable.

2. You're currently working in vocational Sheet Metal.

3. You have achieved your AA through Patton University in 2007; you're to be commended for that.

4. You, obviously, have a lot on board, and far in educational... As to vocations, we rarely see three vocational certifications

12

that you've achieved: the HVAC, the Mechanical Drafting, the sheet metal. And you also have 1,500 hours in Electronic Data Processing. So, that is certainly to be commended.

5. As to your AA, you've participated in AA on a regular basis' from 1990 until 2006. We have chronos up to through much of that period. And you were able, immediately, to give up your clean and sober date, which you stated was July

6. You are to be commended, also, for saving an inmate's life who was choking in 1997. And most recently, you have completed some large programs in the last two years, including No More Tears, the TRUST (Acronym for "Teaching Responsibility Utilizing Sociological Training) Program, Impact, Real Choices, and the No More Tears is the employability program. You are to be commended for your self-help.

7. As to your misconduct in prison, you have seven 115's. The most recent, in 2000, for disobeying medical lay-in. That has been explained, but you so have six 115's but you showed that you are now displaying positive behavior in prison.

8. As to the psychological report dated March 20th 2006 by Dr. Michelle Inaba, basically it supports your parole; assessing you as having a low-risk of dangerous and a global assessment of functioning of 90, which is high.

9. Your parole plans are reasonable. You have three residential offers from your extended family. And you have acceptable employment plans. You have two job offers and one offer of an interview. You clearly do have marketable skills.

(Exhibit "A" p. 110-111)

In the initial finding the Board listed the crime to be exceptional pursuant to the

California Code of Regulations Title 15 § 2402 (Cal. Regs.) **Determination of Unsuitability** (c)

(1), (A), (B), (C), (D), (E), (2). The Board then found Petitioner to meet the criteria pursuant to

Cal. Regs., 2402 (d) Circumstances Tending to Show Suitability (2), (3), (7), (8), and (9).

Petitioner was commended for his exemplary program. Exhibit "A" pp. 110-112.

The Board then 'double counted' Petitioner's offense to deny him parole when in the

Board's separate finding it utilized all the factors it had just commended Petitioner for fulfilling.

(which were also what the previous Board Panel recommend Petitioner to fulfill (Exhibit "B" p.

13

98). The court in In re Dannenberg, 102 Cal.App.4th 95, 113, stated: "The court noted that the Board's reliance on the nature the offense to deny parole could constitute an impermissible "dual use" of facts to enhance punishment." The court in Barker, supra, at p. 766, stated that after 2[9] years of exemplary rehabilitation, continued reliance on the aggravating facts of the crime no longer amounts to 'some evidence' supporting the denial of parole, (Elkins, supra, 50 Cal.Rptr.3d 503). The Barker court further noted that "[M]oreover, as Barker argues, **it could be said that reliance on this factor could be viewed as a dual use of facts**, as one victim was killed in each of the three crimes for which Barker was convicted, and for each of which he has already received a separate sentence." In re Barker, supra, at p. 766. The court in Barker did not decide this issue of 'dual use' because it did not find "some evidence" to support the findings that the convictions of first degree murder, and two second degree murders met the 'particularly egregious' standard to deny Barker parole for three years. (See United States v. McCullah 76 F.3d 1087, 1111 (1996) The Fifth Circuit was of the view that in weighing scheme, "double counting" has a tendency to skew the process so as to give rise to the risk of an arbitrary, and thus unconstitutional death sentence.") "[w]hen the same aggravating factor is counted twice, the "defendant is essentially condemned 'twice for the same culpable act,' which is inherently unfair." (U.S. v. McCullah (quoting Parsons v. Barnes 871 P.2d 516, 529 (Utah) (quoting Cook v. State, 369 SO.2d 1251, 1256 (Ala. 1979), Cert. denied).) "The fallacy of our rule is its failure to recognize that murders are aggravated by a defendant's conduct, not by the statutory language... A single, legally indivisible act of the defendant may rationally aggravate a murder but once." (Wiley v. Mississippi, 479 U.S. 906 93□L.Ed.2d 278.). This is exactly what the Board did when it double counted the commitment offense although the offense was not an exceptional offense. As it stands now, because the dual use of the commitment offense by the Board, this court should rule that the Board's finding of unsuitability was unconstitutional. The Court in

Barker reversed the three-year denial and ordered Barker back to the Board for a rehearing that comports with due process.

Petitioner would ask this court to take judicial notice, pursuant to Evidence Code § 452, of a recent unpublished decision in In re Lozano, Case No. C051792. An unpublished case may be quoted when it falls under the doctrine of 'Res Judicata'. In the instant action the denial of parole was based on the same factors the Board used at Petitioner's the previous (2006) hearing. (See Exhibit "B") The Lozano court further stated that the Board can rely on the same facts to deny parole for multiple years, as it did to find the prisoner unsuitable for parole, as long as it identifies the reasons for the postponement, and the recognition that the Board is making a separate decision. In the instant action, there was no evidence to support the multiple year denial, and the decision was based on the same facts that the Board used to deny Petitioner parole. It was in direct conflict with the Board's initial findings commending Petitioner for several achievements. As the Court in People v. Dial, stated: "We have herefore pointed out that the evidence is in substantial conflict, and that any serious error could under these circumstances have a prejudicial effect." (People v. Dial 22 Cal.2d 642, 659; 140 P.2d 828, 837). (In re Jackson, (1985) 39 Cal.3d 464, 479; See also, People v. Belmontes, (1983) 34 Cal.3d 335,347-348.). In the instant petition, the factors relied on by the Board did not even poses a 'modicum of evidence' for its two year denial. The Lozano court did not find any evidence that it would take Lozano three years to satisfy the Boards concern, just as one year would not be enough to do the same.

Furthermore, this court should hold that the Board's denial of parole for two more years was cruel and unusual punishment. The two year denial was given in light of the previous Board's statement **"[W]e're going to recommend to you that you remain disciplinary free, as you have done, that you continue with your current programming, that you continue with**

15

**your religious activities and your good work have its in PIA, and I think - I think you're getting close, sir, ... [a]nd I think that you'll certainly find yourself being in a lot better position when you come back next year."** (Exhibit "B" p. 98-99). There was no reason to deny Petitioner parole for two years because nothing was recommended that would take more than a year to fulfill, nor was anything recommended that could not be completed within one year.

## A. THE BOARD DISREGARDED ITS OWN GUIDELINES FOR SETTING PAROLE THEREBY, VIOLATED PETITIONER'S DUE PROCESS.

As horrible as Petitioner's homicidal conduct may have been, by the parole Board's own guidelines, Petitioner's term "shall normally be set at his initial parole hearing (January 24, 1995, Exhibit "B-6") Pursuant to Penal Code § 3041 (a), the Board has established criteria for setting terms for prisoners convicted for murder "The panel shall determine the category most closely related to the circumstances of the crime. The panel shall impose the middle base term reflected in the matrix unless the panel finds circumstances in aggravation or mitigation." Cal. Regs., § 2403 (C).) The criteria set forth in Cal. Regs., § 2403 (b) describes three circumstances and victim situations to be used for setting terms for various types of murders. Petitioner falls under

**CIRCUMSTANCES: B. Direct or Victim Contribution; III. No Prior Relationship.** (Cal. Regs., 2403 (b) Matrix of Base Terms for First Degree Murder on or after November 8, 1978.) The Board's own guidelines recognizes elements that go beyond what is necessary to convict for first degree murder, including murder related to death of the victim during robbery, as factors that do not preclude a finding of suitability. The Court in People v. Wilks, (1978) 21 Cal.3d 460, 470 held that: "That it is established that a circumstance that is an element of the substantive offense cannot be used as a factor in aggravation.

In Little v. Hadden, 504 F.Supp. 558, 561, the Court addressed the same type of problem and abuse present in the instant case:

16

> [I]t is unreasonable and impermissible for the Commission to base a decision to
> continue beyond the guidelines on the same factors that went into formulating the
> guidelines in the first place. No one disputes that this was a serious crime, but the
> factors of seriousness indicated by this record are included in the guidelines
> themselves. Thus something more must be supported by any evidence... It is clear
> to the Court from the record in this case that the Commission has attempted to
> continue Little in custody beyond the guidelines because of its **ad hoc** decision
> regarding the seriousness of the offense, but the factors relied upon are either
> unsupported by the record or were already considered in formulating the
> guidelines... **In short, the Commission's decision is arbitrary and capricious
> because it is not based on anything in the record before it. Moreover, it
> reflects an abuse of discretion because it attempts to continue Little's
> confinement beyond the guidelines without the statutory required good
> cause.**"

This is exactly the same abuse of discretion that is occurring in this case and repeatedly in

other similar situated cases. A prisoner, even a murderer, is entitled "to something more than

mere pro forma consideration." (In re Rosenkrantz, supra, Cal.4th at p. 655, quoting In re Sturm,

11 Cal.3d at p. 268.) He is entitled to have his rights to "due consideration" enforced in a

"practical sense." (In re Sturm, supra) The Board's purported "individual analysis" of Petitioner's

case was no more than the necessary means to an end, with the findings of the Board

representing "a predetermined conclusion in search of a justification, supported by little more

than make weight rationalizations..." (In re Caswell, (2001) 92 Cal.App.4th 1017, 1030; see also

Biggs' v. Terhune, (9th Cir. 2003) 334 F.3d 910, 916-917. "The possibility that the Board may

not be giving individualized, due consideration to parole applicants is more than hypothetical."

(In re Dannenberg, supra at 1104 (dis. opn. of Moreno, J.).) It is established by the facts and

statistics here, which show that the executive has all but abolished parole. (See Ibid. ["in 1999,

for example, no life prisoners were released on parole."]).

> The Board's reluctance to grant parole is understandable, but troubling. Denial of
> parole may incur the wrath of the prisoner and his immediate supporters. But
> granting parole to a prisoner who reoffends will incur the disapproval of society at
> large. [Citation.] The Board's commissioners therefore have little to gain and
> potentially much to lose by granting parole, and accordingly, the incentive to give
> only pro forma consideration to parole decision is strong.

17

(Id. at pp. 1104-1105.)

A policy of rare parole simply is not the policy that the Legislature enacted "The Word

'normally as used in subdivision (a) of section 3041, may denote a legislative assumption, or

hope [or expectation or intent], that uniform release dates would be a typical or common result

for indeterminate life inmates..." (In re Dannenberg, supra, at p. 1087.) Nor can the executive's

rare parole policy be justified by a concern for public safety.

> Because of the [political] nature of the parole process, there is more than a little
> risk that the Board's power to deny parole will at times be exercised in an
> arbitrary and capricious manner. Failure to grant parole where parole is due
> wastes human lives, not to mention considerable tax dollar, concerns that, along
> with public safety, unquestionably motivated the legislature when it enacted
> section 3041.

(Id. at p. 1109 (dis. opn. of Moreno, J.).)

The Board may not replace the legal standard for parole with their own personal and

political ones.

> No man in this country is so high that he is above the law. No officer of the law
> may set that at defiance with impunity. All the officers of the Government from
> the highest to the lowest are creatures of the law and are bound to obey it. It is the
> only supreme power in our system of functions in only the more strongly bound to
> submit to that supremacy, and to observe the limitations, which it imposes upon
> the exercise of the authority which it gives.

(United States v. Lee (1882) 106 U.S. 196, 220.).

The Board's finding that Petitioner is unsuitable for parole, implicates "the role of the rule

of law in a society that justly prides itself on being 'a government of laws, and not of men' (or

women)" every bit as much as did Lockyer v. City and County of San Francisco, (2004) 33

Cal.4th 1055, 1068, where the Supreme Court in those words heralded the rule of law (United

States v. Nixon, (1974) 418 U.S. 63, 695-696) even more than Lockyear did, for here the

executive fiat is directed at a number of a group that is literally disenfranchised and enjoys little

public sympathy or support. (See, e.g., Lockyer v. City and County of San Francisco, supra 33

Cal.4th at p. 1119 ["[H]istory demonstrates that. individuals who are unpopular powerless[] have the most to lose when the rule of law is abandoned -- even for what appears, to the person departing from the law, to be a just end."] see also, Langraf v. USI Film Products, (19994) 511 U.S. 244, 253 [114 S.Ct. 1483, 128 L.Ed.2d 229] [An elected body's "responsibility to political pressures poses a risk that it may be tempted in use [its power] as a means of retribution against unpopular groups or individuals."].) The executive's lawless practice must be stopped because it inflicts grievous and irreparable injury on large numbers of prisoners by imposing excessive imprisonment upon them. As one court found when it concluded that life prisoners who had not been provided a release date under the DSL were denied their constitutional rights to equal protection:

> The members of petitioner's class have an interest in being free from incarceration as soon as possible. The interest, dubbed by Chief Justice Wright a "personal liberty interest," has been determined by a unanimous Supreme Court to be a "fundamental interest, second only to life in itself." [Citation.]

(In re Henson, (1981) 123 Cal.App.3d 518, 521.).

The record shows that the Board, using the immutable factors of the crime, also stated that parole was denied for the following reasons:

1. Public safety was at risk.

2. You had a clear opportunity to cease.

3. The motive for this crime was very trivial in relation

4. It was a robbery and it was gang-related.

(Exhibit "A" pp. 111-112).

Nothing in the record shows that the public was at risk, being that Petitioner approached to men standing on the sidewalk, and only discharged the weapon after the victim in defense of his property grabbed for the gun. In In re Weider, (2006) 145 Cal.App.4[th] 570, 575, 576, the

Weider court held that although Weider fired a weapon in a restaurant, it did not make the

murder of his victim particularly egregious. Nevertheless, "[b]ecause Petitioner cannot change

the past, denying Petitioner parole based only on the facts surrounding the crime itself effectively

changes his sentence from 25 years to life into a sentence of life without the possibility of

parole." Martin v. Marshall, 431 F.Supp.2d 1038, 1046 (N.D. Cal. 2006).

The answer regarding the Board's finding that Petitioner had a clear opportunity to cease,

is found in In re Barker, which states:

> "[Barker] could have stopped those actions" the complete answer is found in
> Elkins: "Because it violates due process to deny parole '"where no circumstances
> of the offense reasonably could be considered more aggravated or violent than the
> minimum necessary to sustain a conviction for that offense."' (Scott II, surpa, 133
> Cal.App. 4th at p. 598, 34 Cal.Rptr.3d 905), the [Board] could not rely on the fact
> that [Barker] might have avoided killing to show his killing to be especially
> brutal." (Elkins, supra, 144 Cal.App.4th at p. 497 50 Cal.Rptr.3d 503.).

The Board also determined that the offense was trivial in relation the offense. The Barker

court, quoting In re Scott, I. stated:

> The offense committed by most prisoners serving life terms is, of courts, murder.
> Given the high value our society places upon life, there is no motive for
> unlawfully taking the life of another human being that could not reasonably be
> deemed trivial.' The legislature has for closed that approach, however, by
> declaring that murderers with life sentences must 'normally' be given release dates
> when they approach their minimum eligible parole dates.... The reference in
> Board regulations to motives that are 'very trivial in relation to the offense'
> therefore requires comparisons; to fit the regulatory description, the motive must
> be materially less significant (or more 'trivial') than those which conventionally
> drive people to commit the offense in question, and therefore more indicative of a
> risk of danger to society if the prisoner is released than is ordinarily present."
> (Scott I, supra, 119 Cal.App.4th at p. 893, 15 Cal.Rptr.3d 32.)

(In re Barker, supra at p. 767.).

Petitioner's offense will always be trivial it is an immutable factor that is the same today

as it was over 25 years ago. Petitioner has fulfilled all the recommendations from the previous

Board Panel, which recommended that Petitioner continue self help and get positive chronos, and

20

stay disciplinary free. This 2007 Panel commended Petitioner for his institutional behavior and programming, and having solid parole plans.

The Board further stated that the commitment offense was gang related, or was "committed to benefit of, at the direction of, or association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, ..." (Cal. Penal Code 186.22 Street Gang. (b) (1).). Petitioner was not convicted of committing a gang-related crime. Petitioner admitted to being involved in a street gang, and has also informed the hearing Panel's in the past that Petitioner walked away from the gang after being incarcerated over 27 years ago. Petitioner was willing to suffer the repercussions from leaving the gang. Since that time Petitioner has had no involvement with gangs, nor is there any record other than Petitioner's own admittance of ever being involved with gangs. Petitioner should be commended for walking away from that life-style and using his past experience to divert at risk youth. Petitioner's offense was committed over 27 years ago, Petitioner is not the same person he was 27 years ago. The district attorney at the previous hearing stated that they did not believe Petitioner would go back out and hang with the same type of people. (See Exhibit "B" pp. 85) This factor does not even apply to Petitioner's offense. Nothing in the record points to this offense following under Cal. Penal Code 186.22. In In re Elkins, supra, the Elkins noted that prisoner's were reluctant to discuss facts of the crime for fear of being accused of minimizing or not taking full responsibility for their actions, or for fear of the Board making their own conclusions of what actually occurred. The instant Petitioner, is a clear example of the Elkins court noted. Petitioner's honesty was used against him and turned into a gang-related crime.

/////////////////////////

/////////////////////////

/////////////////////////

## **CONTENTION**

### **III.**

## **THE BOARD OF PRISON HEARINGS VIOLATED PETITIONER'S STATE AND FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS WHEN IT ARBITRARILY USED REGULATIONS WHICH CONTAIN INTOLERABLE VAGUE CRITERIA FOR DETERMINING UNSUITABILITY FOR PAROLE**

Petitioner's parole suitability hearing was an arbitrary decision because it used intolerable

vague criteria to determine Petitioner's unsuitability. Our courts have recognized that the state

and federal due process requirements dictate that the Board must apply detailed standards when

determining whether a prisoner is unsuitable for parole on public safety grounds. (In re

Dannenberg, (2005) 34 Cal.4th 1061 at p. 1096, fn. 16). The standards are found in Cal. Reg.,

2402 (c)

- (1). Commitment offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to consider include:
- (A). Multiple victims were attacked, injured or killed in the same or separate incidents.
- (B). The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
- (C). The victim was abused, defiled or mutilated during or after the offense.
- (D). The offense was carried out in a manner which demonstrates an exceptionally callous disregard for
- (E). The motive for the crime is inexplicable or very trivial in relation to the offense.

The threshold question in a vagueness challenge is "whether to scrutinize the statute for

intolerable vagueness on its face or whether to do so only as the statute is applied in particular

case." Schwartzmiller v. Gardner, 752 F.3d 1341, 1345 (9th Cir. 1984). The Board used the

following sections of the Cal. Regs. "Determination of Unsuitability" (c) (1), (A), (B), (C), (D),

(E), (2). The Board has consistently used all the language contained in these statutes to deny

22

Petitioner parole at every hearing. The terms "especially heinous, atrocious or cruel" do not render the factor unconstitutionally vague if the crime fits within the criteria and serves as a basis for the finding of unsuitability, the circumstances of the crime must be more aggravated of violent than the minimum necessary to sustain a conviction for that offense. (In re Rosenkrantz, (2002) 29 Cal.4th 616, 682-683.) In such case the commitment offense alone can justify the denial of parole. (In re Dannenberg, supra, at p. 1095.) However, the Board has applied such language in an arbitrary and capricious manner throughout Petitioner's parole consideration hearings (See Exhibits "B", "B-1", "B-2", "B-3", "B-4", "B-5", "B-6"), in light of the fact that Petitioner's conviction for first degree murder (felony murder) was not "particularly egregious", nor was it committed with more than the necessary force to convict him of the offense. In applying the unsuitability criteria, the Board fails to distinguish the factors it applies. For instance if the offense resulted in an instant death the Board, than maybe the Board could find that it was "dispassionate and calculated manner, such as an execution-style murder." At the same time, if the murder does not result in instant death then maybe the Board could find that the murder shows a "callous disregard for human suffering." If bare hands were used to extinguish another human life, then maybe the Board could find that the crime is particularly heinous and atrocious." But the Board cannot arbitrarily apply each and every factor to the single act of felony murder, because these factors do not apply, especially to the instant action. Accordingly, even if the standards set curt in section 2402 (c) (1) are not unconstitutionally vague on their face, the Board's application of these standards renders them void in their application.

> [Courts have] an obligation, however, to look beyond facial validity of a statute that is subject to possible unconstitutional administration since a "law though 'fair on its face and impartial in appearance' may be open to serious abuses in administration and courts may be imposed upon if the substantial rights of the persons charged are not adequately safeguarded at every stage of the proceedings, but also to the administration of the Indeterminate Sentencing Law."

23

(In re Rodriguez, 14 Cal.3d 639, 648 (Cal. 1975) (quoting Minnesota v. Probate Court 309 U.S,

270, 277 (1940) [84 L.Ed. 744, 751, 60 S.Ct. 523, 126 A.L.R. 530]).

Petitioner moves this Court to declare the Board's findings unconstitutionally vague.

## CONTENTION

### IV.

### THE BOARD OF PRISON HEARINGS VIOLATED PETITIONER'S STATE AND FEDERAL LIBERTY INTEREST RIGHTS BY HAVING HIS PAROLE CONSIDERATION HEARING PREDETERMINED

Petitioner's entire parole consideration hearing was totally positive. All the factors in

favor of suitability were found to be commendable, except the commitment offense+ and prior

criminality. The disciplinary factor was once and for all put to rest when Petitioner was able to

discuss his disciplinaries, even deputy commissioner Shields acknowledged the caldron of prison

life, when she admitted that she was aware of Petitioner's situation. (Deputy commissioner

Shields even stated that disciplinaries do not negate parole. Exhibit "A" p. 70). The Board's

separate finding pointed out disciplinaries as a justification to deny parole, after it initially did

not indicate the disciplinaries as a factor to deny parole. (Exhibit "A" p. 112-114).

The practice of arbitrarily pre-determining prisoners suitability dates back to Governor

Pete Wilson and Governor Gray Davis' implementation of a "No Parole Policy", which has

recently been found to still exist under Governor Arnold Shwarzennegar. (See Martin v.

Marshall, (C.D. 2006) 448 F.Supp.2d 1143 The Martin Court stated, "[I]n sum, The Board

appears to have capitulated to the blanket no-parole policy described by this court in its previous

order, abandoning its role as an independent assessor of petitioner's eligibility." (Martin, supra,

at p. 1144.). A declaration from Albert Leddy, a former Chairman of the Board (the then BPT)

was directed by the administration to deny parole to [all or nearly all] prisoners convicted of

murder. (Exhibit "D"). Recently the federal district court for the Eastern District of California,

found Mr. Leddy's declaration to be credible evidence that the Board has a "No Parole Policy."

Petitioner asks this Court to take judicial notice of Melvin H. Coleman v. Board of Prison Terms,

Case No. Civ S-96-0783 LKK PAN P Findings and Recommendations, which states in pertinent

part:

> Petitioner presents evidence that under Governors Wilson and Davis the Board disregarded regulations ensuring fair suitability hearings and instead operated under a sub rosa policy that all murderers be found unsuitable for parole. The record shows that between 1992 and 1998 less than one percent of the prisoners in this group were released on parole... Petitioner presents sworn testimony that the policy was enforced by (1) appointing members less likely to grant parole and more willing to disregard their statutory duty;... (6) Panel members agreeing upon an outcome in advance of the hearing; ... See e.g., declaration of former BPT Commissioner Albert Leddy (Leddy) paras 5,6, 8-17, 20..."

The Coleman court found that the denial of parole under the governor's no-parole policy

for murderers is per se invalid, because the petitioner in that case was denied his constitutional

right to be heard by an impartial decision-maker (See Withrow v. Larkin, 421 U.S. 35, 47, 95

S.Ct. 1456, 43 L.Ed.2d 712 (1975) ("Not only is a biased decision-maker constitutionally

unacceptable but 'our system of law has always endeavored to present even the probability of

unfairness." (quoting In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed 942 (1955)).)

In Martin v.Marshall, 448, F.Supp.2d 1143, 1144 that court found:

> In light of the Board's apparent abandonment of its independent role--which occurred after Governor Schwarzeneggar took office--the court finds that a remand would indeed be futile. The Board denied parole in 2004 on the basis of the same record, which this court found to be insufficient Cf McQuillion v. Duncan, 342 F.3d 1012, 1015 (9th Cir. 2003).

Recently another former Board member confirmed Albert Leddy's testimony,

after she was ask to resign by Governor Shwarzennegar's deputy appointment secretary,

Albert Roldan because the Governor was going in different direction. (See Exhibit "E",

"E-1"). It is clear that this "No Parole Policy" exists, therefore resulting in pre-

determined parole suitability hearings.

25

In <u>O'Bremski v. Maas</u>, 915 F.3d 418, 422 (9th Cir. 1990), the Ninth Circuit has held that a California inmate is "entitled to have his release date considered by a Boar that [is] free from bias or prejudice." Furthermore, concomitant to the guarantee against arbitrary and capricious state action is the right to a fact-finder who has not predetermined the outcome of a hearing. [See, Withrow, supra 421 U.S. 35 (1975) (a fair trial in a fair tribunal is a basic requirement of due process, and this rule applies to administrative agencies which adjudicate as well as to court). Edwards v. Balisok, 520 U.S. 641 (1997) (recognizing due process claim based on allegations that prison disciplinary hearing officer was biased and would suppress evidence of innocence); Bakalis v. Golembeski, 35 F.3d 318, 326 (7th Cir. 1994) (a decision-making body "that has prejudged the outcome cannot render a decision that comports with due process")].

Numerous court have recognized that the right to a disinterested decision-maker, who has not prejudged the case, is par of the fundamental guarantee against arbitrary and capricious government conduct in the California parole context. The guarantee of neutral parole officials in a suitability hearing is just as fundamental as the right to a neutral judge in a court proceeding. The Ninth Circuit previously has acknowledged California inmate' due process right to parole consideration by neutral decision-makers. (O'Bremski, surpa, at 422) The U.S. Supreme Court clearly held, "[a] decision made by a fact-finder who has predetermined the outcome is per se invalid—even where there is ample evidence to support it." (Balisok, 520 U.S. at 648).

When the record is reviewed it is clear that there was no legal basis to find Petitioner unsuitable for parole. Therefore, this Court should fulfill its judicial duty and find that Petitioner's hearing was predetermined as a result of Board Commissioners fulfilling the Governor's wishes.

## CONTENTION

### V.

### THE SAN JOAQUIN COUNTY SUPERIOR COURT AND THE BOARD'S CONTINUOUS FAILURE TO HONOR PETITIONER'S PLEA AGREEMENT VIOLATES PETITIONER'S STATE AND FEDERAL DUE PROCESS AND EQUAL PROTECTION OF THE LAW UNDER THE FOURTEENTH AMENDMENT

Pursuant to a negotiated plea bargain, Petitioner plead guilty to first-degree murder (felony murder), whereby the stated dropped the robbery charge, and the gun allegation. Plea agreements are contractual in nature and are measured by contract law standards. In California, "[a]ll contracts, whether public or private are to be interpreted by the same rules…" Cal.Civ. Code § 1635; (See also, Shelton, Cal.4th at 344.0 A court must first look to the plain meaning of the agreement's language. United States v. Keller, (9th Cir. 1990) 902 F.2d 1391, 1393. As with other contract provisions of the plea agreements are occasionally ambiguous and the government must bear responsibility for any lack of clarity. Construing ambiguities in favor of the defendant makes sense in light of the parties' respective bargaining parole and expertise. Unites States v. De La Fuente, (9th Cir. 1993) 8 F.3d 1333, 1337-1338. Both the State and the defendant must adhere to the terms of a plea bargain. People v. McClellan, (1993) 6 Cal.4th 367, 375, and both should be held strictly to the terms of the agreement. People v. Almendariz, (1993) 16 Cal.App.3d 77, 79. "A plea agreement is, in essence, a contract between the defendant and the prosecutor to which the court consents to be bound." Armendariz, supra, at 911. "When a guilty plea is entered in exchange for specified benefits such as the dismissal of other counts or an agreed maximum punishment, both parties, including the State, must abide by the terms of the agreement." People v. Walker, (1993) 13 Cal.3d 1013, 1024. (The harmless error test is inapplicable to a situation involving failure to fulfill the terms of a plea bargain) (People v. Mikhail, (1993) 13 Cal.App.4th 846, 850), since a court can only speculate as to why a defendant

27

would negotiate for a particular term of a bargain, and a defendant's entitlement to the benefit of his bargain cannot be predicated on the assumption that violation of the bargain must result in some measurable detriment. People v. Bounds, (1987) 194 Cal.App.3d 1574, 1578.

Moreover, the concept of harmless error only addresses whether the defendant prejudiced by the error, while in the context of a broken plea agreement, there is at stake the honor of the government, public confidence in the fair administration of justice, and the efficient administration of justice. People v. Mancheno, (1982) 32 Cal.3d 85, 866. The reciprocal nature of a plea bargain agreement mandate that either party to the agreement is entitled to enforce the agreement in a situation where the party to the agreement is deprived of the benefit of the bargain. People v. Collins, (1996) 45 Cal.App.4th 849, 863. In the instant action, Petitioner plead guilty to first-degree (felony murder) murder, which was a contract between the prosecutor and the court and himself. The robbery charge was dismissed; yet, the prosecutor continuously attempts to retry the case every time Petitioner appears for parole consideration. The deputy district attorney attempts to recreate the robbery because it is trying to discredit Petitioner's facts of the crime. For instance the line of questioning by the deputy district attorney is whether or not Petitioner knew that the robbery victim stated that he seen Petitioner point the gun at the victim and shot him for no reason. The deputy district attorney then asks Petitioner if he knew that his crime partner testified that Petitioner pointed the gun at the victim and shot him for no reason. The prosecutor is trying to re-establish facts of the crime that are not true. Even though the Boad and the prosecutor are not permitted to retry the case, that is exactly what occurred. (See Exhibit "A" p. 80-95) This is a violation of Petitioner's due process right. According to Penal Code § 3041. 7 the Boar is required to invite "the prosecutor of the county from which the prisoner was committed, or his representative, to represent the interests of the people" at the parole hearing. "Prosecutor Participation" is covered by the Cal. Regs., § 2030, which provides, in subsection

28

(d) (2): "Role of the Prosecutor" … the prosecutor's role "is to comment on the facts of the case and present an opinion about the appropriate disposition … The prosecutor may be permitted to ask clarify questions of the hearing panel…" The regulation does not permit a prosecutor to question the life prisoner about anything, directly or through the Panel, and limits the prosecutor's questions to the panel to "clarifying" questions. However, in the instant action the questioning was allowed to be direct, and allowed to continue without regard to the prisoner and counsel's objections that purpose of the hearing was not to re-try the case. (See exhibit "A" p. 80-95)

Furthermore, Petitioner must receive consideration of value. The mere opportunity to appear before a second punishment tribunal that historically maximizes punishment for over 99% of those under its jurisdiction is not actual consideration. It is not the less severe punishment system lenience [or] lessened punishment" owed by the state to Petitioner. (See Victoria V. Supreme Court, (1986) 40 Cal.3d 634, 639, 645, noting that "[h]owever broad ma be the terms of the contract, it extends only to those things concerning what it appears that [both] the parties intended to contract.") In U.S. v.De La Fuente, (9th Cir. 1993) 8 F.3d 1333, 1337, the court noted that a plea agreement is governed by the laws of contracts. Furthermore, in Shelton, 37 Cl..4th at 344, a court must first look to the plain meaning of the agreement's language, if the language in the contract is ambiguous, "it must be interpreted in the sense in which the promisor believed, ant the time of making it, that the promisee understood it." (Cal. Civ. Code § 1649.) The inquiry considers not the subjective belief of the promisor but rather, the "objectively reasonable" expectation of the promisee. Bank of the West v. Superior Court, 2 Cal.4th 1254, 1265 (1992) Badie v. Bank of Am., 67 Cal.App.4th 779, 802 n.9 (1998) "although the intent of the parities determines the meaning of the contract, the relevant intent is objective – that is, the objective intent as evidenced by the words of the instrument, not a party's subjective intent." In the instant

29

casus of action, the belief as the Petitioner understood it, was that after serving 17 to 25 years,

(Petitioner was told by counsel that he could get out earlier with good-time credit) would be

released. Petitioner being a layman and ignorant of the law had not even considered the

"goodtime" credit would be applied only after being found suitable, and Petitioner at most would

have only served 24 years, and at the least 21 years.

In a recent decision in the Ninth Circuit, in Buckley v. Terhune, (2006) DJDAR 3235, 0.

3239, it held that:

> The proper interpretation of the plea agreement becomes clear when we turn, as
> California law provides to § 1654 of the California Civil Code. "In cases of
> uncertainty not removed by proceeding rule, the language of a contract should be
> interpreted most strongly against the party who caused the uncertainty to exist...
> Given the direct conflict  in terms of the plea agreement, we must adopt the
> construction of the agreement that is most favorable to Buckley; a maximum
> prison sentence of fifteen year.

The Ninth Circuit further held that under Santobello, Buckley had a due process right to

enforce the provision of his plea agreement, and that under Ricketts v. Adamson, 483 U.S. 1, 6

n.3 (1987), found that "In [a] negotiated plea agreement is a form of contract, and it is interpreted

according to general contract principles." Petitioner in this action plead guilty to 25 years-to-life

sentences. The benefit to Petitioner granted by the State in exchange for his plea, was that he

would be eligible for parole at his MEPD, (Minimum Eligible Release Date) which is set a 17

years 8 months. At the time Petitioner agreed to waive his rights there was not a "No Parole

Policy" which the Court in Martin v. Marshall, 431 supra, found to be true. At the time Petitioner

accepted his plea, based on all available information, he probably expected that he would serve

uniform term, and that if he made substantial efforts towards reforming himself (e.g.

demonstrated a sincere appreciation for, and remorse for the gravity and wrongfulness of his

crime, and learned marketable skills with realistic parole plans, and obtaining psychiatric

clearance for parole and if he behaved well in prison, a reduced classification score from over

30

one hundred (100) point s down to zero). A parole Board conscientiously exercising it discretion would set Petitioner a parole date and release him. The Governor's pronouncement of no parole In the interest of justice, this court should specifically enforce Petitioner's plea bargain by ordering Petitioner's immediate release.

## CONTENTION

### VI.

### THE SUPERIOR COURT DECISION WAS AN UNREASONABLE DETERMINATION OF STATE AND FEDERAL LAW; AND OR AN UNREASONABLE DETERMINATION OF THE FACTS

Petitioner submitted his fourth habeas petition regarding denial of parole. Petitioner has submitted habeas petitions in each of his last four parole denials, and on March 6, 2008 the San Joaquin County Superior Court again denied habeas relief for the fourth time. The superior court made an unreasonable determination of state and federal law; and or an unreasonable determination of the facts presented by Petitioner in this habeas petition. Exhibit "F"

The superior court made a perfunctory review of Petitioner's claims regarding the Board's denial of parole. "If appellate review is to be meaningful, it must fulfill its basic historic function of correcting error in the trial court proceedings. A review for correctness reinforces the authority and acceptability of the trial court's decision and controls the adverse effect of any personal short comings in the initial decision maker."(Barclay v. Florida, U.S. 939, 989). It is clear that the superior court did not consider the evidence presented in this action. The superior court simply restated the Board's contradictory decision and determined that there was "some evidence" to justify the denial of parole. (Exhibit "F" p. 2)

The superior court upheld the Board's findings that Petitioner's commitment offense was exceptional, and that Petitioner had an escalating criminal history, that the offense was trivial in relation to the offense, and that Petitioner's institutional behavior was not acceptable. Had the

31

superior court reviewed the record it would have that the Board contradicted itself, because, aside from the commitment offense, which will never change, the Board made the following positive findings: 1) **"Your institutional behavior has been commendable**; 2) As to your misconduct in prison, you have seven 115's. **The most recent, in 2000, for disobeying medical lay-in. That has been explained, but you so have six 115's but you showed that you are now displaying positive behavior in prison**; 3) As to the psychological report dated March 20th 2006 by Dr. Michelle Inaba, basically it supports your parole; assessing you as having a low-risk of dangerous and a global assessment of functioning of 90, which is high; 4) Your parole plans are reasonable. You have three residential offers from your extended family. And you have acceptable employment plans. You have two job offers and one offer of an interview. You clearly do have marketable skills." (Exhibit "A" 110-111).

The Board's finding that Petitioner may still have forces that may draw him back into gangs is unsubstantiated. At his 2006 parole consideration hearing the deputy district attorney for San Joaquin County believed that Petitioner would not return to the gang life style he lived over 28 years ago. "[a]nd its not so much that Mr. Valdivia is going to walk out of her and return to gang life, I don't think anybody's worried about that, ... Mr. Valdivia, he's a little older that I am, and I don't' think he has any desire to go back to 1 living on the street and hustling money here and there and hanging out with gang members as he did before when he was 19 years old,..." (See Exhibit "B" p. 85) The California Supreme Court held in In re Rosenkrantz, (2002) 29 Cal.4th 616, that the Board has broad discretion, but it does not have absolute discretion. The courts may review Board decisions to see whether there is "some evidence" to justify its decision. However, as held in In re Caswell, (2003) 112 Cal.Rptr. 2d, that there is "some evidence" in virtually every parole decision. "Some evidence" does not literally mean any evidence, and the Board's reliance on factors that allow for Petitioner to win parole, (the

32

commitment offense) and factors that it commended Petitioner for achieving is an arbitrary and capricious decision.

The superior court further denied Petitioner's claim that his plea agreement was violated, although the record reflects that the deputy district attorney clearly retried Petitioner. The superior court neglected to review Petitioner's remaining claims that Petitioner was unlawfully denied multiple years without justification. Nor did the superior court address Petitioner's claim that his parole hearing was predetermined.

The superior court was plain wrong in upholding the Board's decision to deny Petitioner parole. For the above mentioned reasons this Court should grant habeas relief requested below.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully prays that this court would;

1. Issue an Order t Show Cause;

2. Order Petitioner's immediate release;

3. Apply goodtime credits (which Petitioner has accumulated), towards his parole time.

4. Declare the Board's practices predetermining parole suitability hearings unconstitutional;

5. Declare the rights of the prisoner;

6. Grant any all relief this Court deems appropriate.

Dated: this 2<u>3</u> day of June 2008.

Noel Valdivia Sr.

**In Pro Se**

33

NOEL VALDIVIA SR. C-29917
SAN QUENTIN STATE PRISON 3-N-21
SAN QUENTIN, CA 94964

Legal
Mail

RECEIVED

JUN 2 4 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATE DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA 94102-3483

