CV-08 - 3225 PJH (PR)

E-filing

**FILED**

JUL 0 3 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

EXHIBIT "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

| | | |
|---|---|---|
| In the matter of the Life ) | | |
| Term Parole Consideration ) | | |
| Hearing of: ) | CDC Number C-29917 | |
| ) | | |
| NOEL VALDIVIA ) | | |
| ) | | |

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

AUGUST 1, 2007

2:10 P.M.

PANEL PRESENT:

Sandra Bryson, Presiding Commissioner
Patricia Shields, Deputy Commissioner

**INMATE**

OTHERS PRESENT:

Noel Valdivia, Inmate
Pat Fox, Attorney for Inmate Valdivia
Ron Freitas, Deputy District Attorney, San Joaquin County
Stacey Sprenkel, Observer
Armella Staley, Observer
Correctional Officer(s), Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

```
_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum
```

**TERRI O'BRIEN**

**FOOTHILL TRANSCRIPTION COMPANY, INC.**

INDEX

Page

Proceedings ................................................. 1

Case Factors ............................................... 13

Pre-Commitment Factors ..................................... 32

Post-Commitment Factors .................................... 41

Parole Plans ............................................... 75

Closing Statements ......................................... 96

Recess ................................................... 108

Decision ................................................. 109

Adjournment .............................................. 116

Transcriber Certification ................................ 117

--oOo--

1

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **PRESIDING COMMISSIONER BRYSON:**  Mr. Valdivia, |
| 3 | good morning. |
| 4 | **INMATE VALDIVIA:**  Good morning. |
| 5 | **PRESIDING COMMISSIONER BRYSON:**  Or afternoon. |
| 6 | All right.  This is the seventh subsequent parole |
| 7 | consideration hearing for Noel Valdivia, CDC number C, |
| 8 | Charles, 29917.  Today's date is August 1st of 2007, and |
| 9 | the time is now 1410.  We're located at San Quentin State |
| 10 | Prison.  This inmate was received May 5th of 1981 from |
| 11 | San Joaquin County.  The life term began May 5th of 1981, |
| 12 | with a minimum eligible parole date of October 11th, |
| 13 | 1995.  Charging case number 31522, Count One and |
| 14 | controlling offense Penal Code 187, murder first, with |
| 15 | the use of a firearm, to wit .22 caliber sawed-off rifle, |
| 16 | for which the inmate received the term of 25 years to |
| 17 | life.  This hearing is being recorded.  For the purpose |
| 18 | of voice identification, each of us will state our first |
| 19 | and last name, spelling the last name.  When it is your |
| 20 | turn, sir, after you spell your last name and please |
| 21 | state your CDC number.  I will start and go to my left. |
| 22 | Sandra Bryson, B-R-Y-S-O-N, Commissioner, Board of Parole |
| 23 | Hearings. |
| 24 | **DEPUTY COMMISSIONER SHIELDS:**  Pat Shields, |
| 25 | S-H-I-E-L-D-S, Deputy Commissioner. |

2

1         **DEPUTY DISTRICT ATTORNEY FREITAS:**  Ron Freitas,

2    F-R-E-I-T-A-S, Supervising Deputy District Attorney, San

3    Joaquin County, Homicide Division.

4         **MS. SPRENKEL:**  Stacey Sprenkel,

5    S-P-R-E-N-K-E-L.  Attorney here for educational

6    observation.

7         **PRESIDING COMMISSIONER BRYSON:**  Thank you.

8         **MS. STALEY:**  Armella Staley, S-T-A-L-E-Y, from

9    Morrison and Forrester, also here for educational

10   purposes.

11        **PRESIDING COMMISSIONER BRYSON:**  Thank you.

12        **ATTORNEY FOX:**  Pat Fox, F-O-X, attorney for Mr.

13   Valdivia.

14        **INMATE VALDIVIA:**  Noel Valdivia,

15   V-A-L-D-I-V-I-A, C Number C-29917.

16        **PRESIDING COMMISSIONER BRYSON:**  Thank you.  I note

17   for the record we have two correctional peace officers in

18   the room who are here for security purposes.  And, sir, I

19   need to swear you in.  Will you raise your right hand,

20   please?  Do you solemnly swear, or affirm, that the

21   testimony you give at this hearing will be the truth, the

22   whole truth, and nothing but the truth?

23        **INMATE VALDIVIA:**  Yes, ma'am.

24        **PRESIDING COMMISSIONER BRYSON:**  Commissioner

25   Shields, is there confidential material in the file, and

1    if so, will be used today?

2        **DEPUTY COMMISSIONER SHIELDS:** There is, but we

3    will not be using it.

4        **PRESIDING COMMISSIONER BRYSON:** Thank you.  And

5    I've passed the Hearing Checklist, marked Exhibit 1, to

6    your attorney, sir, and then to the District Attorney, to

7    ensure that we're all proceeding with the same set of

8    documents.  And, confirming Counsel, you have all the

9    documents?

10        **ATTORNEY FOX:** Yes, I do.  Thank you.

11        **PRESIDING COMMISSIONER BRYSON:** And does the

12    District Attorney have all the documents?

13        **DEPUTY DISTRICT ATTORNEY FREITAS:** Yes.  I was

14    handed, just at the start of this proceeding, a packet

15    from the defense attorney; can I speak to that right now?

16        **PRESIDING COMMISSIONER BRYSON:** Yes.

17        **DEPUTY DISTRICT ATTORNEY FREITAS:** And I would

18    like to respectfully object to this being used.  As the

19    Commissioners did note, it is 2:00 in the afternoon, and

20    this was scheduled for 10:30.  Ms. Fox has been here for

21    the same three and a half hours I have, and has never

22    provided me with any of this information that I, in fact,

23    now have to read this in the middle of this -- these

24    proceedings.  This is very late notice; it puts me in a

25    tough situation trying to prepare for this proceeding,

4

1    and I think it's patently unfair.  She's had this in her
2    possession all day.  I've been waiting all day, and I
3    could have, at least, made some attempt to work through
4    this.  So, I'm very disappointed that I'm receiving
5    this -- I received this about five minutes ago -- about
6    two minutes before the start of the hearing.

7         **ATTORNEY FOX:**  May I respond?

8         **PRESIDING COMMISSIONER BRYSON:**  Yes, you may.

9         **ATTORNEY FOX:**  Thank you.  First of all, there is
10   no requirement that the defense provide the District
11   Attorney's Office with any documentation that we intend
12   to submit during a hearing.  However, as a personal
13   courtesy and a professional courtesy, I did, at the
14   hearing, provide that to Mr. Freitas.  I did not receive
15   it myself until about ten minutes ago.  It is a document
16   prepared by Mr. Valdivia.  And I think a perusal of it,
17   even a perfunctory perusal, will show that it's documents
18   that already exist in the file.  In the event there are
19   questions the District Attorney chooses to inquire about,
20   or areas, he can inquire with Mr. Valdivia.  But,
21   certainly, I didn't intend to take advantage of the
22   District Attorney's Office in anyway.  And -- and I
23   believe it's not a requirement that you do so, in any
24   event.

25        **PRESIDING COMMISSIONER BRYSON:**  And that is true.

5

1    It's not a requirement, but moreover, we only received
2    this -- a copy of this document also, within the last few
3    moments.  And so, we have not had a chance to peruse this
4    document either.  Go ahead.

5        **DEPUTY COMMISSIONER SHIELDS:**  May I just -- a
6    suggestion before the District Attorney goes forward to
7    his portion of the hearing, why don't we just take a
8    brief recess, let him go through the material, so you
9    don't have to multi-task.  Because I -- I believe --
10   well, let me also further say, I'm the one who will be
11   going over that material.  I think it is a duplicate
12   of -- predominately of material we have.  I intended,
13   sir, to go off the Board reports.  So, you can follow me
14   in the Board report.  So, even though it's inconvenient,
15   I'm not sure that it will be that prejudicial.  And,
16   again, I think the easiest thing to do, would be to just
17   take a two or three minute recess at the appropriate
18   time, and we can all take a look at it.

19       **PRESIDING COMMISSIONER BRYSON:**  It's all
20   (inaudible.)

21       **DEPUTY COMMISSIONER SHIELDS:**  Because I don't
22   intend to review it either, at this point.

23       **PRESIDING COMMISSIONER BRYSON:**  All right.  Let's
24   get through the initial phase, and then we'll take a
25   recess.

6

1        **DEPUTY DISTRICT ATTORNEY FREITAS:**  Thank you.

2        **PRESIDING COMMISSIONER BRYSON:**  Are there any

3    additional documents, Counsel, beyond those that you

4    provided us at the begin of the hearing?

5        **ATTORNEY FOX:**  No, not at this time.  However, we

6    would reserve the right to submit additional

7    documentation if it becomes necessary during the course

8    of hearing.

9        **PRESIDING COMMISSIONER BRYSON:**  Yes.

10        **ATTORNEY FOX:**  Thank you.

11        **PRESIDING COMMISSIONER BRYSON:**  All right.  Sir,

12    would you please read the ADA statement ahead of you

13    aloud?

14        **INMATE VALDIVIA:**  "The American with

15            Disability Act, (ADA) in parentheses, is

16            law to help people with disabilities.

17            Disabilities are problems that make it

18            harder for some people to see, hear,

19            breath, talk, walk, learn, think, work or

20            take care of themselves, than it is for

21            others.  Nobody can be kept out of the

22            public places, or activities, because of a

23            disability.  If you have a disability, you

24            have the right to ask for help to get ready

25            for BPT hearing, get to the hearing, talk,

7

```
 1              read forms and papers, and understand the
 2              hearing process.  BPT will look at what you
 3              ask for to make sure that you have a
 4              disability that is covered by the -- a
 5              disability that is covered by the ADA, and
 6              that you have asked for the right kind of
 7              help.  If you do not get help, or if you
 8              don't think you got the kind of help you
 9              need, ask the BPT -- ask for a BPT 1074
10              Grievance Form.  You can also get help to
11              fill it out."
```

12           **PRESIDING COMMISSIONER BRYSON:**  Do you understand
13      what you read, sir?

14           **INMATE VALDIVIA:**  Yes, sir.

15           **PRESIDING COMMISSIONER BRYSON:**  All right.  Thank
16      you.  Sir, the record reflects that on March 20th, of
17      2007, you signed BPT Form 1073, the Reasonable
18      Accommodation Notice and Request, in accordance with the
19      American's with Disabilities Act.  Disability defined
20      under the ADA is -- let's see -- this shows that you --
21      in fact you have no disabilities identified from your
22      file review, that you have a reading level of 12.9, which
23      is the highest possible attainable, and that you have
24      your GED.  Sir, I notice that you wear glasses; do they
25      accommodate you in both reading and seeing?

8

1          **INMATE VALDIVIA:**  Yes, ma'am.

2          **PRESIDING COMMISSIONER BRYSON:**  All right.  You

3     don't appear to have any hearing difficulties; is that

4     true?

5          **INMATE VALDIVIA:**  Yes, ma'am.

6          **PRESIDING COMMISSIONER BRYSON:**  All right.  You

7     also didn't appear to have any motility issues getting

8     the to the hearing room; is that correct?

9          **INMATE VALDIVIA:**  No, I did not.

10          **PRESIDING COMMISSIONER BRYSON:**  All right.  And

11     have you ever been involved or included in the Triple CMS

12     or EOP Programs?

13          **INMATE VALDIVIA:**  No, ma'am.

14          **PRESIDING COMMISSIONER BRYSON:**  And have you ever

15     taken psychotropic medication either in prison or on the

16     street?

17          **INMATE VALDIVIA:**  No, ma'am.

18          **PRESIDING COMMISSIONER BRYSON:**  Do you suffer from

19     any disability that you think might prevent you from

20     participating in today's hearing?

21          **INMATE VALDIVIA:**  No, ma'am.

22          **PRESIDING COMMISSIONER BRYSON:**  And, Counsel, do

23     you concur?

24          **ATTORNEY FOX:**  Yes, I do.

25          **PRESIDING COMMISSIONER BRYSON:**  This hearing is

9

1   being conducted pursuant to Penal Code Sections 3041 and
2   3042 in the rules and regulations of the Board of Parole
3   Hearings governing parole consideration hearings for life
4   inmates.   The purpose of today's hearing is to consider
5   your suitability for parole.   In doing so, the Panel will
6   consider the number and nature of the crimes for which
7   you are committed, your prior criminal and social
8   history, and your behavior in the program since your
9   commitment.   The Panel has the opportunity to review your
10  Central File.   You will be given the opportunity to
11  correct or clarify the record.   The Panel will consider
12  your progress since your commitment, your counselor's
13  report, psychological report, and any other relevant
14  information.   Any change in parole plans should be
15  brought to the Board's attention.   The Panel will reach a
16  decision today and inform you whether or not it finds you
17  suitable for parole and the reasons for its decision.   If
18  you're found suitable for parole, the length of your
19  confinement will be explained to you.   Nothing that
20  happens here today will change the findings of the court.
21  The Panel is not here to retry your case; the Panel is
22  here for the sole purpose of determining your suitability
23  for parole.   Do you understand?
24          **INMATE VALDIVIA:**  Yes, ma'am.
25          **PRESIDING COMMISSIONER BRYSON:**  This hearing will

10

1    be conducted in three phases.  I will discuss with you
2    the crime for which you were committed, your prior
3    criminal and social history.  Commissioner Shields will
4    discuss with you your progress since your commitment,
5    your counselor's report and your psychological
6    evaluation.  I will then discuss with you your parole
7    plans and any letters of support or opposition that may
8    be in your file.  Once that is concluded, the Panel, and
9    then the District Attorney, and then your attorney will
10   be given the opportunity to ask you questions.  Questions
11   from the District Attorney shall be asked through the
12   Chair, and you'll direct you answers though the Panel.
13   Next, the District Attorney, then your attorney, and then
14   you will be given an opportunity to make a final
15   statement regarding your parole suitability.  Your
16   statement should address why you feel you're suitable for
17   parole.  The Panel will then recess, clear the room, and
18   deliberate.  Once the deliberations are completed, the
19   Panel will resume the hearing and announce its decision.
20   The California Code of Regulations states, that
21   regardless of time served, a life inmate shall be found
22   unsuitable for and denied parole, if in the judgment of
23   the Panel, the inmate would pose an unreasonable risk of
24   danger to society if released from prison.  You have
25   certain rights.  Those rights include the right to a

11

1    timely notice of this hearing.  Did you receive timely

2    notice of this hearing?

3          **INMATE VALDIVIA:**  Yes, ma'am.

4          **PRESIDING COMMISSIONER BRYSON:**  And then, I

5    believe either counsel would like to speak to this.

6          **ATTORNEY FOX:**  Yes.  We are waiving the notice

7    requirements under Penal Code Section 3042(a).  Mr.

8    Valdivia's trial counsel was not notified of this

9    hearing, so he's deprived of any input that person might

10   have.  However, he is prepared to go forward today, and

11   so am I.

12         **PRESIDING COMMISSIONER BRYSON:**  Well, I thank you

13   for that, sir.  And I'd like to add to that, that we, in

14   fact, have met with the Records Department, Hearing

15   Records Manager, also personally sends her apologies

16   for -- on behalf of CDCR because, in fact, that notice

17   was not properly sent, and that that will be amended in

18   the future; they will not be doing that.  So, in the

19   future that will be rectified.  And you also have the

20   right to present relevant documents, which you are doing

21   here today.  You also have the right to review your

22   Central File.  Were you given an opportunity to review

23   your Central File, sir?

24         **INMATE VALDIVIA:**  Yes, ma'am.

25         **PRESIDING COMMISSIONER BRYSON:**  Did you do so?

12

1         **INMATE VALDIVIA:** Yes, ma'am.

2         **PRESIDING COMMISSIONER BRYSON:** All right.  And

3    you have the right to be heard by an impartial Panel.  Do

4    you have any evidence that the Panel before you cannot be

5    impartial?

6         **INMATE VALDIVIA:** No, ma'am.

7         **PRESIDING COMMISSIONER BRYSON:** You will receive a

8    copy of the Panel's written tentative decision today.

9    That decision will become effective within 120 days.  It

10   is also subject to review by the Governor.  A copy of the

11   tentative decision and a copy of the transcript will be

12   sent to you.  The Board has eliminated its appeal

13   process.  If you disagree with anything -- excuse me --

14   in today's hearing, you have a right to go directly to

15   the Court with your complaints.  You're not required to

16   admit your offense or discuss your offense if you do not

17   wish to do so.  However, this Panel does accept as true

18   the findings of the Court, and you're invited to discuss

19   the facts and circumstances of the offense if you desire.

20   The Board will take into consideration any prior

21   statements that have made regarding the offense in

22   determining your suitability for parole.  So, basically,

23   it's quite simple; just tell the truth.  Counsel, are

24   there any further objections?

25        **ATTORNEY FOX:** No, not at this time.  Thank you.

13

1          **PRESIDING COMMISSIONER BRYSON:**  All right.  Will
2     the inmate be speaking with the Panel today?
3          **ATTORNEY FOX:**  Yes, he will, as to all aspects.
4          **PRESIDING COMMISSIONER BRYSON:**  All right.  And I
5     shall read into the record the summary of the comments
6     presented in the most recent full Parole Board Report we
7     have, which is of May 2006, by K. Hilliard,
8     H-I-L-L-I-A-R-D, Correctional Counselor I.  As to the
9     offense summary on Page 1,

10              "On July 10th of 1980, the victim, Charles
11              Wayne Decker, and Charles Thomas were
12              standing in front of the Risso
13              Apartments --"
14     That's R-I-S-S-O.
15              "-- located at 9 North Stanislaus Street in
16              Stockton, California, when two males, later
17              identified as Noel Valdivia and Eddie
18              Macias Ruiz, walked up and demanded the
19              victims' money.  Valdivia pointed what
20              appeared to be a .22 caliber sawed-off
21              rifle in the direction of Decker.  Victim
22              Thomas threw his wallet on the ground,
23              while suspect Ruiz reached for the wallet.
24              Valdivia shot the victim Decker in the
25              face.  Decker died shortly thereafter.

14

 1            Valdivia and Ruiz fled the scene.

 2            Sunglasses were found where the escape

 3            vehicle had been parked.  There appeared to

 4            be glasses that the shooter had worn.  The

 5            glasses were examined for fingerprints; the

 6            right thumbprint of Noel Valdivia was found

 7            on the lens."

 8    Now, sir, do you take responsibility for this crime?

 9            **INMATE VALDIVIA:**  Yes, ma'am.

10            **PRESIDING COMMISSIONER BRYSON:**  Were you a gang

11    member, sir?

12            **INMATE VALDIVIA:**  Yes, ma'am.

13            **PRESIDING COMMISSIONER BRYSON:**  What gang were you

14    in?

15            **INMATE VALDIVIA:**  It's call Little Unity.

16            **PRESIDING COMMISSIONER BRYSON:**  Little Unity?

17    Okay.  And what did Little Unity mean?

18            **INMATE VALDIVIA:**  It meant a group of people

19    trying to unite in a group -- well, actually gang.

20            **PRESIDING COMMISSIONER BRYSON:**  Was that in your

21    neighborhood?

22            **INMATE VALDIVIA:**  It was -- well, the reason we

23    named it Little Unity is because it was various people

24    from different neighborhoods around the city.  It wasn't

25    a neighborhood as much as it was a gang.  It was more of

15

1  a gang that couldn't have a neighborhood because people

2  from outside the neighborhood would come and participate

3  in the activity for joining gangs.

4  **PRESIDING COMMISSIONER BRYSON:**  Well, if you're

5  from Stockton -- it was Stockton; is that correct?

6  **INMATE VALDIVIA:**  Yes.

7  **PRESIDING COMMISSIONER BRYSON:**  How did you keep

8  cohesiveness then?

9  **INMATE VALDIVIA:**  We would meet at a certain

10  area -- at a certain park, certain park in Stockton,

11  would be the primary hang-out.  Some of the member's

12  homes who were part of the gang, we would meet at their

13  home.  A lot of us met through high school, summer

14  school.  You know, Stockton, they did this integration

15  process, where they would integrate kids from the south

16  side into the north side, and the north side into the

17  south side, and so forth -- to the east side.  And we met

18  a lot of -- met a lot of each other there.

19  **PRESIDING COMMISSIONER BRYSON:**  I see.

20  **INMATE VALDIVIA:**  And formed a little gang.

21  **PRESIDING COMMISSIONER BRYSON:**  I see.  And was

22  the primarily -- was -- some gangs have started out or

23  have been race-based.  Was this race-based or was it

24  just -- was it multi-ethnic, or what was it?

25  **INMATE VALDIVIA:**  It was, I would say, multi-

16

1   ethnic, in the sense, predominantly Latino.  There was
2   other race; black and white, so it was -- it was multi-
3   races, multi-race based.

4       **PRESIDING COMMISSIONER BRYSON:**  So, was this --
5   did this have some basis in gang activity, this crime?

6       **INMATE VALDIVIA:**  In the sense that it was -- it
7   was -- the guys in the gang that had committed the crime.
8   Was it for profit for the gang, no it wasn't.  It was
9   just one night -- a night out thing, that -- that
10  occurred.  I'm trying to put it into words.  We just --
11  guys -- we just -- guys with me that were hanging out at
12  that time.

13      **PRESIDING COMMISSIONER BRYSON:**  I see.

14      **INMATE VALDIVIA:**  Got together and the idea came
15  up of robbing somebody and we acted on that idea.

16      **PRESIDING COMMISSIONER BRYSON:**  I see.

17      **INMATE VALDIVIA:**  So, it wasn't for profit for the
18  gang.

19      **PRESIDING COMMISSIONER BRYSON:**  Approximately,
20  what was the time of day of this crime?

21      **INMATE VALDIVIA:**  I would say about 10:00 p.m.

22      **PRESIDING COMMISSIONER BRYSON:**  Okay.  And what
23  were the circumstances on that evening for you.  Had you
24  been with the gang members that evening?

25      **PRESIDING COMMISSIONER BRYSON:**  Yes.  We were at

17

1    the park.  Gathered together at the park drinking and
2    hanging out, as usual.

3         **PRESIDING COMMISSIONER BRYSON:**  Okay.  And was
4    that your weapon that you held, at the time?

5         **INMATE VALDIVIA:**  No, it wasn't.  It belonged to
6    one of the guys in the gang.

7         **PRESIDING COMMISSIONER BRYSON:**  How did you get
8    possession of it?

9         **INMATE VALDIVIA:**  I took it -- I initiated the
10   robbery.  So, I took the leadership role in the robbery
11   and told them I would do it.  Because it was -- it was a
12   discussion about, well, we don't have any money for beer.
13   We're not doing anything.  So, then we came up with the
14   idea of robbing somebody.  And the conversation went back
15   and forth, well, who's going to do it?  We'll all do it,
16   you'll do it, or who wants to do it?  And I just
17   initiated it.  I took a leadership role -- took the
18   leadership and said, well, give me the gun, I'll do it.
19   But, as far the causing factors of it, that was my
20   personality.  That's what I was; I was always the first
21   one to jump out, you know, from -- from as a child.  You
22   know, I had a lot of leadership qualities at the time,
23   and they developed as I grew.  But they were misplaced
24   and distorted.

25        **PRESIDING COMMISSIONER BRYSON:**  And did you have a

18

1    personal weapon you carried most of the time, also?

2         **INMATE VALDIVIA:**  No.  Whenever I had -- I didn't

3    have a personal gun.  Whenever I could find something to

4    carry.  When you're involved in a gang, gang activities,

5    you're always on caution and aware of the other gangs.

6    You know, you never want to -- in that line of lifestyle,

7    you never want to get caught, so to speak as they call

8    it, with your pants down.  You always wanted aware and

9    try to carry something that you could protect yourself

10   with in case you get jumped or attacked by multiple

11   people of other gangs.

12        **PRESIDING COMMISSIONER BRYSON:**  How did you --

13   what were some of the identifiers you used?  Were you --

14   how did you identify your gang?

15        **INMATE VALDIVIA:**  We just had the name.  There was

16   no --

17        **PRESIDING COMMISSIONER BRYSON:**  No colors?

18        **INMATE VALDIVIA:**  No colors.

19        **PRESIDING COMMISSIONER BRYSON:**  A specific --

20        **INMATE VALDIVIA:**  That was long before colors.

21        **PRESIDING COMMISSIONER BRYSON:**  Yes.  It was a bit

22   before that.

23        **INMATE VALDIVIA:**  Yeah.

24        **PRESIDING COMMISSIONER BRYSON:**  How about dress or

25   anything like that?

19

1        **INMATE VALDIVIA:**  No.  It's just regular.

2        **PRESIDING COMMISSIONER BRYSON:**  So, you're in the

3    park and you're drinking beer right?  Was dope involved

4    in this as well?

5        **INMATE VALDIVIA:**  No.

6        **PRESIDING COMMISSIONER BRYSON:**  And you hatched

7    this plan to rob somebody?  So, what happened?

8        **INMATE VALDIVIA:**  We're at the park, sitting in

9    the park, and as I stated before, the conversation came

10   up, and I take full responsibility for this crime.  I

11   told you, it's solely me; I'm responsible for the death

12   of Mr. Wayne Decker.  Like I stated, I took the

13   leadership role and attempted to rob them.  We drove

14   around.  Before we had the plan, I grabbed the gun, and

15   we were just randomly choosing a victim.

16       **PRESIDING COMMISSIONER BRYSON:**  Was this -- who

17   drove?  Did you drive?

18       **INMATE VALDIVIA:**  No.  One of the -- Alex drove

19   the car.  And it was his car, we jumped in his car; I was

20   in the backseat.  We drove around downtown Stockton,

21   where we kind of believed that people would be hanging

22   out.  And ended up in the city of Stockton on Main

23   Street, between Main Street and Stanislaus.  And it's

24   like a strip where people hang out, dope dealers hang

25   out, and prostitutes.  Various people, people looking for

20

1    action.  And so, we drove over there to find a victim.

2        **PRESIDING COMMISSIONER BRYSON:**  Okay.  And why did

3    you target these two people?

4        **INMATE VALDIVIA:**  Well, we parked the car -- I

5    told them to park the car, let us out here, and we'll

6    walk around and find somebody.  And so, we're walking.

7    We parked on the southeast corner of Weber.  Corner of

8    Weber and Stanislaus.

9        **PRESIDING COMMISSIONER BRYSON:**  Right.

10       **INMATE VALDIVIA:**  And we crossed the street,

11   across from Weber, to the southwest corner.  On the

12   sidewalk we seen people standing on -- on the sidewalk,

13   and we walked passed them, and we walked all the way to

14   the corner of Main Street and Stanislaus, and we turned

15   around, and when we turned around, I told my crime

16   partner, I said, those two guys that we passed by; I'm

17   going back.  Those are the guys we're going to rob.

18       **PRESIDING COMMISSIONER BRYSON:**  How old would you

19   say they were?

20       **INMATE VALDIVIA:**  They were almost 59 -- in their

21   50's, late 50's I think.

22       **PRESIDING COMMISSIONER BRYSON:**  So, they were old

23   guys back then?

24       **INMATE VALDIVIA:**  Yes, ma'am.

25       **PRESIDING COMMISSIONER BRYSON:**  Okay.  Go ahead,

21

1   sir.

2          **INMATE VALDIVIA:**  And so, we approached the two

3   men.  I told my crime partner, I'll take the one on the

4   inside, you take the outside.  So, we approached them,

5   and as soon as we passed them up, like, about a foot and

6   half, two feet, I turned around and I pulled the gun out,

7   and I stuck it towards his face area.  And just asked

8   him, give me your money.  And, at that time, he grabbed

9   for the gun, and I had my hand on the trigger, and he was

10  attempting to take the gun from me, and I pulled the

11  trigger and shot him in the face.

12         **PRESIDING COMMISSIONER BRYSON:**  Did he fall right

13  then?

14         **INMATE VALDIVIA:**  Yes, ma'am.  He fell.  I

15  panicked; I was scared and I ran.  I immediately ran.  I

16  ran to the car and shortly thereafter my crime partner

17  came.  And to clarify, the weapon -- the weapon I had was

18  a .38 snub nose.  It wasn't a .22 rifle, as the record

19  reflects.  And every time I come here and I try to

20  clarify it.

21         **PRESIDING COMMISSIONER BRYSON:**  Can the D.A. speak

22  to that?  To the type of weapon it was?

23         **DEPUTY DISTRICT ATTORNEY FREITAS:**  The autopsy

24  show that it was a .38 caliber slug.  Mostly, a wad

25  cutter cut from a .38 Special, .38 revolver, or a .357.

22

1      **PRESIDING COMMISSIONER BRYSON:**  I see.  So, that,

2  indeed, is an error, then, in our reports?

3      **DEPUTY DISTRICT ATTORNEY FREITAS:**  It's not an

4  error in the reports, in that the witnesses initially saw

5  what appeared to be a .22 caliber weapon.  And they

6  described it was a sawed-off.  So, is there a gun that

7  matches the two?  Sure.  But the slug from victim,

8  recovered during the autopsy was a .38 caliber slug.

9      **PRESIDING COMMISSIONER BRYSON:**  And did you

10  recover the -- the weapon?

11      **DEPUTY DISTRICT ATTORNEY FREITAS:**  No weapon was

12  ever recovered.

13      **PRESIDING COMMISSIONER BRYSON:**  I see.  So, sir,

14  did -- were you both armed?  Both of you?

15      **PRESIDING COMMISSIONER BRYSON:**  Yes.  My crime

16  partner's the one that had the .22 sawed-off rifle.

17      **PRESIDING COMMISSIONER BRYSON:**  So, he had the .22

18  rifle?

19      **INMATE VALDIVIA:**  Yes.

20      **PRESIDING COMMISSIONER BRYSON:**  I see.  What did

21  you do with the .38 caliber?

22      **INMATE VALDIVIA:**  One of the guys took it out.  I

23  can't remember what he did with it.

24      **PRESIDING COMMISSIONER BRYSON:**  So, it disappeared

25  into the gang?

23

1          **INMATE VALDIVIA:**  Yes.

2          **PRESIDING COMMISSIONER BRYSON:**  I see.  And you

3     shot how many shots?

4          **INMATE VALDIVIA:**  Just one shot.

5          **PRESIDING COMMISSIONER BRYSON:**  And then you ran

6     back to the car?

7          **INMATE VALDIVIA:**  Yes, ma'am.

8          **PRESIDING COMMISSIONER BRYSON:**  Do you know what

9     your partner did during that time?

10         **INMATE VALDIVIA:**  Well, he -- from what I gather,

11    he picked up the wallet, and there was -- the wallet was

12    thrown out by the other person, which I didn't see.  So,

13    he picked it up and -- and what he told me he put the gun

14    back in his pants, and he walked back to the car.  Sort

15    of -- sort of hurriedly back to the car.

16         **PRESIDING COMMISSIONER BRYSON:**  Sir, this is an

17    example -- I'll just stop to point it out now, of

18    mistakes that keep tracking you on your career inside

19    here.  The only way that this type of -- type of error be

20    corrected, if you wish to correct it, would be during an

21    Olson Review, and you can -- there are the forms that

22    they do have.  You can ask your counselor about it, for

23    you to -- to note corrections.  And that would be

24    appropriate, if wish to do so.  That's up to you.  But,

25    because this keeps showing up, we can correct it on

24

1   record, which we are doing here today, it tends -- these
2   things do tend to reappear, and that's the only way to
3   correct it.

4       **INMATE VALDIVIA:**  Yes, ma'am.  I try to correct
5   them all the time.  As she said, this last time, she
6   mentioned, she says it's on the record.  It stays on the
7   record.  So, I'll keep trying -- I'll keep trying until
8   we get right.

9       **PRESIDING COMMISSIONER BRYSON:**  That's only
10  information that I can give you.  All right?

11      **INMATE VALDIVIA:**  Yes, ma'am.

12      **PRESIDING COMMISSIONER BRYSON:**  Now, so when you
13  got in the car, and then your partner got in the car, and
14  then what did you do -- what happened?

15      **INMATE VALDIVIA:**  We drove to the alleyway, of
16  Oscar Gonzalez's house where we (inaudible).  But, prior
17  to that, let me clarify something, last hearing, the
18  Deputy Commissioner asked me, because in the police
19  report, one of my crime partners states that I asked for
20  the wallet, and did when we were in the car.  And, at
21  that time, I mentioned before and at that time it escaped
22  me, but I did ask for the wallet when we were in the
23  backseat, as soon as he hit, and I looked at, and I gave
24  it back to him.  And I made the statement that I hope he
25  doesn't die.  And I really did.  I really did.

25

1      **PRESIDING COMMISSIONER BRYSON:**  How much money was
2  in the wallet?

3      **INMATE VALDIVIA:**  There was no money in the
4  wallet.  The victim, the actual victim, had $800 in his
5  pocket, they found.  The other victim that didn't die had
6  -- that was -- threw the wallet out, he didn't have any
7  money in his pocket.  The police were puzzled at the
8  time, they thought it was a hit.  They thought it was a
9  hit or it was a robbery that went bad, because the victim
10  still had $800 in his pocket.  And they were trying -- I
11  always ask -- they kept asking me what happened there?
12  What -- I never spoke up, because I didn't want to say
13  nothing at the time.  And they kept badgering me -- my
14  attorney came to see me, and he says something went wrong
15  out here and you're not telling us.  Something's
16  happened.  Either it's a hit or the robbery went bad.
17  What is it?  And, if I may go into --

18      **PRESIDING COMMISSIONER BRYSON:**  Yes.

19      **INMATE VALDIVIA:**  I want to say, is that, two
20  weeks after I got arrested, a conversion took place.  You
21  know, you're a young kid, you're scared.  And when you're
22  in county jail, a lot of people try to reach out to you.
23  The ministers come by and read you bibles and things of
24  that nature.  And two weeks after than, one of my friends
25  that I knew from the gang that was in there, and he each

26

1    gave me bibles and I started reading the bible, to help
2    get out.  And, so during that process, I'm unwinding
3    through this whole thing, I did -- I made the choice to
4    pick up the bible and to read it.  Not knowing what I was
5    getting into.  I started reading it and I tried it.  So,
6    that's -- for the lack of a better word, I tried it, and
7    instantly I stopped smoking, I stopped cussing, I --
8    everything like, it just hit me.  It just changed.  It
9    was a miraculous just changed.  And so, I was caught in
10   this change for, like, six months.  And that's why when
11   the attorneys are coming and asking me what was going on,
12   I don't remember saying anything, I was just caught in
13   this change, until six months later when reality hit, and
14   my heart -- my conscious speaking to me about change and
15   what's real change.  What is real change?  Real change is
16   realizing that you done wrong, you know?  I left victims
17   behind.  Victims started, you know, coming to my
18   conscious, and when change takes place, there has to be a
19   real change.  You can't continue to pretend that
20   nothing's wrong.  You have to rectify the situation.  And
21   so, at that time, I came to the decision myself that I
22   was going to plead guilty, I was going to admit to the
23   crime.  And it was a bad experience that took place, but
24   at the time, it was, like, a conversion.  Being in
25   trouble -- but in my young life, I've experienced so much

27

1    bad criminal behavior, that I was tired.  And so, at that
2    time, I made that change and accepted in my heart, and to
3    make sure it was a -- an officer, deputy sheriff's
4    officer, named Rich Katou (phonetic), and I call him to
5    my cell and I'm exploring it, you know, just exploring
6    it, you know, people who do this get changed.  They have
7    to make a total change, right?  For things of that
8    nature.  He knows I was getting into this.  You know,
9    there's no -- talk to police, don't become a snitch, and
10   things of that nature.  So, I'm going around because I
11   want him to -- if you want, I'll help you.  I said,
12   that's the decision that you have to make, it's the right
13   decision.  So, I settled it.  You know, I wanted to make
14   this right.  And three months later, that's when they
15   approached me through the department, and I already spoke
16   to my brother, I told my family, don't say nothing.  They
17   were, like -- and the people around me, too, they're
18   like, what are you doing?  What's wrong with you?  You
19   know.  And I said, nothing's wrong with me, it's what's
20   right.  And so, I pled guilty nine months later.
21             **PRESIDING COMMISSIONER BRYSON:**  Did you give up
22   your gang?
23             **INMATE VALDIVIA:**  Yes, ma'am.
24             **PRESIDING COMMISSIONER BRYSON:**  And your
25   involvement?

28

 1          **INMATE VALDIVIA:**  Everything right there.  I
 2   just --
 3          **ATTORNEY FOX:**  I'm sorry, what do you mean by gave
 4   up?
 5          **PRESIDING COMMISSIONER BRYSON:**  Gave information
 6   about other members, and --
 7          **INMATE VALDIVIA:**  Oh, no.
 8          **DEPUTY COMMISSIONER SHIELDS:**  Okay, I don't think
 9   he understood that.
10          **PRESIDING COMMISSIONER BRYSON:**  Oh.
11          **INMATE VALDIVIA:**  I gave up the gang.  Like, gave
12   it up.  Gave up --
13          **PRESIDING COMMISSIONER BRYSON:**  Well, you also
14   gave up your participation in the gang?
15          **INMATE VALDIVIA:**  Everything.  Yes, I just walked
16   away.  Willing to take the consequences, it's up to
17   whatever has to happen, has to happen.
18          **PRESIDING COMMISSIONER BRYSON:**  If we could, that
19   night, I'd like to just get back and complete what
20   happened after.  You went to your uncle's house?  Was
21   that correct, is that --
22          **INMATE VALDIVIA:**  No.  We went to Oscar
23   Gonzalez's.
24          **PRESIDING COMMISSIONER BRYSON:**  Oscar Gonzalez's
25   house?  Okay.

29

1          **INMATE VALDIVIA:**  One of the guys, and we disband,
2     and everybody went home.

3          **PRESIDING COMMISSIONER BRYSON:**  And then what did
4     you do?

5          **INMATE VALDIVIA:**  I went to my girlfriend's house,
6     and stayed there until she gave me a ride home.

7          **PRESIDING COMMISSIONER BRYSON:**  Did you tell her
8     what you had done?

9          **INMATE VALDIVIA:**  Yes, I told her.

10          **PRESIDING COMMISSIONER BRYSON:**  Did you tell her
11     you had killed somebody?

12          **INMATE VALDIVIA:**  Yes.

13          **PRESIDING COMMISSIONER BRYSON:**  What did she say?

14          **INMATE VALDIVIA:**  She didn't know what to say.

15          **PRESIDING COMMISSIONER BRYSON:**  Did you think
16     about how you were putting her life in danger by going to
17     her?  Have you ever thought about that?

18          **INMATE VALDIVIA:**  At that time I never thought
19     about it.

20          **PRESIDING COMMISSIONER BRYSON:**  Have you thought
21     about that since?

22          **INMATE VALDIVIA:**  Yes, I did -- yes, I have.  And
23     I apologized to her and my family --

24          **PRESIDING COMMISSIONER BRYSON:**  Because she could
25     have been held for harboring a fugitive.

1          **INMATE VALDIVIA:**  She could have.  And she
2    became -- she was there with me, I just carried on until
3    I got arrested and --

4          **PRESIDING COMMISSIONER BRYSON:**  What were the
5    circumstances of your arrest?

6          **INMATE VALDIVIA:**  The circumstances of my arrest
7    is that I was at the park sitting, waiting.  And my -- at
8    this time, I was still thinking criminally.  You know, I
9    was still -- I was still living an anti-social life.  And
10   the lifestyle that I adopted was an anti-social life.  It
11   had its own rules, its own games, its own laws.  I was
12   still not thinking, you know, that I'm going to turn
13   myself in, and I'm going to give up the gang, and I'm
14   going to change my life.  Nothing like that.  I was
15   thinking about escape; I'm getting away with this and I
16   have to find a way to get away with this.  I tried to
17   contact my crime partners -- don't say nothing.  We're
18   plotting a plan, you know, how not to tell on each other.
19   Just keep your head up, and it'll pass.

20         **PRESIDING COMMISSIONER BRYSON:**  So, you're sitting
21   in the park?

22         **INMATE VALDIVIA:**  Yes.

23         **PRESIDING COMMISSIONER BRYSON:**  And what happened?
24         **INMATE VALDIVIA:**  I'm sitting in the park, a week
25   later, and the cop -- police officers drive by.  Two

31

1     officers drive by.  And I seen one drive by and I didn't
2     think nothing of it, but another one drove by and I
3     didn't think nothing of it, then another one drove by,
4     then I thought they were trying to get the guy that I was
5     sitting next to.  I didn't think about myself.  And then
6     an officer pulled over -- drove by and pulled over.  And
7     was asking, do you know who Noel Valdivia is?  He just
8     comes up and said I need to talk to you.  He put me in
9     the car, too, and drove me police station and arrested
10    me.

11          **PRESIDING COMMISSIONER BRYSON:**  Had you ever
12    thought about the officer charging you and what kind of
13    fear and consternation you must have caused him?  Have
14    you thought about that?  When he thought you were
15    probably who you were, were they looking for you at that
16    time?

17          **INMATE VALDIVIA:**  Yes.  I didn't know they were
18    looking for me.

19          **PRESIDING COMMISSIONER BRYSON:**  But they were?
20          **INMATE VALDIVIA:**  Yes.

21          **PRESIDING COMMISSIONER BRYSON:**  And so he had
22    every reason to believe you were probably armed, because
23    you had been before.

24          **INMATE VALDIVIA:**  Yes.  He probably did.
25          **PRESIDING COMMISSIONER BRYSON:**  So, that was

32

1    probably a pretty scary thing for him, too.

2         **INMATE VALDIVIA:**  I'm sure it was.

3         **PRESIDING COMMISSIONER BRYSON:**  Okay.  Your

4    history is considerable as a juvenile.  You were out of

5    control, I guess, at some point, and you were counseled

6    and released for being out of control.  We'll talk about

7    your personal life in a minute.  Just going over your

8    juvenile record, you were counseled and released for

9    loitering and failure to disburse at one point.  When did

10   you -- how old were you when you joined the gang?

11        **INMATE VALDIVIA:**  Like, 14 or 15.

12        **PRESIDING COMMISSIONER BRYSON:**  Okay.  And you got

13   a possession of marijuana in 1977, and you were counseled

14   and released for that.  You had a drunk driving in 1978;

15   you were counseled and ordered to attend AA.  Did you do

16   so?

17        **INMATE VALDIVIA:**  One time, I think.

18        **PRESIDING COMMISSIONER BRYSON:**  One time?

19        **INMATE VALDIVIA:**  Yes.

20        **PRESIDING COMMISSIONER BRYSON:**  As to drunk

21   driving, it says all charges were subsequently dismissed.

22   And a lot of this is contingent on the incident offense.

23   Then you have another interfering with a police officer

24   and battery upon a police officer, for which you were

25   given six months' probation, which was subsequently

33

1   dismissed, based on the incident offense.  So, you were
2   on probation at the time?

3          **INMATE VALDIVIA:**  Yes, ma'am.

4          **PRESIDING COMMISSIONER BRYSON:**  Okay.  And, what
5   is the incident, I'd like to know, on September 11th, in
6   which,

7          "residents have been shot at, one juvenile

8          had been shot in the left leg by a shotgun

9          blast.  Stockton police investigation, as

10         well as statements, lead apparent victims

11         and other neighbors reveal the presence of

12         activities between two gangs.  Subject was

13         questioned, photographed, and later

14         released."

15  Was this just another gang activity?

16         **INMATE VALDIVIA:**  Yes.  It was part of a gang
17  activity.  I was at the park and a couple other guys came
18  to me and asked me to switch cars with them, because they
19  had just gotten into a disagreement.  They didn't tell me
20  about the shooting and that were just screaming at
21  somebody and they got in a fight.  And so, they said
22  let's switch cars, the cops are looking for my car.  And
23  people seen me at the park there all this time.  So,
24  they'll witness I was there.  So, being part of a gang,
25  you make those type of sacrifices.  You're not

34

1    considering anything, you just go on with the group.  And
2    so, I switched cars with him, and then he drove away, and
3    the officers targeted that car.  Pulled me over and took
4    me in for questioning.

5           **PRESIDING COMMISSIONER BRYSON:**  Okay.  And then,
6    what happened on the assault with a deadly weapon, the
7    charge in 1979?

8           **INMATE VALDIVIA:**  That's another situation where
9    you're with a gang, one of the guys was in a fight, so
10   the gang shot him -- shot at him.  And didn't hit him.
11   But, because I'm part of the group, they mentioned me as
12   part of it, so they arrested me.  And I did six months'
13   county time for that.  And my crime partner got three
14   years.  He would have had seven if I didn't sacrifice
15   myself and take the six months.  They didn't have
16   anything on me, other than saying I was there.  So, I
17   could have, probably, been -- whatever they call it --
18   got away with it.  But because it would cut his time, I
19   took six months.  And I think they were just trying to
20   establish a record on me, that's why I took the six
21   months and he had three years.  Being involved in gangs,
22   being involved in that kind of culture, that violent
23   culture, it calls for sacrifices that you don't think for
24   yourself.  You don't think -- you don't like being in a
25   family or anybody, just the gang lifestyle.  They become

35

1    your family.

2         **PRESIDING COMMISSIONER BRYSON:**  And in some ways,

3    that becomes a badge of honor to some time.

4         **INMATE VALDIVIA:**  Badge of honor, and sacrifice

5    yourself for the gang and the people in the gang.

6         **PRESIDING COMMISSIONER BRYSON:**  And did you do

7    this jail time in Stockton?

8         **INMATE VALDIVIA:**  Yes, ma'am.

9         **PRESIDING COMMISSIONER BRYSON:**  And then you had

10   the incident offense.  You're the youngest of 11

11   children.  Is that all one family?

12        **INMATE VALDIVIA:**  Yes, ma'am.

13        **PRESIDING COMMISSIONER BRYSON:**  Your mother --

14   that's a large family.  Born in the union of Jose

15   Valdivia and Amalia Tobias (phonetic) who were married

16   since 1945, moved to California in 1965.  I guess, did

17   you start out in (inaudible)?

18        **INMATE VALDIVIA:**  Yes, ma'am.

19        **PRESIDING COMMISSIONER BRYSON:**  Okay.  And then

20   you decided -- you were living with your parents just

21   prior to this incarceration; is that correct?

22        **INMATE VALDIVIA:**  Yes, ma'am.

23        **PRESIDING COMMISSIONER BRYSON:**  Okay.  Do you

24   still have your parents today?

25        **INMATE VALDIVIA:**  Yes, ma'am.

36

1          **PRESIDING COMMISSIONER BRYSON:**  And how are they
2     going?

3          **INMATE VALDIVIA:**  Terrible.  My mother just
4     suffered a stroke earlier this year, and my father's
5     (inaudible).

6          **PRESIDING COMMISSIONER BRYSON:**  Are they retired?
7          **INMATE VALDIVIA:**  Yes, ma'am.
8          **PRESIDING COMMISSIONER BRYSON:**  It says that you
9     attend the high school on-line at the Golden Valley
10    Continuation High School, and your highest level of
11    education being the ninth grade.  It says you were not
12    attending school.  You were working to help support your
13    family during a financial difficulty; is that true?

14         **INMATE VALDIVIA:**  Yes, ma'am.

15         **PRESIDING COMMISSIONER BRYSON:**  What's some of the
16    work you did?

17         **INMATE VALDIVIA:**  I did -- I worked at a pallet
18    company, a lumber company, making pallets there sometime.
19    And that was our history through our lives, helping our
20    parents out working.  They would -- they would follow the
21    crop; farm laborers.  And so, we would all go help out
22    and work.  And I grew up like that.  And as I grew older,
23    I got different jobs, go to work, get the check, give it
24    to mom.  That was just custom that you grew up with to
25    help out at home.

37

1       **PRESIDING COMMISSIONER BRYSON:**  How about your
2  siblings?  Do you keep in contact with all of them?
3       **INMATE VALDIVIA:**  Yes, ma'am.
4       **PRESIDING COMMISSIONER BRYSON:**  Are -- how are
5  they all doing?
6       **INMATE VALDIVIA:**  They're doing well.  My brother,
7  Rick, passed away in '94, but the others, they're all
8  fine.
9       **PRESIDING COMMISSIONER BRYSON:**  Did any of the
10  rest of them become involved in gangs?
11       **INMATE VALDIVIA:**  Yes.  A couple of them became
12  involved in the gang with me.  But, I found out later,
13  that they did that to protect me, to take care of me.
14  And my brother, Albert -- I call him my angel, he's a
15  year old than me, and he was always with me there to
16  protect me.  I didn't realize that at that time.  Not
17  until now, you know.  Not now, but after my
18  incarceration.  He's always been by my side.
19       **PRESIDING COMMISSIONER BRYSON:**  And what happened
20  to his life?
21       **INMATE VALDIVIA:**  He's doing great.  He's living
22  life.  He's got a family.  He's got a home and he's
23  working.  I'm the only one out of the -- that came to
24  prison.
25       **PRESIDING COMMISSIONER BRYSON:**  I see.  But you do

38

1    keep in contact with your family.

2           **INMATE VALDIVIA:**  Yes.

3           **PRESIDING COMMISSIONER BRYSON:**  That's good.  This

4    says that you considered yourself a pre-alcoholic

5    excessive drinker.  You said that you were drinking at

6    the time of this crime.  Do you feel you were under the

7    influence at the time of the crime?

8           **INMATE VALDIVIA:**  Yes.  I was under the influence.

9           **PRESIDING COMMISSIONER BRYSON:**  Of alcohol?

10          **INMATE VALDIVIA:**  I wasn't stumbling drunk, but I

11   was under the influence.

12          **PRESIDING COMMISSIONER BRYSON:**  Okay.  Do you

13   consider yourself an alcoholic?

14          **INMATE VALDIVIA:**  Yes.

15          **PRESIDING COMMISSIONER BRYSON:**  It says that you

16   know now the risks associated with drinking.  And you had

17   only occasional narcotics and marijuana use.  So, did you

18   ever get into heavier drugs at all?

19          **INMATE VALDIVIA:**  No, ma'am.

20          **PRESIDING COMMISSIONER BRYSON:**  It says you never

21   served in the military and no mental disorders.  Is there

22   anything else about your personal history that you think

23   we should know, that would help us understand you?

24          **INMATE VALDIVIA:**  Like I mentioned, growing up,

25   and I think this is the causing factors of leaving my

```
 1   home life and getting into crime and a criminal history.
 2   As a young kid, I was always protected.  I had 11
 3   siblings; seven were brothers.  I was the youngest one.
 4   So, I always protected.  And I never really had to do
 5   anything to protect myself, so to speak.  I went to
 6   school and did my school work.  And then we moved into
 7   the neighborhood of Stockton, and it's predominantly
 8   Mexican/American, and a lot of gang and drugs and stuff.
 9   It's not, so far, the low income, it would probably be
10   pretty close.  It's right next to the projects.  And we
11   went into this neighborhood meeting different type of
12   people and meeting a different culture and environment,
13   where it is violent.  Even in elementary school.  And my
14   first account with violence was when I was in third
15   grade.  And I was approached by three kids and I was
16   attacked, and the attack was one punch to the stomach.
17   But the overall fear of being approached by three people
18   was real, real bad for me.  And so, I went home and I
19   said to my mom and did that I wouldn't go back to school.
20   I would never go back to school.  So, my brother, Albert,
21   and my other brothers, they said, no, we're going to
22   straighten the thing out.  And they came back and told
23   me, you can go to school now.  And I did.  This is the
24   thing, and like I take responsibility for my whole life,
25   but there's key factors that occur in lives, and occurred
```

40

1    in my life, that changed my life dramatically, because of

2    the characteristics and the personality that I have.  You

3    know, I pick things up right away, quick -- at that time

4    I did.  And so, they left this thought in my mind, that

5    we're not always going to be around.  And this was a

6    concept they said, you have to learn how to protect

7    yourself.  You have to learn to fight to protect

8    yourself, because we're not going to always be around.

9    But it was the cultural concept in that neighborhood.

10   And kids learn how to fight.  And shortly thereafter, I

11   learned how to fight.  And they -- at first I was

12   fighting, you know, protecting myself.  I didn't have to

13   learn how to fight.  I realized that later.  But at that

14   time, I adopted that, and it was every fight.  In the

15   neighborhood, so to speak, in the ghetto-type lifestyle,

16   there's another fight.  And one fight grows into another

17   fight.  And the more you beat up, the more, you know, and

18   I was a good fighter.  And with that, that lifestyle

19   comes prestige and recognition and pride wells up.  So, I

20   adopted this lifestyle and I carried it to criminal

21   behavior.  And so, that's how my life started.  I had the

22   upbringing of my parents, you know, which was old-

23   fashioned and respectful, responsible.  As I mentioned

24   before, I used to work as a kid.  I'd get my bike, I'd go

25   find jobs.  You know, if I didn't have a -- what I would

41

1    do is, I would get a lawnmower, get some gas, get a rake,

2    and I'd go cut lawns and make money.  All through my

3    life.  And even to 14, 15 years old, I got a job working

4    with my cousins.  You know, just helping my family out.

5    But this other life prevailed.  This outside life --

6    criminal, anti-social behavior life prevailed in my life.

7    And that sent me into a direction that just distorted my

8    value, and just distorted and misplaced and I adopted

9    this lifestyle.  And it wasn't the personality, the

10    person that I was, it wasn't going to stop.  Because it

11    just kept growing and growing.  And I mentioned before to

12    the Board member before that, the only thing that was

13    going to stop me was death or this incarceration.  And --

14    **PRESIDING COMMISSIONER BRYSON:**  Thank you, sir.

15    Well, if you'll turn your attention to Commissioner

16    Shields, she talk about your post-conviction factors.

17    **DEPUTY COMMISSIONER SHIELDS:**  Good afternoon, sir.

18    **INMATE VALDIVIA:**  Hi.

19    **DEPUTY COMMISSIONER SHIELDS:**  Let me follow up,

20    and again, sir, my goal is to talk about what happened

21    once you hit the -- hit the correctional system.  You

22    mentioned that almost as soon as you were arrested --

23    right after you were arrested, you had a religious

24    experience?

25    **INMATE VALDIVIA:**  Yes, ma'am.

42

1          **DEPUTY COMMISSIONER SHIELDS:**  And what kind of

2     name would you put to that?  What happened?  There was

3     something that happened at a specific moment, right?

4          **INMATE VALDIVIA:**  Yes.

5          **DEPUTY COMMISSIONER SHIELDS:**  When things changed?

6     What would you call that?

7          **INMATE VALDIVIA:**  A transformation.

8          **DEPUTY COMMISSIONER SHIELDS:**  A transformation?

9          **INMATE VALDIVIA:**  It's a conversion.

10         **DEPUTY COMMISSIONER SHIELDS:**  And it sounds like

11    you're saying that that was, sort of, a complete --

12         **INMATE VALDIVIA:**  No.  It wasn't complete.

13         **DEPUTY COMMISSIONER SHIELDS:**  Okay.

14         **INMATE VALDIVIA:**  Yeah.  Because I still had my --

15    the heart, so to speak, the heart stuff is, you know, the

16    smoking and drinking and cussing.  Whatever it was, the

17    externals were, pretty much, wiped away.  But, I still

18    had my personality traits and my anger, my -- how do you

19    say it, the weaknesses that I had.  And what I actually

20    did was it just became a framework.  It's like a light

21    was turned on the room.

22         **DEPUTY COMMISSIONER SHIELDS:**  Uh-huh.

23         **INMATE VALDIVIA:**  And somebody, before that, had

24    just tore the whole place up.  And so, everything had to

25    appropriated.  I had to set everything back in the room.

43

1    And it took time. And it's taken me -- and it's still

2    taking me time. I'm still not done. But, everything's

3    pretty much in order where I can live life, a straight

4    life, day-by-day. And that's what I mean by

5    transformation at the heart.

6    **DEPUTY COMMISSIONER SHIELDS:** Okay. I wanted to,

7    you know, understand that word. Because when you were

8    describing that, what came to my mind was your

9    disciplinary history. And, when you were talking to the

10    Commissioner, it sounds to me like, oh, the light went

11    on. And then I went back, and checked -- I mean, since

12    you've been down, you've had seven 115's starting in

13    1983, and the last one was in 2000. And then, you have

14    also had -- it looked the 90's were kind of bad for

15    128A's, which you had seven of those. And, you know,

16    some of the -- I mean, originally the physical

17    altercation, that my not be totally not unexpected if

18    you're new to a prison system, if you're new. But there

19    was one participating in a work strike in 1994, failure

20    to obey orders, a lot of failure to apply with count

21    procedures. What was the contraband in 1996?

22    **INMATE VALDIVIA:** In '96?

23    **DEPUTY COMMISSIONER SHIELDS:** I could -- I can

24    look while you think. We have your record here. Oh, I

25    may not. Well, there was only two things that, sort of,

44

1    related to things.  One was the theft of license plates,
2    and one was the contraband.  Do you remember the license
3    plates?

4         **INMATE VALDIVIA:**  Oh, yeah.  License plates.  I
5    worked in the PIA Department --

6         **DEPUTY COMMISSIONER SHIELDS:**  Uh-huh.

7         **INMATE VALDIVIA:**  -- at Folsom where license
8    plates are made.  And everybody has license plates.  We
9    used to have inmates -- we had them -- we'd just have
10   them lined up everywhere.  And I had some guy make me
11   some license plates.  And I was in the process of moving
12   them to my area and they were found by the officer.  That
13   was in -- I was in the -- yeah, that was when I was going
14   to take them to my area, and try to take them home, you
15   know, souvenirs.

16        **DEPUTY COMMISSIONER SHIELDS:**  Home to your house
17   or home when you got paroled?

18        **INMATE VALDIVIA:**  Yes, ma'am, to the house.  To
19   the --

20        **DEPUTY COMMISSIONER SHIELDS:**  To yourself?

21        **INMATE VALDIVIA:**  No.  To the home in the streets.

22        **DEPUTY COMMISSIONER SHIELDS:**  Oh, so it's a --

23   well, this happened in 1999 and you were in prison.

24        **INMATE VALDIVIA:**  Yeah.

25        **DEPUTY COMMISSIONER SHIELDS:**  So you were kind of

45

1    making souvenirs?

2        **INMATE VALDIVIA:**  Yes.  Yes.  It was -- yes.  It

3    was a souvenir.  And it was just part of what everybody

4    had at that time.

5        **DEPUTY COMMISSIONER SHIELDS:**  Are you supposed to

6    be doing it?

7        **INMATE VALDIVIA:**  No.

8        **DEPUTY COMMISSIONER SHIELDS:**  Did you know you

9    were supposed -- not supposed to be doing it?

10       **INMATE VALDIVIA:**  No.  I knew we weren't supposed

11   to be doing it.

12       **DEPUTY COMMISSIONER SHIELDS:**  Did you think you

13   might get a 115 for it?

14       **INMATE VALDIVIA:**  Well, at that time I didn't --

15   it was in the shop.  You know, they were everywhere.  It

16   was just like a part of -- you know, they were even in

17   the office at that point.  So, I didn't consider that.

18   You know, it just would have to be domesticated in places

19   like -- some things that are not -- rules that are not --

20   how do you say -- enforced and become lackadaisical

21   behind them and it's like going into a place and --

22   that's, you know, you see them already there, and you

23   think that that's part of the program, which it's not.

24   And they don't ever really enforce the rules, so you

25   think that's part of the program, so you just make it,

46

1    without thinking, hey, I can get a 115. You know,

2    knowing that you could, knowing that you know you could.

3    But at the same time, not believing that you can, because

4    it's a known practice and everyone's practicing that.

5    And so, that's where you get carried away and you fall

6    right into making them, just like everybody else does.

7    And the thing, I was going to send them as souvenirs to

8    family. That's why.

9        **DEPUTY COMMISSIONER SHIELDS:** But, at that point,

10   what year -- your term started in '81. So, at that

11   point, you had done 18 years on a life term, right?

12       **INMATE VALDIVIA:** Yes, ma'am.

13       **DEPUTY COMMISSIONER SHIELDS:** What were you

14   thinking? Didn't it occur to you -- well, let me ask you

15   another question I actually had. Do you want to get out?

16       **INMATE VALDIVIA:** Yes, ma'am.

17       **DEPUTY COMMISSIONER SHIELDS:** How badly do you

18   want to get out?

19       **INMATE VALDIVIA:** Bad enough that I stopped doing

20   that. Like I said, at that time, I didn't consider the

21   consequences because it was a normal practice in that

22   area. And, I just felt that I could do the same, same

23   things that goes on there. If I could, better explain

24   it, you know, I'm not denying it.

25       **DEPUTY COMMISSIONER SHIELDS:** Okay. I guess,

47

1    well, that creates a red flag for me, because you started

2    out by saying that you had a transformation.  In other

3    words, you started to become aware in 1980, but in 1999,

4    knowing that you're a lifer, you're different than other

5    people here.  Most people here aren't a lifer.

6         **INMATE VALDIVIA:**  Yes, ma'am.

7         **DEPUTY COMMISSIONER SHIELDS:**  You're that rare

8    breed who's a lifer, who has a chance to get out.  You

9    did something because everybody was doing it.

10        **INMATE VALDIVIA:**  Yes, ma'am.  I shouldn't have

11   done it.

12        **DEPUTY COMMISSIONER SHIELDS:**  And you came from a

13   gang background, which to me is one of those things

14   where, it's kind of like, everybody's doing it.  And

15   then, what we're talking about today is, can you go out

16   on parole and not do what everyone else is doing?

17        **INMATE VALDIVIA:**  Yes, ma'am.

18        **DEPUTY COMMISSIONER SHIELDS:**  And so, what we're

19   looking for, is what is it about you that -- let's say

20   you happened to get a construction job, and particularly,

21   my observation, but I don't know the stereotype, is you

22   know, whenever I have seen Hispanic workers on Friday

23   night, somebody gets a case of beer, they on the site,

24   they have a BBQ, they sit around, they drink beer.

25   That's what everybody's doing.  How do I know you're not

48

1    going to do that?

2         **INMATE VALDIVIA:**  Well, I won't do that, because I

3    have the tools to work with to not drink.  I made it a

4    point not to drink.  And I understand what you're saying,

5    is that you get caught up in a situation where people are

6    doing everything, you know, and I just, you know, that

7    was my mistake, because I allowed myself.  But I learned

8    from that, you know, and I abstain from those things.

9    For instance, the other day we were coming back from

10   work, and I saw lunch is over.  And these are things that

11   I put in my mind, and in my heart.

12        **DEPUTY COMMISSIONER SHIELDS:**  Uh-huh.

13        **INMATE VALDIVIA:**  I come back to class, and

14   there's an area, and there's a desk there.  And there's

15   an inmate playing with the desk, hey, look, look what we

16   got there here.  You know?  Check this out, come over

17   here.  I says, why do you want me to get arrested?  I

18   said, don't you know right now what you're doing?  I

19   says, you probably should have got a third strike right

20   now, and now you're trying to get me a third strike?

21   Excuse me.  I'm sorry.  I got to go to work.  Just in

22   passing, just things that I put into my mind behind these

23   actions of past experiences of stopping and not thinking

24   before.  I stopped and I thought, and caught him right

25   out of the gate and he felt ashamed.  He was, oh, you

49

1    know, it's not -- I said, no, that's exactly what it is.

2    If I'm on the street, and you find -- you run into

3    something, and you say, hey, look, let's get this.  I

4    said, I can't do that.  I say, I have to practice that

5    now, today.  I says, you're not going to trap me.  If

6    there's something that's wrong, and I know it's wrong,

7    and you're trying to entice me to it -- no, I got to go.

8    I'm not falling into anything everybody else is doing

9    that type of thing anymore.  I'm not doing it.  And I

10   caught it right there, at that spot, at that time.  And I

11   just kept going.  And I even told the guys that was

12   walking with, my coworkers.

13        **DEPUTY COMMISSIONER SHIELDS:**  But, you came here

14   as a lifer and got 14 disciplinaries.

15        **INMATE VALDIVIA:**  Yes, ma'am.

16        **DEPUTY COMMISSIONER SHIELDS:**  After the light bulb

17   went on.

18        **INMATE VALDIVIA:**  Right.  I did.

19        **DEPUTY COMMISSIONER SHIELDS:**  And, you know, I

20   would say -- now, it's hard to generalize this, there are

21   so few people in your category, that's a way above-

22   average number of disciplinaries for a lifer who's

23   serious about getting out.  So, that's why I started to

24   wonder, well, gee, maybe he became spiritually oriented,

25   and you see your mission as being in here and you really

1    don't care if you get out.

2         **INMATE VALDIVIA:**  No.  My mission is not to stay

3    in here.  My mission --

4         **DEPUTY COMMISSIONER SHIELDS:**  You could be of

5    service in here, can't you?

6         **INMATE VALDIVIA:**  I am of service in here.

7         **DEPUTY COMMISSIONER SHIELDS:**  Uh-huh.

8         **INMATE VALDIVIA:**  But I would like to get out.  I

9    would like to be of service on the street, to give back

10   to the community from which I took.  I understand what

11   you're saying, and as I mentioned before, I sincerely

12   turned on the light, but I still had to work through my

13   own personal battles or situations --

14        **DEPUTY COMMISSIONER SHIELDS:**  Okay.  Well, let me

15   turn to -- and I'm sorry to cut off you here, but let me

16   turn to, and I'm taking this from the Board report.  It's

17   something that we had a question about; one of the

18   issues, always when we have someone who's been for a long

19   time, we have a lot of paper.  The very practical issue

20   is how we're going to get through it in a fair way so we

21   get, you know, your programming on paper.  And, as

22   Ms. Fox can tell you, because she's been here for several

23   hearings, I do sort of at least a two-way process, to

24   where I will try to go through it.  Sometimes she will

25   assist me, if I miss something at the moment, but also at

1 the end of, you know, going through the chronos you can

2 point out of there are additional ones.  The other thing,

3 just as my practice, I mean it is the Board report, which

4 I assume is incorporated in our decision, what I try to

5 do is to really focus on the more in-depth activities,

6 where you get a certificate.  Instead of reading 16

7 impact certificates -- chronos I'd rather just say, you

8 know, you're in module one of the impact.  So, that is

9 where I'm headed.  Well, we're already going run into a

10 little bit of something here.  But let me work back, but

11 the chronos and the Board report, or the certificates,

12 really stop in 2006.  Oh, wait.  Let me do this here, let

13 me do it this way -- oh, no, that's vocational.  Okay.

14 They've mixed some of these things in.  Let me go -- they

15 note that -- whoever did this, did not do this in a very

16 organized way.  But let me note, that it appears to me

17 that you've completed the No More Tears -- do you have a

18 certificate for No More Tears?

19     **INMATE VALDIVIA:**  Yes.

20     **DEPUTY COMMISSIONER SHIELDS:**  Okay, and that is --

21     **ATTORNEY FOX:**  We've already seen the report.

22     **DEPUTY COMMISSIONER SHIELDS:**  Well, see, that's

23 where we get into the packet.  And I'd rather not jump

24 around.  But, you know, obviously, it doesn't serve you

25 to misrepresent whether or not you have a certificate,

52

1    because all of this will be checked.  So, I will take you

2    at your word that you have the No More Tears certificate.

3    And that -- that is how many classes?

4         **INMATE VALDIVIA:**  I can't recall, like 16 maybe.

5    I don't recall that.

6         **DEPUTY COMMISSIONER SHIELDS:**  Okay.

7         **INMATE VALDIVIA:**  It's been two years.  This last

8    year I've been just assisting.

9         **DEPUTY COMMISSIONER SHIELDS:**  Okay.  Let me try to

10   get through these.  Project Impact.  Now, I know that

11   that's -- how many classes in that?

12        **INMATE VALDIVIA:**  I've taken two.  I think there's

13   eight modules.  I'm not sure.  I've taken --

14        **DEPUTY COMMISSIONER SHIELDS:**  So, you've taken two

15   classes and that's it.  You don't have a certificate yet?

16        **INMATE VALDIVIA:**  No.  I'm in the -- I'm on the --

17   presently, I'm in the Life Skills, number six.

18        **DEPUTY COMMISSIONER SHIELDS:**  Okay.  That's --

19   that's a very good program.  You have a certificate,

20   because it says certificate, the TRUST Program, and you

21   got that in 2006.  Tell me, what is the TRUST Program?

22        **INMATE VALDIVIA:**  There's three phases.  And the

23   acronym for TRUST is Teaching Responsibility Utilizing

24   Sociological Training.

25        **DEPUTY COMMISSIONER SHIELDS:**  Okay.  And you

1    completed that?

2              **INMATE VALDIVIA:**  Yes, ma'am.

3              **DEPUTY COMMISSIONER SHIELDS:**  One of the things

4    that you do in there, is you do a parole plan.  Did you

5    write down a parole plan?

6              **INMATE VALDIVIA:**  No.  I didn't write down a

7    parole plan.

8              **DEPUTY COMMISSIONER SHIELDS:**  Do you have a

9    written parole plan?

10             **INMATE VALDIVIA:**  No.  I don't have a written

11   parole plan, but I have parole plans.

12             **DEPUTY COMMISSIONER SHIELDS:**  Right.  I just

13   wondered if that happened.  Let me go --

14             **INMATE VALDIVIA:**  I wrote down a budget.

15             **DEPUTY COMMISSIONER SHIELDS:**  Okay.  Tell me, what

16   did you get -- what was the most important thing you got

17   out of that?

18             **INMATE VALDIVIA:**  The TRUST program?

19             **DEPUTY COMMISSIONER SHIELDS:**  Uh-huh.

20             **INMATE VALDIVIA:**  Is the purging process, which

21   obvious -- it's an on-going process --

22             **DEPUTY COMMISSIONER SHIELDS:**  Uh-huh.

23             **INMATE VALDIVIA:**  -- of changing.  Like I said,

24   myself -- I'm not going to talk about everything

25   generalized -- but myself, I adopted this anti-social

54

1    behavior; didn't follow the laws of society, I didn't
2    abide by society's laws, and developed a belief system
3    that was distorted, that had its own laws and its own
4    rules of the game. They call it the street life, the
5    street game. And it teaches you how to identify it and
6    to compare that with life, with the social laws of life.

7    **DEPUTY COMMISSIONER SHIELDS:** Uh-huh. Uh-huh.

8    **INMATE VALDIVIA:** Society's laws. And it's a
9    purging process where you purge yourself, you identify
10    those, and you see where you're wrong at. And you start
11    correcting those and you start living by society's rules.
12    And, like the pyramid concept is yourself first, your
13    family, and your community. You have to change yourself
14    first, and then to start reaching out to your family.
15    And after your family, start reaching out to your
16    community. And that's what I got out of it. That's the
17    main part of it, is purging yourself first. You know,
18    then you're able to help your family out, and after your
19    family, your community. So, that's --

20    **DEPUTY COMMISSIONER SHIELDS:** Okay. Let me -- so
21    when I see the individual chronos, there are Impact --
22    from the Impact Program, from the TRUST Program, from No
23    More Tears. I'm going to leave Alcoholics Anonyms for a
24    minute. Changing Your Mindset Workshop, that's a good
25    one, isn't it?

55

1          **INMATE VALDIVIA:**  Yes.  That's basically the same
2    thing as the TRUST purging process.

3          **DEPUTY COMMISSIONER SHIELDS:**  Uh-huh.

4          **INMATE VALDIVIA:**  It's changing your mindset

5          **DEPUTY COMMISSIONER SHIELDS:**  So, that was for
6    another aspect and you had that in 2005?

7          **INMATE VALDIVIA:**  And the No More Tears Program.

8          **DEPUTY COMMISSIONER SHIELDS:**  Okay.  And the New
9    Leaf on Life Group.  Do you have a certificate from that
10   or you went to a class?

11         **INMATE VALDIVIA:**  No.  They're chronos --

12         **DEPUTY COMMISSIONER SHIELDS:**  Quarterly chronos --
13   so you got one of those, actually, it looks for the last
14   quarter in December.  That looks like it for educational
15   chronos.  Let me go back, though, you have a bunch of
16   Alcoholic's Anonymous chronos going up to 2004 -- oops,
17   there's one in 2005, another one --

18         **ATTORNEY FOX:**  And two more in '06.

19         **DEPUTY COMMISSIONER SHIELDS:**  Right.  But -- so,
20   the one in '06 would be for the third quarter in '06, but
21   it doesn't look to me like you have any after that; is
22   that true?

23         **INMATE VALDIVIA:**  No.  They're --

24         **DEPUTY COMMISSIONER SHIELDS:**  They're in the
25   packet?

56

1         **INMATE VALDIVIA:** There's two of them missing; I
2    couldn't find the other one for the first quarter of
3    this, but the last quarter is in there, of --
4         **DEPUTY COMMISSIONER SHIELDS:** In there, so you
5    went in the last quarter in December?
6         **INMATE VALDIVIA:** Right.  They give us -- yes.
7         **DEPUTY COMMISSIONER SHIELDS:** And then you
8    went -- you're missing the first quarter in --
9         **INMATE VALDIVIA:** Yes, but I when through them.
10        **DEPUTY COMMISSIONER SHIELDS:** Okay.
11        **INMATE VALDIVIA:** I have the last one for this --
12        **DEPUTY COMMISSIONER SHIELDS:** And you have the --
13   and you have the one that verifies the second quarter.
14        **INMATE VALDIVIA:** -- second quarter, 2007.
15        **DEPUTY COMMISSIONER SHIELDS:** Okay.  So, how long
16   have you been in Alcoholic's Anonymous?
17        **INMATE VALDIVIA:** Since 1990.
18        **DEPUTY COMMISSIONER SHIELDS:** What's your sobriety
19   date?
20        **INMATE VALDIVIA:** Sobriety date is July 17th,
21   1981.  The day I was arrested.
22        **DEPUTY COMMISSIONER SHIELDS:** So, you have been
23   clean and sober for -- do the math -- 26 years or
24   something?
25        **INMATE VALDIVIA:** Twenty-six years, just over.

57

1        **DEPUTY COMMISSIONER SHIELDS:**  No pruno, no --

2        **INMATE VALDIVIA:**  No, ma'am.

3        **DEPUTY COMMISSIONER SHIELDS:**  No, nothing?  How

4  did you do it?

5        **INMATE VALDIVIA:**  As I told you, I converted, the

6  transformation took place.  It took the desire away and I

7  never desired it after that.  And I just kept working on

8  it.

9        **DEPUTY COMMISSIONER SHIELDS:**  Now, is that from AA

10  or is that from your religious belief that --

11        **INMATE VALDIVIA:**  They're both.  It's both.  The

12  AA continues to keep me aware of the dangers and the bad

13  effects of drinking.  Not only that, but actually

14  physical problems, but the actual -- I need to separate

15  both that -- the practice the results of drinking,

16  externally and internally, you know.  So, I keep that

17  always with AA because it keeps me -- I love going to AA

18  because it reminds me -- keeps a reminder, fresh

19  reminder, of what alcohol does and did to me and does to,

20  and will do if I go back.

21        **DEPUTY COMMISSIONER SHIELDS:**  What is your AA

22  practice?  How do you practice the program.

23        **INMATE VALDIVIA:**  How do I practice it?  I go to

24  AA weekly.  We read sections in the book every time we go

25  in there.  We talk about --

58

1          **DEPUTY COMMISSIONER SHIELDS:**  What section did you

2    read last time?

3          **INMATE VALDIVIA:**  Last week we read about passing

4    on your sobriety to others.  The --

5          **DEPUTY COMMISSIONER SHIELDS:**  Is that a story or

6    is that a chapter?

7          **INMATE VALDIVIA:**  It's like a -- it's a chapter of

8    a date in the book.  And each day has a -- each week we

9    have a date and we take that -- it's actually Step 12.

10         **DEPUTY COMMISSIONER SHIELDS:**  Oh.  So, is that --

11   oh, well, Step 12?  Or is it a meditation book?

12         **INMATE VALDIVIA:**  It's a meditation book.  But

13   it's presenting Step 12, about passing it on.  And that's

14   spiritual awakening, the Steps to try to carry the

15   message to (inaudible).  So, that's what the practice is

16   about.  That --

17         **DEPUTY COMMISSIONER SHIELDS:**  What about Step 2?

18   Does that apply to you?

19         **INMATE VALDIVIA:**  Yes, it does.

20         **DEPUTY COMMISSIONER SHIELDS:**  How?

21         **INMATE VALDIVIA:**  Step 1, when I converted my

22   lift, I came to believe that part to restore my sanity.

23   And that, actually, like I said, when the guy sent me the

24   bible, you know, and that initial change took place, I

25   came to believe, actually came to believe, that the power

59

1    greater than myself could restore my sanity and it has.

2    The conversion and my belief in God.  But, remember, I

3    went -- I was committed before I went to AA.  So, when I

4    went to AA, I found these steps are based -- are -- it's

5    ability-based.  Because that's what you're doing when you

6    come -- when you get converted, is you believe.  You're

7    lost, you're out there, you're looking for help, you're

8    looking for assistance, you're looking for change.  And

9    then, you realize -- but the thing is about AA, is AA is

10    what you attribute as your God.  You can chose to

11    attribute anything that you want as God.  And the bible

12    attributes as Jesus Christ being the savior of your sole.

13            DEPUTY COMMISSIONER SHIELDS:  What -- what are the

14    requirements to being an AA member?

15            INMATE VALDIVIA:  Excuse me?

16            DEPUTY COMMISSIONER SHIELDS:  What are the

17    requirements to join AA?

18            INMATE VALDIVIA:  A willingness to stop drinking.

19            DEPUTY COMMISSIONER SHIELDS:  Does it have to be

20    sincere?

21            INMATE VALDIVIA:  It has to be sincere.

22            DEPUTY COMMISSIONER SHIELDS:  Do you --

23            INMATE VALDIVIA:  It doesn't work if you

24    don't --

25            DEPUTY COMMISSIONER SHIELDS:  Work --

60

1            **INMATE VALDIVIA:**  That's why we practice, at the
2     end of the meeting, when we break, we say keep working;
3     it works if you work.   It's going to work.
4            **DEPUTY COMMISSIONER SHIELDS:**  What about -- do you
5     own the 12 and 12?
6            **INMATE VALDIVIA:**  No, I don't own the 12 and 12.
7            **DEPUTY COMMISSIONER SHIELDS:**  Have you ever seen
8     the 12 and 12?
9            **INMATE VALDIVIA:**  Yes.   It's practicing each step
10    by step.   Taking time to read, practicing the steps
11    and --
12            **DEPUTY COMMISSIONER SHIELDS:**  It's a book, the --
13            **INMATE VALDIVIA:**  Yes, it's a book.
14            **DEPUTY COMMISSIONER SHIELDS:**  And what does -- but
15    what does it stand for?   Do you know?
16            **INMATE VALDIVIA:**  I can't recall.   I don't --
17            **DEPUTY COMMISSIONER SHIELDS:**  Okay.   And I know, I
18    mean, you're really on the spot here.   So, let me switch
19    to -- okay.   Here's something interesting.   Let me switch
20    to your laudatory chronos.   You saved the life of a
21    fellow inmate in 1997?
22            **INMATE VALDIVIA:**  Yes, ma'am.
23            **DEPUTY COMMISSIONER SHIELDS:**  Tell me about that.
24            **INMATE VALDIVIA:**  We were in the chow hall eating
25    a hamburger or a cheeseburger and the onion got lodged in

1    his throat.  And so, he was telling me -- well, he wasn't

2    saying anything.  I'm like, what --

3         **DEPUTY COMMISSIONER SHIELDS:**  He was pointing to

4    his throat?

5         **INMATE VALDIVIA:**  Right.  His throat.  So, I

6    realized, you know, that he was getting something stuck

7    in his throat.  So, I went behind him and, like, did the

8    Heimlich maneuver on him and the onion came out.

9         **DEPUTY COMMISSIONER SHIELDS:**  That's kind of

10   dangerous to do that in a prison, isn't it?

11        **INMATE VALDIVIA:**  It is, it is.

12        **DEPUTY COMMISSIONER SHIELDS:**  That was a high-risk

13   thing.  Did you think about that at all?  That it could

14   be misinterpreted by custody and they'd think you were

15   fighting or --

16        **INMATE VALDIVIA:**  At that time, I didn't think

17   about it.  I just knew that if I didn't --

18        **DEPUTY COMMISSIONER SHIELDS:**  You just did it?

19   Okay.  Let me go -- you donated money in December to the

20   San Quentin Toy Program, participated in a walk/run-a-

21   thon for Children's Hospital.  And then, actually in

22   2005, you were commended for your efforts, skills, and

23   workmanship in manufacturing three seal rescue carriers

24   for the Marine Mammal Center in Sausalito.

25        **INMATE VALDIVIA:**  Yes, ma'am.

62

1          **DEPUTY COMMISSIONER SHIELDS:**  That was an

2     interesting assignment?

3          **INMATE VALDIVIA:**  Yes.  We did such a great job,

4     we have another one coming up next week.

5          **DEPUTY COMMISSIONER SHIELDS:**  Actually, when I

6     read that quickly, I saw seal and I saw marine, and I

7     thought it was a military vehicle.  So, that's why when

8     you said that -- then I think those are the recent ones,

9     unless we may have some more.  Let me go through what

10    you're vocations are.  Well, you know, I'm doing this

11    backwards.  You currently are working in sheet metal,

12    right?

13         **INMATE VALDIVIA:**  Yes, ma'am.

14         **DEPUTY COMMISSIONER SHIELDS:**  Okay.  So, that's

15    your job.  You also have a certificate in mechanical

16    drafting?

17         **INMATE VALDIVIA:**  Yes, ma'am.

18         **DEPUTY COMMISSIONER SHIELDS:**  Electronic data

19    processing?

20         **INMATE VALDIVIA:**  I have 1,500 hours in Electronic

21    Data Processing.

22         **DEPUTY COMMISSIONER SHIELDS:**  That's not a

23    certificate?

24         **INMATE VALDIVIA:**  Like (inaudible).

25         **DEPUTY COMMISSIONER SHIELDS:**  Okay.  Well, see, we

63

1    want to be kind of fair over here.

2         **INMATE VALDIVIA:**  What's HVAC duct work?

3         **DEPUTY COMMISSIONER SHIELDS:**  That's heating and

4    ventilation/air conditioning.  That's a duct work system

5    that you put on to run air through the house or building.

6    You run air, it goes through ducts.  It depends on what

7    you're running.

8         **DEPUTY COMMISSIONER SHIELDS:**  Okay.  And then you

9    got an AA degree in 2006 at Patton University?

10        **INMATE VALDIVIA:**  In 2007.

11        **DEPUTY COMMISSIONER SHIELDS:**  In 2007?  Here it

12   says -- oh, it says 2/9/06.  Is it 2/9/07?

13        **INMATE VALDIVIA:**  Actually, yes.  It's 2/9/07.  It

14   should be 2/9/07.

15        **DEPUTY COMMISSIONER SHIELDS:**  Okay.  Typographical

16   error.

17        **INMATE VALDIVIA:**  It's says on the first page

18   right there in that packet that I gave you.

19        **DEPUTY COMMISSIONER SHIELDS:**  Oh, 2007, you're

20   right.  Okay.  Let me go then to -- unless I've missed

21   something large.  I'm sure that there are individual

22   chronos and, unless they're very significant, I think

23   that we have a flavor of --

24        **ATTORNEY FOX:**  If I might, regarding -- let me

25   see, the disciplinary history.  Regarding the 115 in 1998

64

1    for hanging the sheet up, there is a notation that

2    although he was indeed --

3         **DEPUTY COMMISSIONER SHIELDS:**  Excuse me,

4    Counselor, no, if he wants to testify to this, that's

5    fine.

6         **ATTORNEY FOX:**  Okay.  Well, I'm just --

7         **DEPUTY COMMISSIONER SHIELDS:**  Well, if you want to

8    direct him to that, and if he wants to expand on that, he

9    can do that, but --

10        **ATTORNEY FOX:**  All right.  Well, just to say that

11   the credits were restored.  So, actually --

12        **DEPUTY COMMISSIONER SHIELDS:**  Okay.  That's fine.

13        **ATTORNEY FOX:**  -- the penalty that was imposed, I

14   just thought that would be something the Panel would find

15   relevant.  And then, also, regarding the 128(a) for the

16   laying-in, which is the most recent 115, it would appear

17   that Mr. Valdivia did not understand what --

18        **DEPUTY COMMISSIONER SHIELDS:**  You know, again, I

19   mean, if he has something more to add to that, I would

20   accept directly from him.  But to have it, sort of, in a

21   quasi-argument form --

22        **ATTORNEY FOX:**  It's in the -- if I may, it's not

23   just an argument, it's something that should exists as a

24   statement of fact in the C-File.  I was just trying to

25   save you having to go through it.

65

1        **DEPUTY COMMISSIONER SHIELDS:**  May I -- just give

2    me that copy and let me look at it.

3        **INMATE VALDIVIA:**  This is actually -- what I was

4    trying --

5        **ATTORNEY FOX:**  He can explain it.  Go ahead.

6        **INMATE VALDIVIA:**  I was trying to point out at the

7    time, it's a 2000 administrative 115 for lay-in order,

8    written by an MTA.  And at the time, the things that I --

9    it seems like I come across that I don't believe in

10   authority or I oppose authority or things of that nature.

11   I admit my wrongs.  In Step 10, when I'm wrong, I

12   promptly admit it.  I admit my wrongs when I'm wrong.

13   You know, at this time, I wasn't wrong, I was unaware

14   that practices are being -- are changing without notice

15   or without documentation.  You know, a 115 -- a lay-in

16   slip covers you.  This is so you don't go out of your

17   cell.  This is for your permission to lay in your cell.

18       **DEPUTY COMMISSIONER SHIELDS:**  Uh-huh.  Uh-huh.

19       **INMATE VALDIVIA:**  Right.  During --

20       **DEPUTY COMMISSIONER SHIELDS:**  It's a sick day.

21       **INMATE VALDIVIA:**  -  your works hours.

22       **DEPUTY COMMISSIONER SHIELDS:**  Right.  You get

23   a --

24       **INMATE VALDIVIA:**  You still go program at night.

25   But at this time, they changed the whole rules, and you

66

1    just stay in your house all day, and you don't come out.
2    You know?

3            **DEPUTY COMMISSIONER SHIELDS:**  Uh-huh.

4            **INMATE VALDIVIA:**  And my argument when that came
5    in, when the officer called me into the building, he
6    said, you know you're not supposed to be out?  And I
7    said, why?  He said, because you have lay-in.  I says,
8    yes, I have a lay-in, but that's during my work hours.
9    You know, I'm not at work right now, I'm at the program.
10   You know?  He says, well, they ordered you stay in.  I
11   says, I'm unaware of that.  Unless, I got docked for it,
12   and when I did some research on there, the guy that made
13   the order is not even supposed to be giving the order.
14   And I'm not trying to, justify anything.  I just knew the
15   rules at the time.  But evidently, a higher-up authority,
16   overruled that.  And that's how that -- that's why I
17   wanted to point out.  I'm not trying to argue authority.
18   You know, when I asked him the question about the lay-in,
19   and the authority of the lay-in, he (inaudible) and when
20   I spoke to him, well, they're not supposed to give you
21   orders.  You know?  They knew the rules violation wasn't
22   right.  Because that's -- I wasn't out during my work
23   hours.  I was in the cell.  It's in the evening program.

24           **ATTORNEY FOX:**  So, it would appear to be a
25   misunderstanding, not a willful disregard of the rules.

1           **INMATE VALDIVIA:** It wasn't.

2           **DEPUTY COMMISSIONER SHIELDS:** Well, I wasn't

3    characterizing it all. So, I -- actually you've drawn

4    far more attention to it than I would have, or even

5    probably considered it in -- in my decision. So, what

6    you're saying is that the Board report is incorrect in

7    the sense that --

8           **INMATE VALDIVIA:** No, not the Board --

9           **ATTORNEY FOX:** Well --

10          **DEPUTY COMMISSIONER SHIELDS:** No, excuse me. I

11   mean, if we're going to pursue this, let's lay it to

12   rest. On May 9th, 2000, there was a 115 for disobeying a

13   medical lay-in order, and he was found guilty. Now, it

14   turns out that in January 17th, 2002, it appears that

15   this -- that what you got is a clarification. The 115

16   wasn't overturned.

17          **INMATE VALDIVIA:** No, it wasn't overturned.

18          **DEPUTY COMMISSIONER SHIELDS:** Okay.

19          **INMATE VALDIVIA:** It was a clarification. Because

20   we're talking about my -- and I'm just approaching this

21   from the point of my disregarding authority or having a

22   problem with authority. You know, or disobeying orders,

23   when we're talking about the 115's. You know, and I just

24   wanted to point out, I'm not trying to create more

25   problems for myself than there is.

1          **DEPUTY COMMISSIONER SHIELDS:**  Uh-huh.

2          **INMATE VALDIVIA:**  I just had -- I just wanted to

3      point out that that's an example of a misunderstanding in

4      this situation.  I understand the rules, you know?  But I

5      can't follow rules if I don't know they've been changed.

6      But at the same time, getting docked for --

7          **DEPUTY COMMISSIONER SHIELDS:**  Well, let me ask

8      you, if you got a medical lay-in, then you're supposed to

9      be sick, right?

10          **INMATE VALDIVIA:**  Right.

11          **DEPUTY COMMISSIONER SHIELDS:**  How sick were you?

12          **INMATE VALDIVIA:**  Well, I had a -- I get migraine

13      headaches.  And then they become real bad and I get

14      distorted vision, I get nauseous, the whole works.

15          **DEPUTY COMMISSIONER SHIELDS:**  Uh-huh.

16          **INMATE VALDIVIA:**  And so, it occurred early in the

17      morning.  And so, when I get those, I usually just lay

18      down for a few hours.

19          **DEPUTY COMMISSIONER SHIELDS:**  Uh-huh.

20          **INMATE VALDIVIA:**  And that's what occurred at that

21      time.

22          **DEPUTY COMMISSIONER SHIELDS:**  So, then, you were

23      better later?

24          **INMATE VALDIVIA:**  And cleared.  You know --

25          **DEPUTY COMMISSIONER SHIELDS:**  So, then you got to

69

1    go out to the yard, and you didn't have to go work that
2    day.

3         **INMATE VALDIVIA:**  No, I didn't have -- it was
4    during my work hours.  I only work for six hours, seven
5    hours a day.

6         **DEPUTY COMMISSIONER SHIELDS:**  Uh-huh.

7         **INMATE VALDIVIA:**  But, that lay-in is to cover you
8    for that time --

9         **DEPUTY COMMISSIONER SHIELDS:**  Right.

10        **INMATE VALDIVIA:**  -- during your work hours.

11        **DEPUTY COMMISSIONER SHIELDS:**  Right.

12        **INMATE VALDIVIA:**  And so, it doesn't carry over
13   for the whole day.  As far as --

14        **DEPUTY COMMISSIONER SHIELDS:**  Well, apparently it
15   does.  Is what they're saying, they changed the policy.
16   Because it used to be, if you could get the lay-in --
17   because I happened to work in a Corrections institution
18   during this time.  So, I'm kind of aware of the fact the
19   MTAs were giving out lay-in slips.  I know for a fact
20   that suddenly they were under a lot of pressure to give
21   out lay-in slips, because people wanted to get a day off,
22   but they still wanted to get to do other things.  And so,
23   you got caught up in that little administrative melee,
24   where suddenly they put their foot down and went, this
25   thing's being abused, and the MTAs can't do it anymore --

70

1        **INMATE VALDIVIA:**   That's exactly what's happened.
2        **DEPUTY COMMISSIONER SHIELDS:**   -- and, bingo, so
3    you were standing there.

4        **ATTORNEY FOX:**   Okay.   So, I apologize using up all
5    the time, but I thought it was --

6        **DEPUTY COMMISSIONER SHIELDS:**   Okay.   Well,
7    now --

8        **ATTORNEY FOX:**   -- something we should understand.
9        **DEPUTY COMMISSIONER SHIELDS:**   But it doesn't, I
10   mean, are we going to do that?   I mean, we're talking
11   about, actually, 14 incidents.   Now, that's one of 14.   I
12   mean, the way I was looking at it, is there's a cluster
13   of, you know, problematic things that happened.   I mean,
14   as you well know, it's possible to have gentlemen come in
15   front of us with zero.   So, see that's what I'm saying,
16   whether it was 13 or 14, at this point, isn't
17   particularly relevant to me.   And I -- and I understand,
18   you know, the hazards of being inside a correctional
19   facility, because I've been there and things happen.   And
20   I -- and I think, also, your counselor can tell you that
21   we certainly have given dates to gentleman who -- we have
22   applied that knowledge.   That a 115 isn't, you know,
23   necessarily fatal to getting a date.   But, having done
24   that, let me go on to -- and is there something else?
25   After that, would you like to try and get something else

1   up?

2           **ATTORNEY FOX:**  No, I'll address it in closing.

3           **DEPUTY COMMISSIONER SHIELDS:**  Okay.

4           **ATTORNEY FOX:**  Thank you.  I appreciate your

5   comments.

6           **DEPUTY COMMISSIONER SHIELDS:**  Let me go to the

7   psychological, which was done March 20th, '06, by -- and

8   I think this is a lady.  So, is it Michelle Inaba?

9           **INMATE VALDIVIA:**  Inaba.

10          **DEPUTY COMMISSIONER SHIELDS:**  That's I-N-A-B-A.

11  She's a clinical psychologist.  It's a fairly lengthy

12  report.  Maybe not too lengthy.  But it's a number of

13  pages.  And she gives you a diagnosis of Adult Anti-

14  Social Behavior by History.  And that's on Axis I.  So, I

15  believe what she's referring to there is the incident.

16  And she also gives you a diagnosis of Alcohol Dependence

17  in Sustained Full Remission; and on Axis II, No

18  Diagnosis; on Axis III, Hypertension.  And I was going to

19  ask you, how is your health?

20          **INMATE VALDIVIA:**  It's -- it's good.

21          **DEPUTY COMMISSIONER SHIELDS:**  Other than -- do you

22  have heart problems?

23          **INMATE VALDIVIA:**  High blood pressure.  I had

24  open-heart surgery in '87 to solve a murmur.  So, the

25  only thing I get -- I get extra beats, palpitations,

72

1    arrhythmia, so, every now and then where I have the heart
2    just flutters for a minute.
3            **DEPUTY COMMISSIONER SHIELDS:**  Uh-huh.
4            **INMATE VALDIVIA:**  For a few seconds or so.  But
5    other than that --
6            **DEPUTY COMMISSIONER SHIELDS:**  And then your
7    stressor was a life sentence, and your GAF was 90.  I
8    believe with the Commissioner you addressed your
9    relationship with gangs.  See, here in the psychologist's
10   report, under Assessment of Dangerousness, the
11   psychologist also gets into the fact that you're -- that
12   Mr. Valdivia has been disciplinary free since May of
13   2000.  She notes that only one of these violations is for
14   a violent offense.  But then, she says the most
15   consistent limiting factor in Mr. Valdivia's
16   rehabilitation has been a history of problems with
17   authority, resulting in a number of rule violations for
18   attempting to circumvent institutional rules.  Having
19   said that, thought, I think that her impression of you
20   generally, is -- is positive.  I'm not going to go into
21   your juvenile life because the Commissioner addressed
22   that.  The psychologist does say,
23            "While it would be possible for Mr.
24            Valdivia to participate in additional
25            interventions or therapy programs, his

73

1           present level of functioning does not

2           indicate a need for any specific

3           programming."

4    She notes, and this is what I was saying and I think her

5    evaluation is positive, that you generally have impressed

6    people as being sincere and authentic.  That you're

7    coming across that way.  She says,

8           "Mr. Valdivia does not posses an anti-

9           social or criminal mentality that would

10          support the continuance of those life-

11          styles choices."

12   Referring to the ones you made in the past.  She goes on

13   to say, though,

14          "It's still possible that Mr. Valdivia

15          would be capable in errors of judgment.  He

16          is assertive, likes to think for himself,

17          and stand up for himself.  He trusts his

18          own judgment on matters.  This is both a

19          personality strength and weakness, as no

20          one's judgment is infallible."

21   But she goes onto somewhat mitigate that.  She gives you

22   credit for doing a lot of self-help and for getting

23   strength from your religion.  And then, I think, her

24   conclusion, this is in the old format, your overall

25   adjustment has been successful and is likely to continue,

74

1    as long as you maintain your sobriety.  Your potential

2    for violent recidivism in the community would be

3    considered to be low.  "

4            Present examiner would find -- concurs with

5            findings of previous examiners that Mr.

6            Valdivia would be expected to do very well

7            if parole was granted.  In reviewing the

8            reports of previous examiners, the present

9            examiner was not able to find any result

10           that was not supportive of Mr. Valdivia's

11           suitability for parole consideration.

12   I would, though, add that this isn't the main risk

13   assessment.  And that's all I have on this item.

14           **PRESIDING COMMISSIONER BRYSON:**  Sir, do you have a

15   Sheet Metal vocational certification?

16           **INMATE VALDIVIA:**  Yes, ma'am.

17           **PRESIDING COMMISSIONER BRYSON:**  Okay.  It's

18   important to know, too.

19           **INMATE VALDIVIA:**  It's in the packet.

20           **PRESIDING COMMISSIONER BRYSON:**  I'd like to ask,

21   at this time, if the District Attorney would like us to

22   take a brief recess so you can look through the material?

23           **DEPUTY DISTRICT ATTORNEY FREITAS:**  Actually, I --

24   I think I caught up far enough.  And based upon the

25   Commissioner's questions --

75

 1          **PRESIDING COMMISSIONER BRYSON:**  Sounds good.

 2          **DEPUTY DISTRICT ATTORNEY FREITAS:**   -- it doesn't

 3   appear to be necessary.

 4          **PRESIDING COMMISSIONER BRYSON:**  All right.

 5          **DEPUTY DISTRICT ATTORNEY FREITAS:**  Unless anyone

 6   else needs it.

 7          **PRESIDING COMMISSIONER BRYSON:**  No.  We're fine.

 8   Thank you.  Okay.  As to your parole plans, sir, and your

 9   letters of support.  I wanted to go in -- into that.  And

10   we do have a letter from Alpha Omega Ministries, and this

11   is Arais, A-R-A-I-S, June 6th, 2007.  He says, we're

12   prepared to provide Mr. Valdivia with spiritual and

13   emotional support, mentoring, leadership, and friendship

14   upon his release.  The care and ministry groups will

15   provide the necessary assistance to rebuild his life

16   through teaching, and principals, establishing the word

17   of God.  How do you know Mr. Arais?

18          **INMATE VALDIVIA:**  He's my mother's pastor.

19          **PRESIDING COMMISSIONER BRYSON:**  All right.

20          **INMATE VALDIVIA:**  And my sisters' and my

21   brothers'.

22          **PRESIDING COMMISSIONER BRYSON:**  Okay.  And then we

23   have a letter from -- to the Board from Center Force,

24   Lilly Harvey, this is of No More Tears.

25          **INMATE VALDIVIA:**  My sponsor.

76

1     **PRESIDING COMMISSIONER BRYSON:**  Your sponsor?  All

2    right.  And it says that you've been a dedicated

3    participated in the program's goal.  Making violence

4    prevention a priority for himself and his peers.  A very

5    good letter.  And then we have a letter from Vernal M.

6    Crittendon, C-R-I-T-T-E-N-D-O-N, Jr., retired.  He's a

7    Correctional employee who was assigned to San Quentin for

8    nearly 30 years, and is writing on behalf of Noel

9    Valdivia, and it says that,

10         "While assigned to the Warden's office and

11         serving as executive director of Real

12         Choices, reaching expanded adolescent

13         lives, a youth intervention program, I met

14         inmate Valdivia, Sr., approximately two

15         years ago."

16    It talks about becoming a facilitator for Real Choices.

17    We have a letter from your brother -- or excuse me, your

18    sister, Alicia Inahosa (phonetic).  This is dated May

19    24th, 2007, and she feels that you attempted to make

20    amends for your past behavior by embracing others and

21    that you have equipped yourself well.  She says, in fact,

22         "I am here for my brother to help him with

23         his transition back into society and have a

24         room here in my home in which he'll stay.

25         I will support him in every way possible."

77

1    And so, this is a very good letter of support and a

2    residence offer.  Is that something you might consider as

3    living arrangements?

4            **INMATE VALDIVIA:**  Yes, ma'am.

5            **PRESIDING COMMISSIONER BRYSON:**  Okay.  We also

6    have a letter from your brother, Albert Valdivia.  He

7    also writes as of April 25th of 2007 to show his support.

8    He says,

9            "I will provide a home for my brother, if

10           need be.  My wife and I have a home on

11           Telegraph Avenue in Stockton.  We are here

12           to help in anyway possible in his

13           rehabilitation and we'd welcome him into

14           our home."

15   And then we have a letter from, I believe it would be

16   your niece, Leticia Fuentes (phonetic).  And she she's

17   employed with San Joaquin County Courts,

18           "I am willing to offer any and all support

19           to my uncle.  Whether it be emotional,

20           social or financial.  I'm willing to help

21           him establish a new productive life.  I

22           know my uncle's mentality, his whole

23           person, is reformed."

24   Then we have a letter of March 3rd of 2007 from your

25   parents, Jose and Amalia Valdivia.  And they feel that

78

1    you're reformed.   (Inaudible) your decision.

2              "We're sorry for Noel's actions in taking

3              the life of Charles Wayne Decker.  We know

4              he's very sorry for committing such a

5              horrible crime.  And please find him

6              suitable, we'd like this Panel to know we

7              have a room in house for him.  We also have

8              vehicles, and I, his father, will drive him

9              to and from work and anywhere he needs to

10             be until he obtains his license.  Noel will

11             also be an added help to us around the

12             house, being that we are elderly."

13   And then we have two job offer letters.  One is from

14   Allied Heating and Air, and that's of April 30th of 2007

15   from Ernest A. Felix, the owner of Alliance HVAC.  And he

16   says that,

17             "I'm pleased to say at this time, Alliance

18             has one position available for sheet metal

19             worker.  We'd love to consider you for this

20             position.  If you could please contact my

21             office within the next 90 days, we could

22             schedule an appointment."

23   That's good.  How did you come to know about him?

24             **INMATE VALDIVIA:**  I sent a letter out to a couple

25   of job -- places of employment.

1            me with any questions."

2    So, it appears that you have multiple job opportunities

3    set up.  And have I missed anything, Counsel?

4            **ATTORNEY FOX:**  No.  I think you've covered

5    everything.

6            **PRESIDING COMMISSIONER BRYSON:**  All right.  And we

7    sent out 3042 Notices, those notices go to agencies

8    having an interest in your case.  And we do have a

9    representative of the San Joaquin County District

10   Attorney's Office present who will have the opportunity

11   to make a statement regarding parole suitability prior to

12   the conclusion of this hearing.  Commission Shields, do

13   you have anything?  Any questions that need to be

14   resolved?

15           **DEPUTY COMMISSIONER SHIELDS:**  No, I don't.

16           **PRESIDING COMMISSIONER BRYSON:**  All right.  Does

17   the District Attorney have questions of this inmate?

18           **DEPUTY DISTRICT ATTORNEY FREITAS:**  I do.

19   Mr. Valdivia, how long had you been out of custody before

20   you --

21           **PRESIDING COMMISSIONER BRYSON:**  Excuse me for

22   interrupting.  I would ask you to ask the --

23           **DEPUTY DISTRICT ATTORNEY FREITAS:**  Would the

24   Commissioners mind asking the inmate how long he had been

25   out of custody before he committed this offense?

81

1       **INMATE VALDIVIA:** Forty days.

2       **DEPUTY DISTRICT ATTORNEY FREITAS:** Would you mind

3  asking him if he was on probation at the time of this

4  offense?

5       **ATTORNEY FOX:** Objection. I think the record is

6  clear on that. We've already discussed it.

7       **PRESIDING COMMISSIONER BRYSON:** We did discuss

8  these very points, sir. Is there something, in

9  particular, you were going toward here?

10       **DEPUTY DISTRICT ATTORNEY FREITAS:** Oh, I'm sorry.

11  I didn't have any notes on 40 days.

12       **PRESIDING COMMISSIONER BRYSON:** Oh, okay.

13       **DEPUTY DISTRICT ATTORNEY FREITAS:** And that he had

14  been on probation.

15       **DEPUTY COMMISSIONER SHIELDS:** Actually, I'm

16  finding it relevant.

17       **PRESIDING COMMISSIONER BRYSON:** It is relevant,

18  but we did already go over this. She is right about

19  that.

20       **DEPUTY COMMISSIONER SHIELDS:** Okay.

21       **DEPUTY DISTRICT ATTORNEY FREITAS:** The person you

22  murdered, Mr. Decker, he was unarmed?

23       **INMATE VALDIVIA:** Yes.

24       **DEPUTY DISTRICT ATTORNEY FREITAS:** And you said

25  his age was about 59 years old. Did you know him to be

82

1    the owner of the furniture store where he was?

2          **INMATE VALDIVIA:**  No, sir.

3          **DEPUTY DISTRICT ATTORNEY FREITAS:**  Did you know

4    that he was the owner of the apartments directly above

5    the furniture store?

6          **INMATE VALDIVIA:**  No.

7          **DEPUTY DISTRICT ATTORNEY FREITAS:**  Did you ever

8    read in the police reports that he had returned there

9    because there was a power outage and was helping one of

10   his tenants wait for PG&E?

11         **INMATE VALDIVIA:**  Yes.  A few years ago, I got

12   the -- I actually got records of it, the police report,

13   and I read through it, so I found out.

14         **DEPUTY DISTRICT ATTORNEY FREITAS:**  So, he was no

15   way involved in -- in a criminal activity that you

16   alluded to, occurring in that strip?

17         **INMATE VALDIVIA:**  No, sir, not that I know of.

18         **DEPUTY DISTRICT ATTORNEY FREITAS:**  Did you load

19   the gun?

20         **INMATE VALDIVIA:**  No.

21         **DEPUTY DISTRICT ATTORNEY FREITAS:**  But you knew

22   the gun was loaded?

23         **INMATE VALDIVIA:**  Yes, sir.

24         **DEPUTY DISTRICT ATTORNEY FREITAS:**  Did you make

25   sure the safety was disabled before you began in your

83

1   robbery?

2       **INMATE VALDIVIA:**  I -- I don't recall.  I knew it

3   wasn't -- the safety wasn't on.  I don't recall ever

4   moving it or changing it or anything of that nature.

5       **DEPUTY DISTRICT ATTORNEY FREITAS:**  So, when you

6   pointed the gun at Mr. Decker's head, you knew that the

7   safety was off --

8       **PRESIDING COMMISSIONER BRYSON:**  Sir, I must ask

9   you to do that in third person.  It has to be done that

10  way.  You have to address your questions to the Panel.

11      **DEPUTY DISTRICT ATTORNEY FREITAS:**  Okay.

12      **PRESIDING COMMISSIONER BRYSON:**  Thank you.

13      **DEPUTY DISTRICT ATTORNEY FREITAS:**  So, would the

14  Panel ask him if when the gun was -- he pointed the gun

15  at Mr. Decker's head, he knew that he was pointing a

16  loaded weapon that was capable and ready to be fired?

17      **INMATE VALDIVIA:**  Yes.

18      **DEPUTY DISTRICT ATTORNEY FREITAS:**  When the police

19  officers -- did he lie to the police officers when he was

20  arrested?

21      **INMATE VALDIVIA:**  Yes.

22      **DEPUTY DISTRICT ATTORNEY FREITAS:**  You denied

23  all -- did he deny all involvement in this crime?

24      **INMATE VALDIVIA:**  Yes.

25      **DEPUTY DISTRICT ATTORNEY FREITAS:**  Did you solicit

84

1      your girlfriend -- did he solicit Celeste Aguirre

2      (phonetic) your girlfriend, to give a false statement to

3      an investigator, creating an alibi for you?

4            **INMATE VALDIVIA:**  Yes.

5            **DEPUTY DISTRICT ATTORNEY FREITAS:**  You were aware

6      that -- was he aware that the surviving victim,

7      Mr. Charles Thomas, described him as shooting Mr. Decker

8      for no reason?

9            **INMATE VALDIVIA:**  First of all, let me clarify

10     something.  I made my girlfriend give an alibi.  In other

11     words, I forced her to give an alibi.  She didn't do that

12     on her own voluntarily.  Also, the other question was --

13     excuse me, can you repeat it again?

14           **DEPUTY DISTRICT ATTORNEY FREITAS:**  Was he aware

15     that, from the police reports that he reviewed, that the

16     second victim, Charles Thomas, said that Mr. Decker was

17     shot for no reason?

18           **INMATE VALDIVIA:**  Yes.  I remember reading that.

19     And I further read, that after a second interview, he

20     mentioned that he didn't see anything to know what

21     happened.

22           **DEPUTY DISTRICT ATTORNEY FREITAS:**  Was he aware

23     that no witness has ever corroborated his accounts that

24     Mr. Decker reached for the gun?

25           **INMATE VALDIVIA:**  Yes.  Because, all the witnesses

85

1   mentioned that they didn't see what happened.

2        **DEPUTY DISTRICT ATTORNEY FREITAS:**  Well, was he

3   aware that one of the witnesses was his accomplice, who

4   gave a statement to the police, and didn't describe what

5   he's described here today?

6        **ATTORNEY FOX:**  I'll pose an objection at this

7   point.  We're not here to retry the case.  The facts are

8   the facts, Mr. Valdivia stands convicted of a murder one,

9   and I think going into the facts in this detail is simply

10  an effort to re-try the case.  It's not the reason we're

11  here, we're here to discuss suitability.

12       **PRESIDING COMMISSIONER BRYSON:**  I'll let the

13  present question stand, but were you going somewhere with

14  the line of questioning?

15       **DEPUTY DISTRICT ATTORNEY FREITAS:**  I think that

16  was my last question on that subject.

17       **PRESIDING COMMISSIONER BRYSON:**  Would you like to

18  restate the question, sir?

19       **DEPUTY DISTRICT ATTORNEY FREITAS:**  Sure.  Was he

20  aware that no witness -- I'm sorry, that his accomplice

21  with him, the one he describes as having the sawed-off

22  .22 shotgun, did not describe Mr. Decker grabbing the gun

23  when he spoke with the police upon his arrest?

24       **INMATE VALDIVIA:**  Yes.  He mentioned that he was

25  looking down at the other victim or at the water.  He

1    said he didn't see anything.

2          **DEPUTY DISTRICT ATTORNEY FREITAS:**  Was he aware

3    from the police report that Charles Thomas' words to the

4    police officer was, he threw his wallet down on the

5    ground, and when the second subject went to pick up the

6    wallet, the -- Mr. Valdivia, the inmate, pointed the gun

7    and shot at Mr. Decker for no reason?

8          **ATTORNEY FOX:**  Objection.  Again, we're not here

9    to retry the case.  I think it's vague as to time, and

10   also it's compound and confusing.

11         **PRESIDING COMMISSIONER BRYSON:**  If you could

12   restate that question, sir?  And then you said that was

13   your last question; is that correct?

14         **DEPUTY DISTRICT ATTORNEY FREITAS:**  As to that

15   area, sure.

16         **PRESIDING COMMISSIONER BRYSON:**  As to that area?

17   Okay.  Will you please restate that question?  Because

18   it's -- I didn't understand the question either.

19         **DEPUTY DISTRICT ATTORNEY FREITAS:**  Was he aware

20   the second victim, Charles Thomas, told the police

21   officers in his interview with the detectives that Mr.

22   Valdivia pointed the gun and shot Mr. Decker for no

23   reason?

24         **ATTORNEY FOX:**  At what time would he have been

25   aware of that?  It's vague as to time.

87

1        **DEPUTY DISTRICT ATTORNEY FREITAS:**  When he read
2   the reports.

3        **INMATE VALDIVIA:**  I answered that question, and I
4   also, like I mentioned before, I also read that in the
5   second interview Mr. Thomas stated that he didn't see
6   anything.  He doesn't know because he didn't see
7   anything.

8        **DEPUTY DISTRICT ATTORNEY FREITAS:**  The offense
9   that you were on probation for that you had been released
10  40 days prior to this, was -- could you answer me if that
11  was a gun-related offense?

12       **INMATE VALDIVIA:**  Yes.  It was a gun-related.  I
13  mentioned that to the Commissioner when she asked the
14  question.

15       **DEPUTY DISTRICT ATTORNEY FREITAS:**  You said
16  earlier -- I believe you said you earlier that he was
17  arrested on July 17th, 1981.  Was that a misstatement?
18  Did he -- I believe the offense was actually 1980?

19       **INMATE VALDIVIA:**  Oh, yes.  Excuse me.  It was
20  1980, July 17, 1980.

21       **DEPUTY DISTRICT ATTORNEY FREITAS:**  Did he make any
22  attempts to assist law enforcement in the solving of this
23  crime?

24       **INMATE VALDIVIA:**  No.

25       **DEPUTY DISTRICT ATTORNEY FREITAS:**  Did he --

88

1          **ATTORNEY FOX:**  I would object to that, because he

2     did enter a plea of guilty at some point.  And I think

3     that would have been assistance to the officers.

4          **DEPUTY DISTRICT ATTORNEY FREITAS:**  Other than

5     plead guilty, did you agree to testify against

6     codefendants?

7          **INMATE VALDIVIA:**  No.  Initially I didn't.  And --

8     and when I plead guilty, it was a plea bargain between me

9     and the D.A., and my crime partner plead guilty as well.

10    So, initially, I didn't cooperate and when it came to

11    that point in my realization and that's when I plead

12    guilty.

13         **DEPUTY DISTRICT ATTORNEY FREITAS:**  Have you ever

14    assisted in the prosecution of people who provided you

15    the gun that day?

16         **ATTORNEY FOX:**  I'm sorry, I didn't understand --

17         **DEPUTY DISTRICT ATTORNEY FREITAS:**  Has he ever

18    assisted in the prosecution of the people who provided

19    the gun that day?

20         **INMATE VALDIVIA:**  No.

21         **DEPUTY DISTRICT ATTORNEY FREITAS:**  Has he ever

22    paid restitution to Mr. Decker's widow?

23         **INMATE VALDIVIA:**  Excuse me.  I want to just ask

24    the District Attorney why he's continuously retrying the

25    case?

89

1 **PRESIDING COMMISSIONER BRYSON:**  He's not retrying

2 the case now.  He's asking some questions about what

3 you've done after the crime, sir.  And those are

4 realistic questions.

5 **INMATE VALDIVIA:**  Okay.

6 **PRESIDING COMMISSIONER BRYSON:**  Have you ever paid

7 restitution?

8 **INMATE VALDIVIA:**  Oh, no, not -- but he mentioned

9 about the gun.  Did I assist --

10 **ATTORNEY FOX:**  That question's done.

11 **DEPUTY COMMISSIONER SHIELDS:**  You know, actually,

12 let me ask a follow-up question to that.  Did you ever

13 assist in the prosecution of whoever got rid of the gun?

14 **INMATE VALDIVIA:**  No.  I don't know what happened

15 to the gun.

16 **ATTORNEY FOX:**  Did anyone ask you to participate

17 in any investigation?

18 **INMATE VALDIVIA:**  No.

19 **ATTORNEY FOX:**  Thank you.

20 **DEPUTY DISTRICT ATTORNEY FREITAS:**  The people that

21 drove you from the robbery, did you ever assist in their

22 prosecution?

23 **INMATE VALDIVIA:**  No.  They assisted in mine.

24 **DEPUTY DISTRICT ATTORNEY FREITAS:**  At the time he

25 was a member, would he characterize Little Unity as the

90

1    most violent game in Stockton?

2        **ATTORNEY FOX:** I'm going to objection. Again,
3    we're not here to retry the case. The facts are what
4    they are and it's on record. And I think this is getting
5    pretty far a field.

6        **PRESIDING COMMISSIONER BRYSON:** As far as the
7    characterization of the gang itself, I would leave that
8    to the District Attorney for closing.

9        **DEPUTY DISTRICT ATTORNEY FREITAS:** Okay. You --
10   was he -- he was never forced to be a member of Little
11   Unity under any duress or threats?

12       **INMATE VALDIVIA:** No.

13       **DEPUTY DISTRICT ATTORNEY FREITAS:** How -- maybe he
14   could tell the Commission how long he was a member of
15   Little Unity?

16       **INMATE VALDIVIA:** I think I mentioned from the age
17   of 15?

18       **PRESIDING COMMISSIONER BRYSON:** You said 14.

19       **INMATE VALDIVIA:** Fourteen -- 15, something like
20   that.

21       **DEPUTY DISTRICT ATTORNEY FREITAS:** I'm sorry, my
22   notes didn't reflect that. He was arrested for the
23   beating and stabbing by the Little Unity gang members of
24   Lee Ardis Morgan (phonetic), occurring at Church's
25   Chicken on Charter Way on March 31st, 1979?

1        **ATTORNEY FOX:**  I'm going to object.  I think the
2   record states there was a detention only in that matter.
3        **PRESIDING COMMISSIONER BRYSON:**  Was this the
4   assault with a deadly weapon charge?
5        **DEPUTY DISTRICT ATTORNEY FREITAS:**  No.  It's a
6   murder charge.
7        **PRESIDING COMMISSIONER BRYSON:**  Was that
8   dismissed?
9        **DEPUTY DISTRICT ATTORNEY FREITAS:**  I was going to
10  ask why that happened.
11       **ATTORNEY FOX:**  I'm going to object.  The record is
12  what it is and I'll instruct my client not to answer.
13  Because I don't think it's relevant.
14       **DEPUTY DISTRICT ATTORNEY FREITAS:**  Well, it
15  actually --
16       **ATTORNEY FOX:**  And, in fact, it's argumentative.
17       **DEPUTY DISTRICT ATTORNEY FREITAS:**  The police
18  officers followed an investigation after several
19  individuals participated in the beating and the stabbing
20  of in front of the store.
21       **ATTORNEY FOX:**  I'm going to object.  The District
22  Attorney, if he'd like to testify, he should go under
23  oath and testify.
24       **DEPUTY DISTRICT ATTORNEY FREITAS:**  I think I can
25  answer the objection.  And, they found the defendant

92

1    hiding in the -- in front of the house in the vehicle in

2    which the people had ran into.  He was later prosecuted

3    under this.  I'm just wonder if he knew --

4         **PRESIDING COMMISSIONER BRYSON:**  He was prosecuted

5    under this?

6         **DEPUTY DISTRICT ATTORNEY FREITAS:**  He was

7    prosecuted, but --

8         **PRESIDING COMMISSIONER BRYSON:**  And what was the

9    result of that prosecution?

10        **DEPUTY DISTRICT ATTORNEY FREITAS:**  Sorry.

11   Petitioner alleging -- was subsequently filed on June --

12   something -- 1979, it's very faded.  The petition was

13   dismissed without prejudice to file a new one.

14        **PRESIDING COMMISSIONER BRYSON:**  Okay.  So, it was

15   a dismissed charge?

16        **DEPUTY DISTRICT ATTORNEY FREITAS:**  Right.  I was

17   wondering if he knew why the charges were dismissed?

18        **ATTORNEY FOX:**  I'm going to object as to relevance

19   and instruct my client not to answer.  So, please don't

20   answer.

21        **DEPUTY DISTRICT ATTORNEY FREITAS:**  That's fine.

22        **PRESIDING COMMISSIONER BRYSON:**  Okay.  I'll

23   sustain that objection, because unless -- since that

24   charge was dismissed --

25        **ATTORNEY FOX:**  It's hearsay.  Yes.

93

1          **PRESIDING COMMISSIONER BRYSON:**  -- we can't really

2     consider that charge.

3          **DEPUTY DISTRICT ATTORNEY FREITAS:**  Did he

4     participate in the witness intimidation that occurred

5     during the trial -- I'm sorry, during the preliminary

6     examination, specifically, the letters to the witnesses,

7     and the slashing of their tires?  Did he, in any way,

8     orchestrate any of that during the preliminary

9     examination of the murder charge in this case?

10         **ATTORNEY FOX:**  I'm going to object as to that.

11    There might be victim implications.  And, again, I think

12    it's irrelevant.  And, again, the District Attorney is

13    bringing new facts in that are not part of the record.

14    And so, for those reasons, they're unreliable and -- and

15    irrelevant.

16         **PRESIDING COMMISSIONER BRYSON:**  And we don't have

17    that in our records.

18         **DEPUTY COMMISSIONER SHIELDS:**  What is the source

19    of that information?

20         **DEPUTY DISTRICT ATTORNEY FREITAS:**  It was in my

21    file, in reports that we've had generated from the CDC.

22    It's in the police report.

23         **PRESIDING COMMISSIONER BRYSON:**  Can you point us

24    to those?  Is this in fact in the first report?

25         **DEPUTY DISTRICT ATTORNEY FREITAS:**  Yes.

94

1          **PRESIDING COMMISSIONER BRYSON:**  Some of this I was

2    unable to read because it just wasn't --

3          **DEPUTY COMMISSIONER SHIELDS:**  Right.

4          **PRESIDING COMMISSIONER BRYSON:**  -- it was

5    unreadable.

6          **ATTORNEY FOX:**  Do you have the pages, Counselor?

7          **DEPUTY COMMISSIONER SHIELDS:**  He has to find the

8    document first.

9          **PRESIDING COMMISSIONER BRYSON:**  Okay.  We do have

10   some documentation.  First of all, is this under legal

11   documents?

12         **DEPUTY DISTRICT ATTORNEY FREITAS:**  Yes.

13         **PRESIDING COMMISSIONER BRYSON:**  Okay.

14         **ATTORNEY FOX:**  All right.  I'll withdraw any

15   objection I had.  Mr. Valdivia will save some time and

16   answer.  So, was there anything (inaudible)?

17         **INMATE VALDIVIA:**  Was I involved in the

18   (inaudible)?

19         **ATTORNEY FOX:**  Counsel, is that your question?

20   He's willing --

21         **DEPUTY DISTRICT ATTORNEY FREITAS:**  I think it was,

22   yes.

23         **ATTORNEY FOX:**  All right.

24         **INMATE VALDIVIA:**  No.

25         **DEPUTY COMMISSIONER SHIELDS:**  I -- I would like to

95

1    inquire, is there a document -- what's the source of this
2    information?  Have you found the document -- is this the
3    document we're talking about?  The --

4        **PRESIDING COMMISSIONER BRYSON:**  Well, that's the
5    probation officer's report.

6        **DEPUTY DISTRICT ATTORNEY FREITAS:**  No.  It was a
7    report in the legal documents taken by the investigating
8    officers and the detectives referring to events that
9    occurred during the preliminary examination by some of
10   the witnesses.

11       **PRESIDING COMMISSIONER BRYSON:**  Well, the question
12   has been asked and answered, as far as I can -- Okay.
13   But we can research that information subsequently.  But
14   it is in the police reports you're saying; is that right,
15   sir?

16       **DEPUTY DISTRICT ATTORNEY FREITAS:**  Sure.

17       **PRESIDING COMMISSIONER BRYSON:**  Okay.  Let's move
18   on and do that.  And if you, or if anyone, finds it we'll
19   make sure it's mentioned.

20       **ATTORNEY FOX:**  Okay.

21       **DEPUTY DISTRICT ATTORNEY FREITAS:**  I think those
22   were the questions I had.  Thank you very much.

23       **PRESIDING COMMISSIONER BRYSON:**  Thank you.  All
24   right, Counsel, any questions that haven't been covered
25   at this time?

96

1          **ATTORNEY FOX:**  No.  No questions.

2          **PRESIDING COMMISSIONER BRYSON:**  All right.  Then

3     I'd like to invite the District Attorney to make a

4     closing statement.

5          **DEPUTY DISTRICT ATTORNEY FREITAS:**  Thank you.  The

6     murder of Charles Decker was an extremely heinous crime I

7     in the City of Stockton.  Mr. Decker was a furniture

8     storeowner who also rented apartments above his building

9     in downtown Stockton.  He was 59 years old.  He posed no

10    threat to Mr. Valdivia in any way, shape, or form.  He

11    had come down there that night because the power was out;

12    he was waiting with his tenant, Charles Thomas, the

13    second victim, when the defendant, who had been engaged

14    in an extremely aggravated history of crime, approached

15    them and shot them, as Mr. Thomas describes in the legal

16    documents and the crime report for no reason.  This was

17    after Mr. Thomas had complied with their demands,

18    provided his wallet, and had -- was unarmed and posed

19    absolutely no threat to him.  We see that his conduct

20    afterwards was that he had lied to police, that he was on

21    probation, on community release at the time only being

22    out for 40 days from another firearms offense, and in

23    fact, lied to the police officer upon his arrest,

24    solicited other individuals to, in fact, lie for him, and

25    in fact, was a member of these most violent gang in

97

1    Stockton at that time, Little Unity.  A group that he

2    even admitted here today, he chose to be with and, in

3    fact, chose to participate in numerous activities, many

4    of which have been documented throughout his file.  So,

5    because of the atrociousness of crime, and because of

6    factors that were brought out during hearing, the

7    District Attorney of San Joaquin County opposes his

8    parole.

9         **PRESIDING COMMISSIONER BRYSON:**  Thank you.

10   Counsel, I'd like to invite you to make a closing

11   statement.

12        **ATTORNEY FOX:**  Okay.  I respectfully disagree with

13   my colleague from San Joaquin, which comes as no

14   surprise, I guess.  Mr. Valdivia should be found suitable

15   today for parole, because he is.  Turning to the Board

16   report, it is supportive and it is comprehensive.  Going

17   through the various laudatory chronos and other ways to

18   document the history of Mr. Valdivia in custody.  Things

19   he's done to improve himself, as far as getting

20   educational upgrading, and self-help upgrading.  And of

21   note, regarding the self-help, he has doggedly pursued

22   the Impact Program.  Not being able to complete it day

23   after day, but picking it up as it became available to

24   him, and I think that speaks volumes as to his dedication

25   to self-help.  During that same period of time, he was

98

1    obtaining other certificates of self-help programs as

2    well.  And it wasn't my intention earlier on to divert

3    the attention of the Panel from the 115's.  What I

4    intended to offer were not excuses, but amplifications,

5    and explanations.  And I certainly did not intend to be

6    argumentative.  I just wanted to make sure the record was

7    clear on those two points.  Also, in his history, we did

8    hear of his acting reflexively to the aid of another

9    inmate who was choking, without a second thought to

10   himself.  Here he saw a human being in distress and

11   immediately went to the aid of that person.  So, I think

12   that speaks volumes.  There has been no indication of

13   gang involvement since he's been in custody.  Certainly,

14   something would have appeared if that were the case.  We

15   see a number of out of bounds or late to work, so I think

16   that the gang involvement is something that's long behind

17   him now.  Turning to -- oh, and I wanted to note also for

18   the record, that there were 14 incidents of conduct that

19   were referred to earlier as disciplinaries, but the Court

20   of Appeals tells us that the 128(a)'s are custodial

21   chronos and are not to be considered as disciplinaries.

22   They're more of custodial comments.  So, I wanted the

23   record to be clear on that.  Turning to the psychological

24   evaluation, over the years they've been consistently

25   supportive.  And, although the format has changed, the

```
 1    conclusions of the clinicians will not.  Mr. Valdivia
 2    would pose a low risk of harm to the community.  Turning
 3    to the parole plans, the residential plans are both
 4    viable and verifiable.  There are numerous residential
 5    plans.  So, if things get a little uncomfortable in one
 6    place, too many people want a little piece of him, and
 7    there's time, he can go to another place to seek a little
 8    bit of time for himself.  Turning to employment, he has
 9    numerous offers, and he also has numerous marketable
10    skills.  And thirdly, he has a support network, which
11    includes practical, as well as spiritual matters.  And
12    all of these things portend a successful completion of
13    parole.  I would request that the Panel review the
14    documents supported -- or provided to them today, which
15    contain other support letters, I believe, that may be a
16    little older.  But it does show the consistent, sustained
17    support of his family.  And lastly, I would remind the
18    Panel that the District Attorney's comments are not
19    evidence and ask that they be given the weight that --
20    that they are entitled to.  So, I think it would be
21    appropriate to find Mr. Valdivia suitable, and set a date
22    in the future for his release.  I'll submit on that,
23    unless there's anything Mr. Valdivia would like to add.
24         PRESIDING COMMISSIONER BRYSON:  Sir, are you
25    suitable for parole?
```

100

1        **INMATE VALDIVIA:**  Yes, ma'am.

2        **PRESIDING COMMISSIONER BRYSON:**  Why?

3        **INMATE VALDIVIA:**  Because I've got all the skills

4    and tools -- I've gained the tools necessary to succeed

5    on parole.  I'm saying I'm not the misplaced person that

6    I was 27 years ago.  At that time, that lifetime, I gave

7    myself that kind of lifestyle.  That's what I allowed

8    myself to draw into.  Like I mentioned, since my

9    conversion, I've worked hard to change my life.  And I've

10    had falls, I've had slip ups, but not to the point to

11    where I would commit another crime.  I -- there's many

12    tools that I've picked up along the way.  The first one

13    that can come to mind, of course, is the Alcoholic's

14    Anonymous.  And, I'm admitting I was wrong and I'm

15    admitting that I had a problem with alcohol.  And my life

16    was unmanageable.  Because my life was unmanageable.  And

17    then, I kept that -- I worked on that, and I jumped on

18    that, and I changed that.  The other program that I can

19    think of that really helped me a lot is the I Can

20    Program.  The ability to gain confidence that I can -- I

21    can change.  I can be different.  The Breaking Barriers

22    Program that I took where it talks about sealing out the

23    gaps, the blind spots that you don't see in your life,

24    that they point out to you, that gets you in trouble.

25    And the experience along those when we play chess.  We

1    make bad moves, we don't see the other guy coming to
2    attack.  So, that's scotoma -- it's called scotoma --
3    blind spots.  Also, the Alternative to Violence Program
4    I've taken, along with the No Broken Trust and the No
5    More Tears, response to violence.  Changing your
6    mindset -- you know, the mindset that I came in with when
7    I came in here, is the law that was an anti-social law.
8    You know, laws that were developed and a culture that are
9    anti-social, that do not -- they're not in accordance
10   with the laws of society.  And I had to change those.  I
11   had to let those go, because they're not right.  I
12   developed tools; when I'm in situation of violence, I can
13   walk away, and I could -- I could utilize those tools in
14   an approach, in a diplomatic or communication through
15   understanding, realization, recognition.  There's another
16   thing that I studied called Emotional Intelligence.
17   There's a book I read, it's called I.Q. versus E.Q.  And
18   a lot of the problems -- when I read that I found a lot
19   of the problems had to do with my emotional instability.
20   Which is the driving force of it was the delay of
21   gratification -- the lack of delay of gratification.  And
22   the need, and want, for instant gratification.  Not
23   understanding, you know, the time and the patience and
24   sacrifice to wait on the good things, instead of trying
25   to take everything right now.  You know, you assume

102

1    that -- myself in approaching the negative, unlawful
2    approach to gain these instant gratifications.  Another
3    thing is, I took a couple Impact classes, and I'm in
4    another one right now, dealing with life skills.  But,
5    the education, the college program, come to enlighten to
6    society, into the world out there.  And at one time, I
7    was confined to this little as is.  And you mention this
8    gang; this was my world.  Now, I grew to expand my life.
9    I've -- there's a world out there, and through this
10   college program, I was able to learn a lot of different
11   things.  Excuse me, I was going to say beliefs, but --
12   different ideologies.  I just seen the world.  You know,
13   and I continue to see the world.  I want -- I want to
14   continue to be my B.A., the only reason I haven't
15   approached to take the B.A. is because they don't have a
16   B.A. program here.  You know, I hope to -- my goal is to
17   not only get a master's, but get a doctorate.  And I
18   believe I can do it.  As I mentioned before, when I was a
19   kid, I had these qualities; I still have them.  But their
20   place, you know, I'm not the same guy from 27 years ago.
21   And, like I mentioned, I made mistakes.  But I have these
22   tools that I could draw upon; Alcoholics Anonymous, I
23   located an Alcoholics Anonymous place in Stockton.  I
24   didn't locate a sponsor yet, I'll get that when I get
25   there.  But I have a whole church, I have a whole family,

103

1    over 30-something members, 20 of them which are adults,
2    are there to support me.  They're to help me.  My
3    brother, Albert, my angel is going to be by my side.  And
4    these tools that I picked up, along with the support, are
5    going to help me succeed.  You know, if I feel -- like I
6    mentioned, when I was walking from work, this practice
7    that came right to my mind, I'm going to -- you know, and
8    at the same time, I was able to point out to him that he
9    was wrong.  And later on, that prisoner came me and says,
10   you know what, you're right.  And that was an opportunity
11   to tell him, you guys don't realize that, but those are
12   the simple things that bring you right back to prison.
13   You know, and he was right -- I mean, he told me, you're
14   right.  Also, I have that -- like I said, AA, if I
15   have -- if I need somebody.  You know, from the way it
16   looks and from the all support I have, I'm going to look
17   like I'm going to need get away from somebody to have my
18   own time.  But, nevertheless, I have the support.  If I
19   need -- I feel I need to drink or I feel the need to
20   dabble in drugs, which today I'm sober.  You know,
21   today's another day.  But if I ever get those kinds of
22   thoughts start battling with me, I know I could run to
23   the AA program.  I know I can run to church, I know I can
24   call somebody on the phone.  And I -- I had a visit last
25   weekend, and a couple of my nephews came, and I told

104

1    them, look, I'm going to need you guys. I said, I'm
2    going need you guys to stay on top of everything --
3    everything that doesn't appear right. It's got to get
4    out of the way. I said -- so, I'm equipped with the
5    tools I have. I have skills. At that time, 27 years
6    ago, I didn't have those skills. I didn't have a GED, I
7    didn't have a high school diploma, I didn't have the
8    vocational training. I had no skills; I worked where I
9    could. And, at that moment, I fell into a spot where I
10   didn't know where I was going. I had no confidence in
11   what I was doing. That young kid that grew up working,
12   taking the lawnmower to cut grass to make money and give
13   to the parents, you know, every -- we can get back to
14   that. Every birthday my mom had when I was out there,
15   when I was an adolescent, a teenager, until that time, I
16   would buy her a present. I would go find jobs and do
17   something and buy her a present for her birthday. I lost
18   that, I destroyed that. But now, I have the tools. I'm
19   a sheet metal -- the skills are comparable to a
20   journeyman-level skills. And the only reason I'm not in
21   the Union right now is because the Union will not pick up
22   termed life prisoners. But, however, they tell you, when
23   you get out, come see us. There's one person in
24   particular, Eddie Ramirez, that is a lifer that just got
25   out about three years, and he's working in the Union.

105

1    And even though he has sheet metal journeyman-level
2    skills, as I do, they placed him at a third level
3    apprenticeship.  You know, $16 -- $16, I think, an hour.
4    But, I'm willing to start there.  Because I know my
5    skills can take me higher, to the point of getting $30,
6    $35 an hour in the trade.  Also, I have skills to branch
7    out and start my own business, if I so desire.  I can do
8    that on my own.  I was responsible for the sheet metal
9    shop in Folsom.  And the chrono, I don't know if you read
10   in there, I fabricated an air conditioning system for --
11   for an air conditioning system to use -- I can't remember
12   what it was -- but it was a big warehouse, and I
13   constructed that whole thing by myself.  So, I have the
14   skills, I have the tools necessary.  The victim, with
15   respect to the victim, I speak and I never speak without
16   recognizing the victim and the victim's families.  I've
17   left a trail of victims.  Not only, the victims that I
18   hurt personally in this crime, but the families, my
19   families, and every time I do something wrong, you know,
20   or every time -- every time that I may do something
21   wrong, I have a potential for leaving the victims.  And
22   that's what I would never do again.  I will never do that
23   again.  I'll put myself out there.  I mentioned before
24   about my brother, Rick.  Rick died in 1994.  Prior to his
25   death, he was my mentor.  And he was teaching -- he was a

 1     man.  At 17 years old, he set out and he got married.  He

 2     built his family.  He became a working-man until the day

 3     he died.  And he was always on my side.  And I attribute

 4     a lot of my thoughts and my abilities to his help.  He

 5     encouraged me to push me out and say I can accomplish my

 6     goals.  I -- excuse me -- my parents, they're older;

 7     they're -- my dad's about 80, my mom's 79.  They need

 8     assistance.  For any -- you know, for any other reason, I

 9     would want to get out just to give them something back of

10     their life.  And, again, I speak in regard to the victim,

11     not setting aside, but everyday, you know, working

12     towards that -- the goal to give back of that which I

13     have taken in taking a life.  And I realize that, and I

14     know that all the time I never go by without thinking

15     that, you know, I have to do something that's one of my

16     driving forces; to give back to the community.  To say I

17     have to pay back.  Because that's in me.  It's not

18     something that, you know, the program says to do.  You

19     know.  And I'll close with this; I work with children.  I

20     work with the youth.  I know what makes them tick.  I

21     have the experience to talk to them.  I talk to them all

22     the time when they come in.  It is my goal and my vision;

23     it's not printed out on any paper.  It's in my mind and

24     in my heart, to start, you know, a thousand kid club.

25     You know?  Because, just the way I grew up, knowing the

107

1   needs in that area.  I want to develop, at least, one-
2   thousand kid mark.  You know, marching in the direction
3   of positive and education.  And I know I can do it.  I
4   don't tell -- I don't tell anybody my plans, when I --
5   when I feel -- the fellowship Christian Church in Folsom,
6   I didn't tell anybody.  I just asked the leadership.
7   They didn't know how I was going to do it, but I knew I
8   would do it and I did it.  And today it's a functioning,
9   a full-fledged functioning church in Folsom.  Same thing
10  with the kids.  And I'll give you something; kids are
11  looking for something to get into.  I was a kid.  I was
12  looking for something to get into.  And because there was
13  no program, the way I wanted to go out, I got into
14  something negative and ruined the rest of my life and
15  ruined the victim and his families and a whole lot of
16  people.  But I know, I do know now, I can do something in
17  my community.  And raise those thousand kids as a
18  positive force, just by being available to them.  Just
19  being available to them and listening to them.  Bringing
20  projects out.  Things that I've learned in here.  I know
21  I can succeed.  And I'm just asking you, with a sincere
22  heart, I made mistakes.  I've made mistakes, but I will
23  not commit another crime and I'll never hurt another
24  person again.  And I just ask you for that one
25  opportunity.

108

1          **PRESIDING COMMISSIONER BRYSON:**  Thank you, sir.

2    Thank you for your remarks.  The time is now 1617.  And

3    we'll recess for deliberations.

4          **INMATE VALDIVIA:**  Thank you.

5                    **R E C E S S**

6                    --o0o--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

109

1        CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3        **DEPUTY COMMISSIONER SHIELDS:**  We're back on the

4    record.

5        **PRESIDING COMMISSIONER BRYSON:**  The time is 16:59,

6    and we reconvened for the decision in the matter of Noel

7    Valdivia.  And, sir, the Panel has reviewed all

8    information received from the public and have relied on

9    the following circumstances in concluding that you're not

10   yet suitable for parole and would pose an unreasonable

11   risk of danger to society or a threat to public safety if

12   released from prison.  This offense was carried out in an

13   especially cruel and callous manner.  In that, on July

14   10th of 1980, the victims, Mr. Charles Wayne Decker, a

15   59-year-old male, and Charles Thomas, were particularly

16   vulnerable in that they were apparently unarmed, standing

17   in front of the Risso Apartments at 9 North Stanislaus

18   Street in Stockton, when the inmate and Eddie Macias Ruiz

19   walked up and demanded the victims' money.  Multiple

20   victims were attacked or killed in this same incident.

21   The inmate pointed a .38 caliber pistol in Decker's

22   direction.  The victim Thomas, threw his wallet on the

23   ground.  While Ruiz reached for the wallet, the inmate

24   shot Decker in the face, and they both fled the scene.

25   **NOEL VALDIVIA   C-29917   DECISION PAGE 1   08/01/07**

1    This offense was carried out dispassionately.  Decker
2    died shortly thereafter.  And this was a calculated
3    offense.  The inmate and crime partners drove
4    around looking for somebody to rob.  Sunglasses were
5    found near the escape vehicle bearing the inmate's right
6    thumbprint would link the inmate as the shooter.  Sir,
7    you suffered prior criminality.  You had an escalating
8    pattern of criminal conduct, including violence.  You
9    were -- and, in fact, you suffered county jail time.  You
10   were, in fact, on adult probation at the time of the
11   commitment offense.  Your institutional behavior has been
12   commendable.  You're currently working in vocational
13   Sheet Metal.  You have achieved your AA through Patton
14   University in 2007; you're to be commended for that.
15   You, obviously, have a lot on board, and far in
16   educational.  So, this Panel hopes that you will
17   definitely pursue that.  As to vocations, we rarely see
18   three vocational certifications that you've achieved: the
19   HVAC, the Mechanical Drafting, the sheet metal.  And you
20   also have 1,500 hours in Electronic Data Processing.  So,
21   that's certainly to be commended.  As to your AA, you've
22   participated in AA on a regular basis from 1990 until
23   2006.  We have chronos up through much of that period.
24   And you were able, immediately, to give up your clean and
25   **NOEL VALDIVIA**   C-29917   **DECISION PAGE 2**   08/01/07

111

1    sober date, which you stated was July 17th of 1981.  You

2    do not appear to have been involved in alcohol or drugs

3    since you did come to prison.  And you said that you had,

4    basically, an epiphany at some at some point, and elected

5    not to do so.  You are to be commended, also, for saving

6    an inmate's life who was choking in 1997.  And most

7    recently, you have completed some large programs in the

8    last two years, including No More Tears, the TRUST

9    Program, Impact, Real Choices, and the No More Tears is

10   the employability program.  You're to be commended for

11   your self-help.  As to your misconduct in prison, you

12   have seven 115's.  The most recent, in 2000, for

13   disobeying a medical lay-in.  That has been explained,

14   but you so have six 115's, but you showed that you are

15   now displaying positive behavior in prison.  As to the

16   psychological report dated March 20th of 2006, by

17   Dr. Michelle Inaba, basically, it supports your parole;

18   assessing you as having a low-risk of dangerous and a

19   global assessment of functioning of 90, which is high.

20   Your parole plans are reasonable.  You have three

21   residential offers from your extended family.  And you

22   have acceptable employment plans.  You have two job

23   offers and one offer of an interview.  You clearly do

24   have marketable skills.  This Panel considered, and

25   **NOEL VALDIVIA    C-29917    DECISION PAGE 3    08/01/07**

112

1    wanted to pass on to you, the thought that it might be
2    important, considering your background, for you to plan
3    on some sort of transition housing where you would
4    still be in a structured environment since you've been
5    down for a significant period of time, and also so you'd
6    be monitored and -- and would have immediate access to a
7    lot of programming on the outside, before you make the
8    transition fully to the outside. And, as to Penal Code
9    3042 responses. Responses indicate opposition, defining
10   parole suitability. Specifically, from the District
11   Attorney of San Joaquin County. In a separate decision,
12   the hearing Panel finds it's not reasonable to expect the
13   parole be granted in a hearing during the following two
14   years. Specific reasons for this finding are as follows:
15   This offense was cruel and callous. On July 10th of
16   1980, the victims, Mr. Charles Wayne Decker, a 59-year-
17   old male, and Charles Thomas, were particularly
18   vulnerable and they were unarmed, standing in front of
19   Risso Apartments at 9 North Stanislaus Street in
20   Stockton, when you and Eddie Macias Ruiz walked up and
21   demanded the victim's money. Multiple victims were
22   attacked or killed in the same incident. You point a .38
23   caliber pistol in Decker's direction. The victim Thomas
24   threw his wallet on the ground, and while Ruiz reached
25   **NOEL VALDIVIA    C-29917    DECISION PAGE 4    08/01/07**

113

1    for the wallet, you shot Decker in the face and both of
2    you fled.  This offense was carrier out dispassionately
3    and in a calculated manner.  Decker died shortly
4    thereafter.  Sunglasses found near the escape vehicle
5    bore your right thumbprint and linked you as the shooter.
6    Moreover, this offense was carried out in a manner
7    demonstrating exceptionally callous regard for human
8    suffering.  Public safety was at risk.  You had a clear
9    opportunity to cease.  Certainly, you knew what this was
10   all about driving around.  You were armed with a fully
11   loaded weapon, in itself an illegal procedure, and you
12   were on probation at the time of the crime.  The motive
13   for this crime was very trivial in relation to the
14   offense.  It was robbery and it was gang-related.  You
15   were an unpredictable, dangerous gangster, sir.  You were
16   a community's worst nightmare.  This was, basically,
17   domestic terrorist activity, that you and your crime
18   partner were carrying out.  Sir, this Panel believes that
19   in some ways, you're still minimizing the gang component.
20   Not just of the commitment offense, but your entire
21   criminal history, starting at age 14.  We do have
22   knowledge, the Panel has knowledge, that Little Unity
23   was, indeed, one of Stockton's most violent gangs, and
24   its power, in part, arose from its widespread
25   **NOEL VALDIVIA   C-29917   DECISION PAGE 5   08/01/07**

1    configuration and diversity.  This Panel wants you to

2    continue to develop insight in working to help youth to

3    stay out of gangs.  Distance yourself from your 115's,

4    and show by your actions that you walk the talk, and that

5    you do understand the nature and magnitude of this

6    commitment offense, and that you are no longer

7    unpredictable and a threat to public safety.  And in

8    denying you parole for two years, we're placing you on

9    the 2009 calendar, for you next subsequent hearing.  The

10   Board recommend no more 115's, 128(a)'s, that you

11   continue to get more self-help.  Hopefully, some of it

12   would be direct gang-related information self-help, and

13   that you earn positive chronos, sir, and continue with

14   your good programming.  And I wish you luck, and

15   Commissioner Shields, do you have anything you wish to

16   add?

17       **DEPUTY COMMISSIONER SHIELDS:**  Well, I want to

18   underscore what he said, and maybe, I have one thought

19   that you mind find helpful, you know, for the future.

20   What I found when you were talking is, that you would

21   talk about the past when you were a kid and you would

22   talk about the future when you were going to run a

23   program for a thousand kids; what I think Panels need to

24   hear is in the middle.  And you're -- every case is

25   **NOEL VALDIVIA    C-29917    DECISION PAGE 6    08/01/07**

115

1    unique, and I think your case is unique in that you did
2    have a spiritual awakening, that it seems to have been
3    quite extensive, as far as your sobriety and your
4    participation in another, you know, sort of spiritual
5    program.  My reservation is that I don't know that that
6    awakening has generalized into the rest of life.  And,
7    you know, my concern is that you -- whatever those -- the
8    forces were that drew you into gangs may still be there.
9    And, so what I would like to see, and you're pretty
10   sophisticated and you think you have the contacts to do
11   it, there's Relapse Prevention.  And it's actually
12   something that is a program that's been around now, for
13   about 25 years, that you should be able to get a hold of
14   that through your contacts, and create a written recovery
15   plan.  And it's a way of -- a different way of doing an
16   inventory of yourself.  And what you do, is you identify
17   your weaknesses, your identify danger points, and then
18   you come up with a more elaborate, comprehensive, plan to
19   make sure you don't relapse.  And, I think, you might
20   take a look at gangs in that sense.  And see when are you
21   vulnerable to get pulled back into the group.  And, you
22   know, even though it's quite a while ago, that incident
23   with the license plate, to me was an example of kind of a
24   slip back into, you know, I'm in this group, we have our
25   **NOEL VALDIVIA    C-29917    DECISION PAGE 7   08/01/07**

116

1    own world, you know, the rules are starting not to apply

2    to me, I'm okay because everyone else is, you know, doing

3    it.  I think you need to take a look at that.  And then

4    the other thing I want to underscore is --

5                      A D J O U R N M E N T

6                           --o0o--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    PAROLE DENIED TWO YEARS

22    THIS DECISION WILL BE FINAL ON:    **NOV 2 9 2007**

23    YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

24    DATE, THE DECISION IS MODIFIED.

25    NOEL VALDIVIA    C-29917    DECISION PAGE 8    08/01/07

117

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Terri O'Brien, a duly designated transcriber, FOOTHILL TRANSCRIPTION COMPANY, INC., do hereby declare and certify under penalty of perjury that I have transcribed the audio recording which covers a total of pages numbered 1 - 116, and which recording was duly recorded at SAN QUENTIN STATE PRISON, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of NOEL VALDIVIA, CDC NO. C-29917, on AUGUST 1, 2007, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned audio recording to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated September 12, 2007 at Placer County, California.

Terri O'Brien, Transcriber
**Foothill Transcription Company, Inc.**