*E-filing*

**FILED**

JUL 0 3 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

EXHIBIT    "B"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:               )        CDC Number C-29917
                          )
NOEL VALDIVIA             )        **RECORDS**
                          )
_____)        **COPY**

CALIFORNIA STATE PRISON

SAN QUENTIN, CALIFORNIA

MAY 11, 2006

11:27 A.M.

PANEL PRESENT:

Mr. Jack Garner, Presiding Commissioner
Ms. Noreen Blonien, Deputy Commissioner

OTHERS PRESENT:

Mr. Noel Valdivia, Inmate
Mr. John Stringer, Attorney for Inmate
Mr. Robert Himelblau, Deputy District Attorney
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____          See Review of Hearing
_____          Transcript Memorandum

**Berenice Billington, Peters Shorthand Reporting**

85

1  office in particular, that Mr. Valdivia's

2  conduct in this particular case, which normally

3  would have been a - an LWOP case, but it

4  appeared to come out I can only assume as a

5  felony murder first degree - I don't think he

6  pled to premeditated first degree, I don't see

7  any indication that he did - that the continuous

8  of conduct, from 1978 to 1980 when he committed

9  this murder, was increasing - was an increasing,

10  violent act which resulted in a - in just a

11  complete toss away of a human life, and I don't

12  see any indication, although - except an embrace

13  of faith, but I don't see any indication of any

14  particular epiphany into what caused that

15  particular action, and it's not so much that Mr.

16  Valdivia is going to walk out of here and return

17  to gang life, I don't think anybody's worried

18  about that, I - I think the - I think the - the

19  reporters here are focusing on the - on the

20  wrong thing.  Mr. Valdivia, he's a little older

21  than I am, and I don't think he has any desire

22  to go back to living on the streets and hustling

23  money here and there and hanging out with gang

24  members as he did before when he was 19 years

25  old, but the problem is that, there's a clear

26  indication that on and on and on, and even here,

27  that's got an issue with self-control and anger,

95

1     **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                **D E C I S I O N**

3          **DEPUTY COMMISSIONER BLONIEN:**  We're on

4     record.

5          **PRESIDING COMMISSIONER GARNER:**  All

6     right.  It is now 1:45 p.m. in the matter of

7     Noel Valdivia, C-29917.  Mr. Valdivia, the panel

8     has reviewed all the information received from

9     the public and relied on the following

10    circumstances in concluding that you're not yet

11    suitable for parole and would pose an

12    unreasonable risk of danger to society or a

13    threat to public safety if you were released

14    from prison.  Before we go any farther, I want

15    to let you know it's a one-year denial, so that

16    we can kind of get that past us and – sir, we

17    considered many factors, and we started with the

18    commitment offense, and the panel noted that it

19    was carried out in an especially cruel and

20    callous manner in that the victim, Mr. Charles

21    Decker, he was shot in the head at close range,

22    we had multiple victims, Mr. Thomas, he was a

23    second victim.  He didn't sustain any injuries

24    but was robbed during the incident.  The offense

25    was carried out in a very dispassionate manner

26    in that the victim was shot at close range with

27    **N. VALDIVIA  C-29917  DECISION PAGE 1    5/11/06**

1   a .38 caliber in the head while being robbed.

2   The offense was carried out in a manner that

3   demonstrates an exceptionally callous disregard

4   for human suffering in that we had a victim who

5   was minding his own business, didn't pose any

6   particular threat to you, shot in the head, not

7   resulting in him dying immediately, he died

8   shortly after, and the motive, it was for a

9   robbery, a robbery that went bad, and

10  unfortunately, examining the contents of Mr.

11  Thomas's wallet, there's an indication there was

12  absolutely nothing that was found in it, so -

13  conclusions were drawn from the Statement of

14  Facts, and these were contained in the Board

15  Report that was prepared for the May 2006

16  calendar in that on July 10, 1980, the victim,

17  Charles Wayne Decker, and Charles Thomas, were

18  standing in front of the Risso Apartments at -

19  located at 9 North Stanislaus Street in

20  Stockton, California, when two males, later

21  identified as Noel Valdivia and Eddie Macia

22  Ruiz, walked up and demanded the victim's money.

23  Valdivia pointed a .38-caliber snub-nose in the

24  direction of Decker.  Victim Thomas threw his

25  wallet on the ground while suspect Ruiz reached

26  for the wallet, that Valdivia shot the victim

27  **N. VALDIVIA  C-29917  DECISION PAGE 2   5/11/06**

97

1  Decker in the face.  Decker died shortly
2  thereafter.  Valdivia and Ruiz fled the scene.
3  Sunglasses were found where the escape vehicle
4  had been parked.  They appeared to be the
5  glasses the shooter had worn.  The glasses were
6  examined for fingerprints, and the right
7  thumbprint of Noel Valdivia was found on the
8  lens.  The panel noted that on previous
9  occasions you had inflicted serious injury on a
10  victim, and assaultive behavior was noted at an
11  early age, that you did have a record of
12  assaultive behavior, and as a - a youngster and
13  a young man, you had an escalating pattern of
14  criminal conduct.  You've failed previous grants
15  of probation, and also county jail, and the
16  panel noted that you were on probation at the
17  time of the commitment offense, and that you did
18  have prior criminality, including the battery on
19  a peace officer, and also the assault with a
20  deadly weapon, which was November 1979 as an
21  adult.  So far as your institutional behavior,
22  the panel noted that misconduct while
23  incarcerated, your last 128 was April 22nd,
24  1998, for contraband, and you've had 12 128s
25  during your period of incarceration.  You've had
26  six 115s, the last being May 9th, 2000, and that
27  **N. VALDIVIA  C-29917  DECISION PAGE 3   5/11/06**

98

1    reviewed and considered the psychologist's

2    report, Dr. Inauba, March of 2006, and found

3    that the - the report is favorable.  With

4    respect to your parole plans, you've got -

5    you're blessed with a family that's outside and

6    they've done a lot of work for you, and your

7    parole plans are fine.  There are no problems at

8    all.  The 3042 notices resulted in an appearance

9    by the District Attorney's Office from San

10   Joaquin County, and you heard the opposition to

11   the granting of a date.  The panel also made the

12   following finding.  The panel note that - noted

13   that in Dr. Inauba's March 2006 report she

14   indicates that your hostility toward authority,

15   quote, "seems," end quote, "to be more a

16   competitive attitude than an antisocial

17   behavior," and the panel notes that this finding

18   is recent and needs to be demonstrated over a

19   longer period of time.  We're going to recommend

20   to you that you remain disciplinary free, as you

21   have done, that you continue with your current

22   programming, that you continue with your

23   religious activities and your good work habits

24   in PIA, and I think - I think you're getting

25   real close, sir, but all I said is that this -

26   this issue that kind of seems to have been

27   **N. VALDIVIA  C-29917  DECISION PAGE 4   5/11/06**

99

```
 1   pervasive throughout your - your incarceration
 2   and also as a youngster in growing up is the
 3   antisocial behavior and the rebellion toward
 4   authority, and I think that you'll certainly
 5   find yourself being in a lot better position
 6   when you come back next year.  Any additional
 7   comments, Commissioner?
 8        DEPUTY COMMISSIONER BLONIEN:  I - I - I
 9   do.  I - I just have to say this, that in - in
10   going through the - your file's getting really
11   thick, and in going through it, like I would
12   read a Board Report and it would talk about your
13   lack of anger management, so then I found where
14   you've been a taking Anger Management.  Then I
15   look back, and you've taken it at DVI and
16   Folsom, and, you know, you've been in a long
17   time, first-degree, and things you do sometimes
18   get - get buried.  I would make a resume of
19   everything that you've taken that show - shows
20   your ongoing progress.  I - like there's - in
21   one of the - the - the Board decisions there's -
22   it talks about a 115 that's not even part of
23   your life anymore, I mean, it's not part of this
24   record, it was pulled, it was found to be untrue
25   or - or whatever, and, you know, different
26   panels do different things, and it's sort of
27   N. VALDIVIA  C-29917  DECISION PAGE 5   5/11/06
```

100

1  us; not for us to, you know, find out

2  everything, although we try, but I think you'd

3  be doing yourself a big favor if – if you did

4  that resume, because you've done so much, but it

5  does get buried.  So that would be my advice to

6  you.

7        **PRESIDING COMMISSIONER GARNER:**  I'd echo

8  that.  Commissioner Blonien is very tenacious at

9  verifying documents and searching for documents,

10  when we – when we think there's something there,

11  so she's good at ferreting this out, but you

12  might not be blessed with a deputy commissioner

13  that's as thorough, so I think her idea is

14  something you might want to consider.  The time

15  is now 1:52 p.m. and that concludes the hearing.

16  Good luck to you, sir.

17        **INMATE VALDIVIA:**  Thank you.

18

19

20

21

22            --oOo--            SEP  **8 2006**

23  **PAROLE DENIED ONE YEAR**

24  **THIS DECISION WILL BE FINAL ON:**_____

25  **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26  **DATE, THE DECISION IS MODIFIED.**

27  **N. VALDIVIA  C-29917  DECISION PAGE 6   5/11/06**

101

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, BERENICE BILLINGTON, a duly designated
transcriber, PETERS SHORTHAND REPORTING, do hereby
declare and certify under penalty of perjury that I
have transcribed tape(s) which total one in number and
cover a total of pages numbered 1 - 100, and which
recording was duly recorded at CALIFORNIA STATE
PRISON, SAN QUENTIN, CALIFORNIA, in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING OF NOEL
VALDIVIA, CDC NO. C-29917, ON MAY 11, 2006, and that
the foregoing pages constitute a true, complete, and
accurate transcription of the aforementioned tape to
the best of my ability.

I hereby certify that I am a disinterested
party in the above-mentioned matter and have no
interest in the outcome of the hearing.

Dated JULY 17, 2006, at Sacramento, California.

*Berenice Billington*

BERENICE BILLINGTON
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

EXHIBIT    "B-1"

66

1      CALIFORNIA BOARD OF PRISON TERMS

2              D E C I S I O N

3         **DEPUTY COMMISSIONER WOLK:**  We're on record.

4         **PRESIDING COMMISSIONER DALY:**  We're back on

5   record in the matter of Noel Valdivia and it is

6   1753 hours.  The Panel has reviewed all of the

7   information received from the public and relied on

8   the following circumstances in concluding that the

9   prisoner is not yet suitable for parole and would

10  pose an unreasonable risk of danger to society or a

11  threat to public safety, if released from prison.

12  The offense was carried out in a very callous and

13  preplanned manner.  Two victims were confronted to

14  be robbed and one was killed in that same incident.

15  And the offense was carried out in a manner that

16  demonstrated a total disregard for human suffering,

17  in that after the prisoner shot the victim in the

18  face, he ran off and did not seek any help.  And

19  did not think about the consequences of his

20  actions.  The motive for the crime was very trivial

21  in relation to the offense, in that the motive for

22  the crime was just to obtain more money so the

23  prisoner and his crime partners could continue

24  drinking.  These conclusions are drawn from a

25  Statement of Facts, wherein the prisoner and his

26  crime partner were out looking for someone to rob

27  NOEL VALDIVIA   C-29917   DECISION PAGE 1   6/1/04

1    when they saw the victim and his friend together on
2    the street and went back and robbed them at
3    gunpoint. And in the process of that robbery, that
4    the victim was shot in the face. The prisoner has
5    a record of assaultive behavior. He has an
6    escalating pattern of criminal conduct. And he has
7    a history of unstable and tumultuous relationships
8    with others. He failed previous grants of
9    probation and he failed to profit from society's
10   previous attempts to correct his criminality. And
11   those attempts included juvenile counseling, county
12   jail, adult probation, and he, in fact, was on
13   probation at the time this crime occurred. His
14   unstable social history involved his running with
15   gangs at an early age. From the age of 13, he
16   started drinking alcohol and smoking marijuana.
17   And as a juvenile, he was out of control with his
18   parents, picked up for loitering and failure to
19   disperse, possession of marijuana, two instances of
20   drunk driving and interfering with a police officer
21   and battery on a police officer, for which he was
22   given six months probation. And as an adult, he
23   was arrested for assault with a deadly weapon, for
24   which he received nine months county jail and
25   probation and then the instant offense in July of
26   1980 for first-degree murder. It was noted during
27   NOEL VALDIVIA  C-29917  DECISION PAGE 2  6/1/04

68

1   this time when he was running with the gang, there

2   were other homicides that had occurred and he was

3   implicated in, but not incarcerated for.   The

4   prisoner has failed to demonstrate evidence of

5   positive change.   In looking at the disciplinary

6   history, he had a 115 as late as 2001 and it was

7   noted that an appeal was made on the write-up and

8   it was only partially removed.   The psychiatric,

9   psychological reports are okay.   They are from --

10  the last one is in '01, 2001, and so we are going

11  to request a new psychiatric evaluation.   Your

12  parole plans do appear to be sufficient.   It is

13  noted that 3042 responses, there was an indication

14  of an opposition for a finding of parole

15  suitability.   Specifically, by the District

16  Attorney of San Joaquin County, who sent a letter

17  but was not present at the hearing today.   One of

18  the other things that we looked at in considering

19  your unsuitability, and this really has to do with

20  the recency, I'm really a little bit confused

21  because of your Christian walk and everything that

22  you're doing.   And yet, you continue to get, you

23  know, 115s as recently as 2001.   And when I looked

24  back in your counselors' reports, starting out in

25  '94, which was just 10 years ago, they felt you

26  were a very high to moderate degree.   In '97, low.

27  NOEL VALDIVIA   C-29917   DECISION PAGE 3   6/1/04

69

1    In '99, low.  In '98, you were moderate and in '01,
2    you were unpredictable and I'm sure that was
3    because of the 115 that was in there.  Currently,
4    you're rated as low.  But I mean, they're all over
5    the board and those are within, you know, the last
6    10 years and did have some bearing on our decision
7    here today.  The Panel finds that the prisoner's
8    gains are recent and he must demonstrate an ability
9    to maintain his gains over an extended period of
10   time.  Nevertheless, I mean, you have a lot of good
11   things going on and not to say the least, your
12   conversion into Christianity and trying to get your
13   life turned around.  Taking responsibility for the
14   crime was a big thing, you know, that was
15   considered.  The programs that you have been
16   involved in, your education programs, the letters
17   from the instructors that have been involved with
18   you.  Your continued participation in Alternatives
19   -- in Alcoholics Anonymous, Alternatives to
20   Violence, Anger Management, Amer-I-Can
21   participation, Breaking Barriers, REAL Choices,
22   participation in Lifer Therapy Group and
23   participation in personal therapy.  And it was
24   noted that there are a lot of letters of
25   appreciation and laudatory chronos in the file.
26   And we also noted all of the work that you're
27   NOEL VALDIVIA   C-29917   DECISION PAGE 4   6/1/04

70

1    doing, coming just five classes short of your AA.
2    And your vocational certificates and completed the
3    Sheet Metal, so you are doing a lot of the positive
4    things.  However, the positive aspects of your
5    behavior do not outweigh the factors of
6    unsuitability.  The separate decision, the hearing
7    Panel finds that it is not reasonable to expect
8    that parole would be granted at a hearing during
9    the following two years.  The prisoner committed
10   the offense in an especially cruel manner.
11   Specifically, he and his crime partner were going
12   down the street looking for somebody to rob when
13   they encountered the two victims.  And in the
14   process of that robbery, one victim was shot in the
15   face and killed.  Two victims were attacked and one
16   was killed in the same incident.  And the offense
17   was carried out in quite a calculated manner
18   because this was a planned robbery.  They were
19   looking for victims.  And the offense was carried
20   out in a manner which demonstrated a total
21   disregard for human suffering, in that after the
22   victim was shot in the face, the prisoner ran off
23   and was not arrested until about a week later.  And
24   the motive for the crime was very trivial in
25   relation to the offense, in that a life was lost to
26   gain a few dollars to continue drinking that night.
27   NOEL VALDIVIA   C-29917   DECISION PAGE 5   6/1/04

1    The prisoner has a history of criminality and

2    misconduct.  And his criminality and misconduct

3    started out as a juvenile when he was out of

4    control, loitering and failure to disperse,

5    possession of marijuana, two drunk driving charges,

6    interfering with a police officer and battery on a

7    police officer, assault with a deadly weapon and on

8    the current commitment offense.  The Panel

9    recommends that the prisoner remain disciplinary

10   free.  You just simply have to put some time

11   between you and these 115s.  You get any write-ups

12   between now and your next hearing and it just sets

13   you backwards.  If available, continue upgrading

14   vocationally and if available, participating in

15   self-help.  And then we have written up a request

16   for a new clinical evaluation to be prepared for

17   the next hearing.  With the recency of your

18   discipline and --

19          INMATE VALDIVIA:  You mentioned that 115 in

20   2001, it was totally dismissed.

21          PRESIDING COMMISSIONER DALY:  Okay.

22          INMATE VALDIVIA:  You said it was partially

23   dismissed.

24          PRESIDING COMMISSIONER DALY:  In the -- in

25   the -- and we have the letter in the file that says

26   it was partially --

27   NOEL VALDIVIA  C-29917   DECISION PAGE 6   6/1/04

72

1      **DEPUTY COMMISSIONER WOLK:**  In the file, it

2   was (indiscernible).

3      **PRESIDING COMMISSIONER DALY:**  -- dismissed.

4   Okay, your other one was 2000, you know.

5      **INMATE VALDIVIA:**  The administrative.

6      **PRESIDING COMMISSIONER DALY:**  Right.  And,

7   but then you have some others before that.

8      **INMATE VALDIVIA:**  No, I understand that.

9      **PRESIDING COMMISSIONER DALY:**  I mean, you

10   know --

11      **INMATE VALDIVIA:**  I'm just --

12      **PRESIDING COMMISSIONER DALY:**  Okay.

13      **INMATE VALDIVIA:**  It's the thing about the

14   write-ups, it's like last time, Commissioner Welch

15   said I spent my time rationalizing my excuses.  And

16   it's hard for us to bring anything to the table

17   with no paperwork.  We try to bring it to your

18   attention that --

19      **PRESIDING COMMISSIONER DALY:**  Okay.

20      **INMATE VALDIVIA:**  -- you know, we have a

21   part in it but it's --

22      **PRESIDING COMMISSIONER DALY:**  Okay.

23      **INMATE VALDIVIA:**  -- a part of --

24      **PRESIDING COMMISSIONER DALY:**  But I'm just

25   saying it's the recency of it.  It isn't just that.

26   It's the all over the board with your counselors.

27   **NOEL VALDIVIA   C-29917   DECISION PAGE 7   6/1/04**

73

1    Once you get consistent ratings of minimal or low

2    and also, the objection of the District Attorney

3    who wrote a letter of opposition and we need to

4    deal with his concerns.

5         INMATE VALDIVIA:  The District Attorney

6    (inaudible).

7         PRESIDING COMMISSIONER DALY:  So it will be

8    -- that concludes the hearing.  It is 1802.

9         INMATE VALDIVIA:  Okay.

10                   --o0o--

11

12

13

14

15

16

17

18

19

20

21

22

23   PAROLE DENIED TWO YEARS

24   THIS DECISION WILL BE FINAL ON:  _____SEP 2 9 2004_____.

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   NOEL VALDIVIA   C-29917   DECISION PAGE 8   6/1/04

74

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, KARIN R. LEWIS, a duly designated
transcriber, CAPITOL ELECTRONIC REPORTING, do
hereby declare and certify under penalty of perjury
that I have transcribed tape(s) which total one in
number and cover a total of pages numbered 1
through 73, and which recording was duly recorded
at CALIFORNIA STATE PRISON, SAN QUENTIN, at SAN
QUENTIN, CALIFORNIA, in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING of NOEL
VALDIVIA, CDC No. C-29917, on JUNE 1st, 2004, and
that the foregoing pages constitute a true,
complete, and accurate transcription of the
aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested
party in the above-captioned matter and have no
interest in the outcome of the hearing.

Dated June 17th, 2004, at Sacramento County,
California.

Karin R. Lewis

Karin R. Lewis
Transcriber
**CAPITOL ELECTRONIC REPORTING**

EXHIBIT    "B-2"

65

1       **CALIFORNIA BOARD OF PRISON TERMS**

2                     **D E C I S I O N**

3       **DEPUTY COMMISSIONER WEAVER:** You're on

4    record, Sir.

5       **PRESIDING COMMISSIONER WELCH:** Okay.  The

6    Panel reviewed all information received from the

7    public and relied on the following circumstances in

8    concluding that the prisoner is not yet suitable

9    for parole and would pose an unreasonable risk of

10   danger to society or threat to public safety.  The

11   offense was carried out in an especially cruel and

12   callous manner.  The offense was carried out in a

13   dispassionate and calculated manner such as

14   (indiscernible) execution-style murder.  The

15   offense was carried out in a manner which

16   demonstrates an exceptionally callous disregard for

17   human suffering.  The motive for the crime was

18   inexplicable or very trivial in relation to the

19   offense.  The conclusion was drawn from the

20   Statement of Facts wherein in Stockton, California,

21   on July the 10th, 1980, the victim, Charles Decker,

22   and Charles (inaudible) standing in front of an

23   apartment building.  They were approached by two

24   men and told to give them their money.  One of the

25   men, according to the perpetrators, pointed what

26   appeared to be a sawed off .22 caliber rifle

27   **NOEL VALDIVIA   C-29917   DECISION PAGE 1   1/31/02**

66

1   (indiscernible) -- took out his wallet and put it
2   on the ground while perp -- while one of the prison
3   -- while one of the crime partners, later
4   identified as Eddie Ruiz, reached down to pick up
5   the wallet, the prisoner shot Decker in the face.
6   The victim died from that wounds -- those wounds.
7   The prisoner had previously inflicted or attempted
8   to inflict serious injury on a victim.  He had a
9   record -- pattern of escalating assaultive
10   behavior.  He had an escalating pattern of criminal
11   conduct.  He failed previous grants of probation
12   and cannot be counted upon to avoid criminality.
13   He failed to profit from society's previous attempt
14   to correct his criminality.  Such attempts included
15   juvenile probation and adult probation, county
16   jail.  The prisoner has an unstable social history,
17   includes his involvement in gang activity as well
18   as a lengthy juvenile record, which spans from
19   drinking, possession of marijuana, driving drunk --
20   all of those things falls under an unstable social
21   history under prior criminality.  Also an unstable
22   social history (indiscernible) prior criminality --
23   out of control.  The prisoner was also arrested for
24   being out of control.  Under prior criminality
25   (inaudible) for loitering, possession of marijuana,
26   drunk driving, interfering with a police officer
27   **NOEL VALDIVIA   C-29917   DECISION PAGE 2   1/31/02**

67

1    and assault with a deadly weapon and, of course,

2    the instant offense of murder.  The prisoner has

3    failed to demonstrate (indiscernible) in society

4    would change.  Serious one -- Serious

5    disciplinaries while in prison includes a total of

6    -- I believe it's seven disciplinary reports --

7    disciplinaries since his last hearing.  There's one

8    8/15/01 for conduct endangering another person, a

9    5/9/00 for disobeying (inaudible), since his last

10   parole -- Oh yeah, (inaudible) since his last

11   parole hearing, two disciplinaries.  And I didn't

12   mention the 128 for unauthorized manufacture of

13   license plates.  He appeared to have a favorable

14   psychiatric report.  He appears to have suitable

15   parole plans (indiscernible).  The hearing Panel

16   notes that responses to Penal Code 3042 notices

17   indicate an opposition to a finding of parole

18   suitability.  Specifically the Deputy District

19   Attorney, the District Attorney's representative

20   from San Joaquin County, spoke in opposition to a

21   finding of suitability.  The Panel makes the

22   following findings.  The prisoner needs therapy in

23   order to face, discuss, understand, and cope with

24   stress in a nondestructive manner.  Until progress

25   is made the prisoner continues to be unpredictable

26   and a threat to others.  The prisoner's gains are

27   **NOEL VALDIVIA    C-29917    DECISION PAGE 3    1/31/02**

68

1  very recent.  He must demonstrate the ability to

2  maintain these gains over an extended period of

3  time.  (Indiscernible) become and remain

4  disciplinary-free.  Nevertheless, there are things

5  that the prisoner should be commended for.  He

6  received a vocation in vocational drafting.  His

7  work reports (indiscernible) anything from

8  satisfactory to outstanding.  He got some

9  experience in sheet metal.  Also (inaudible)

10  involved in the religious program here at the

11  institution and he received some accolades from

12  that.  He has extensive family support on the

13  outside.  He have places to stay, he have people

14  offering him job opportunities.  However, these

15  positive aspect of prisoner's behavior does not

16  outweigh the factors of unsuitable.  Parole is

17  denied for another two years.  In a separate

18  decision the hearing Panel find that it is not

19  reasonable to expect that parole would be granted

20  at a hearing during the following two years.  The

21  specific reasons are as follow.  The crime was

22  committed in an especially cruel and callous

23  manner.  Mr. Decker was standing on the block in

24  the city -- standing on a corner in the City of

25  Stockton.  Mr. Decker [sic] and his crime partner

26  approached him and attempted to rob him.  He was

27  **NOEL VALDIVIA   C-29917   DECISION PAGE 4   1/31/02**

69

1    eventually shot in the face and he died as a result

2    of that robbery, murder.  The offense was carried

3    out in a (indiscernible) and calculated manner,

4    such as an execution-style murder.  The offense was

5    carried out in a manner which demonstrates an

6    exceptionally callous disregard for human

7    suffering.  These conclusion -- excuse me.  The

8    other reasons for this denial is that the prisoner

9    recently committed two disciplinaries as previously

10   stated.  One was for conduct endangering another

11   person and the other one for disobeying orders, and

12   also a 128 for misappropriation of state license

13   plates.  The prisoner has not completed necessary

14   programming, which is essential to his adjustment

15   and needs additional time to gain such programming.

16   The prisoner needs to continue to participate in

17   (indiscernible) self-help programs that's

18   available.  Therefore, a longer period of

19   observation and evaluation of the prisoner is

20   required before the Board shall find that the

21   prisoner is suitable for parole.  The Panel

22   recommends that the prisoner become -- one, sir --

23   that you become and, two, that you remain

24   disciplinary-free.  If available, we certainly

25   encourage you to continue to upgrade vocationally

26   and also, we certainly encourage you to participate

27   **NOEL VALDIVIA   C-29917   DECISION PAGE 5   1/31/02**

70

1    in self-help programs and even your religious
2    programs.  But most of all you need to become
3    disciplinary-free.  Based on your record, the Panel
4    took into consideration your argument.  We gave you
5    two years.  It would have been very easy to give
6    you an additional time.  So you represented
7    yourself and you made some compelling arguments.
8    Not that we bought all of them but -- You're
9    getting those disciplinaries and you're getting
10   them at a very critical times.  And you've got
11   reasons for why you got them, but you have to
12   remain disciplinary-free.  You committed a real
13   heinous crime.  There's no way you're going to get
14   a parole date if you continue to get
15   disciplinaries.  And you've got to put some
16   distance between these disciplinaries that you're
17   receiving if you ever expect to get a parole date.
18   I'm being real candid with you.  You say that
19   you're a Christian, that you went to
20   (indiscernible), you're preaching, and you're
21   recruiting other people into the faith.  You've got
22   to walk the walk and not just talk the talk.  You
23   have people writing and talking about how you
24   changed their lives.  You've got to change your own
25   life and demonstrate that you can stay
26   disciplinary-free and stop getting into
27   **NOEL VALDIVIA   C-29917   DECISION PAGE 6   1/31/02**

71

1   confrontations with staff -- and come into the

2   Board and spending time trying to rationalize them.

3   You've got to eliminate that from your repertoire.

4   And you shouldn't put yourself in a position when

5   you're asking for a date that you have to come and

6   spend an inordinate amount of time trying to

7   rationalize why you did this, this, or this.  I'm

8   talking about behavior.  You have to demonstrate

9   that your behavior is beyond reproach.  Because

10  walking up and shooting a person in the face, and

11  you said it was a .38 -- a man that -- the only

12  thing that he was doing was standing on the block

13  and taking his wallet.  And that's -- I call that

14  extreme behavior.  And you're still demonstrating a

15  behavior in the institution where you can't control

16  yourself, where you still have to rationalize, and

17  where you still have to go back and say, I'm a

18  Christian and these guys are not taking into

19  consideration that I'm trying to do the right

20  thing.  But you're still doing the wrong thing and

21  you need to come in terms with that.  Your parole

22  is denied for two years.  Commissioner Weaver, any

23  comments?

24      **DEPUTY COMMISSIONER WEAVER:**  No.  Good luck.

25  **PAROLE DENIED TWO YEARS**

26  **EFFECTIVE DATE OF THIS DECISION**   3-20-02

27  **NOEL VALDIVIA   C-29917   DECISION PAGE 7   1/31/02**

72

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, CAROL A. EDWARDS, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 71, and which recording was duly recorded at FOLSOM STATE PRISON, at REPRESA, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of NOEL VALDIVIA, CDC No. C-29917, on JANUARY 31, 2002, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated February 14, 2002, at Sacramento County, California.

Carol A. Edwards
Transcriber
**CAPITOL ELECTRONIC REPORTING**

EXHIBIT     "B-3"

53

1    **CALIFORNIA BOARD OF PRISON TERMS**

2              **D E C I S I O N**

3         **PRESIDING COMMISSIONER NIELSEN:** The Board has

4    reconvened for the purpose of the decision in the

5    Suitability Consideration Hearing for Mr. Noel

6    Valdivia.  Mr. Valdivia, the Panel has reviewed all

7    the information that we had available to us in the

8    record and all that has been presented here and we've

9    reached the conclusion that you are not suitable for

10   the granting of a date today, yet pose an unreasonable

11   risk of danger to society and a threat to the public

12   if you were released from prison.  Your commitment

13   offense was carried out in a manner exhibiting a

14   callous disregard for the life and suffering of

15   another.  It was carried out in a dispassionate and

16   calculated manner.  Multiple victims were threatened,

17   robbed, one was killed in the commission of the life

18   crime which, in effect, was you and a crime partner

19   confronting an individual, a hapless individual,

20   attempting and successfully robbing an individual and

21   then you very coldly and callously shot and killed

22   this individual.  Your previous record evinces a

23   record of violence and assaultive behavior, an

24   escalating pattern of criminal conduct and violence, a

25   persistent pattern of tumultuous relationships and

26   criminal behavior commencing at an early age, an

27   **NOEL VALDIVIA   C-29917    DECISION PAGE 1    7/1/99**

54

1    unstable social history. You had associated yourself

2    in gang activities, you became very successful at

3    that, very renowned, he was a leader in those councils

4    and circles. You had a fairly extensive juvenile

5    record for which you received a lot of grace and

6    opportunity through youth counseling and released

7    rather than committed. That pattern continued to

8    escalate as you then went into adult life. Society's

9    previous attempts to correct your criminality,

10    including probation, adult and juvenile, and county

11    jail, was not successful. Your assaultive record does

12    indicate even in those two counts of assault on

13    officers, though you were not committed, there was a

14    murder for conspiracy that you were at least around

15    and about but you were not committed, of course, for

16    that. Then you had additional malicious mischief,

17    verbal confrontation with officers, drunk driving.

18    Institutionally, though you have done a number of

19    commendable things that we will acknowledge, the Panel

20    does not feel that you've sufficiently programmed to

21    find you a good risk to release to society. The

22    recent 115 that you achieved 9/98, related to the

23    sheet on the window, you gave your explanation of

24    that. It differs somewhat from the officer's

25    recollection but the 115 does stand. I will note that

26    that was a little bit interesting in that in '96 and

27    NOEL VALDIVIA   C-29917    DECISION PAGE 2   7/1/99

55

1    in '98 you had similar incidents, 128s not 115s but

2    lesser 128s, but it was related to the comportment of

3    the cell.  Those were violations of the rules and it

4    does demonstrate some of the kind of behavior, though

5    to a less degree, that you did against, out in free

6    society.  We will note, of course, this was in a

7    closed custodial environment of prison.  The Panel

8    makes the following findings, that you continue to

9    need therapy in order to face, discuss, understand and

10   cope with stress in a nondestructive manner.  Until

11   sustained progress is made, additional progress is

12   made, you continue to be unpredictable and a threat to

13   others.  Your recent 115, I think I've explained the

14   context and the concern the Board has about that based

15   on the 115 itself and prior 128s.  We are going to

16   commend you, though, for some substantial programming.

17   You indicated some comprehensive and application of

18   the things that you've learned and gained while you've

19   been in prison here.  You've been a part of Amer-I-

20   Can, AA, you've been involved in individual

21   psychotherapy, Life and Therapy Group, two times

22   you've been through Basic Alternatives to Violence, as

23   well as Advanced Alternatives to Violence.  You've

24   completed your vocational Drafting.  You've done work

25   in voc sheet metal and you've indicated some 1,200 or

26   1,500 hours in Data Processing, 1,500 you said?

27   NOEL VALDIVIA    C-29917    DECISION PAGE 3    7/1/99

56

1          **INMATE VALDIVIA:**  Yes, sir.

2          **PRESIDING COMMISSIONER NIELSEN:**   Data

3     Processing and, as Commissioner Coldren said, you

4     ought to take a look at that and see if you can get

5     better evidence of completion, we believe what you

6     said.  You've been involved in Life Skills.  You

7     completed a forklift course as well.  You've got a

8     course in non-violence, I guess, as I read that.  You

9     have done a number of things.  Alcoholism, of course,

10    was a part of your criminal past.  You've stayed away

11    from it since you've been in the institution and that

12    is commendable but you'll have to always remain

13    vigilant, your resistance to alcohol and substance

14    abuse.  In a separate decision, the Panel has found

15    him not suitable but expected you to be suitable for

16    release by a majority decision for a two year period

17    of time.  I dissented for a one year denial but the

18    majority prevails so the denial was for two years

19    based on the life crime, the nature of the life crime,

20    the causative factors that led up to that life crime,

21    including your pattern of criminality, which was also

22    punctuated by violent criminality.  The Board finds a

23    longer time is going to be required to evaluate your

24    suitability in view of that history of criminality

25    that began very early as a juvenile, your history of

26    alcohol abuse, your involvement in gang activities,

27    **NOEL VALDIVIA**     C-29917     **DECISION PAGE 4**     7/1/99

57

1    your violent activities.  The Panel feels you haven't
2    completed the necessary programming essential to your
3    adjustment and you need additional time to gain such
4    programming, sustained programming.  We are going to
5    recommend, sir, that you become and remain
6    disciplinary-free, that you maintain your vocational
7    and educational upgrading, and that you participate in
8    self-help and therapy programming and try to keep
9    yourself as clean as you can.  This is your tentative
10   decision today, sir.  I'll indicate to you that I will
11   complement you on the maintenance of your marriage.
12   It has lasted a long time under difficult
13   circumstances and I think that's an impressive thing
14   and you are to be commended.  And you have done a lot
15   of positive things and you should try to sustain
16   yourself in that regard.  Any comments, Commissioner
17   Shelton?

18          COMMISSIONER SHELTON:  Yes.  Number one, it was
19   a horrible crime.  Both of you went out with loaded
20   weapons to rob somebody and to think that the crime
21   couldn't happen and a person couldn't lose their life
22   and you set off in that type of a goal setting and it
23   would be ridiculous at any age and your lifestyle
24   (inaudible) with that.  And I was surprised when it
25   was mentioned in here today that you had actually had
26   Anger Management classes because I saw you being very
27   NOEL VALDIVIA    C-29917    DECISION PAGE 5    7/1/99

58

1    domineering.  You may not realize this how you come

2    across but with your attorney and you cut people off

3    and you want to take over and take charge.  Sometimes

4    it's a good leadership quality and sometimes it's a

5    poor leadership quality.  If you can get back in any

6    kind of a class with Anger Management or Self-Control,

7    I'd suggest that.  I wish you the best.

8            **PRESIDING COMMISSIONER NIELSEN:**  Commissioner

9    Coldren?

10           **DEPUTY COMMISSIONER COLDREN:**  No, comment.

11           **PRESIDING COMMISSIONER NIELSEN:**  All right,

12   sir, good luck to you.

13           **INMATE VALDIVIA:**  Okay, thank you.

14                          --o0o--

15

16

17

18

19

20

21

22

23

24

25   PAROLE DENIED TWO YEARS

                                      JUL 3 0 1999

26   EFFECTIVE DATE OF THIS DECISION_____

27   NOEL VALDIVIA    C-29917    DECISION PAGE 6    7/1/99

EXHIBIT   "B-4"

42

1       CALIFORNIA BOARD OF PRISON TERMS

2                   D E C I S I O N

3       DEPUTY COMMISSIONER DOUGLAS:  You're on.

4       PRESIDING COMMISSIONER GIAQUINTO:  We're back o

5   record.  We denied you parole for a year.  And I am

6   going to read a statement here, then I am going to

7   talk to you briefly after I read the statement.  The

8   Panel reviewed all the information received from the

9   public and relied on the following circumstances in

10  concluding that you are not suitable for parole, you

11  pose an unreasonable risk of danger to society and a

12  threat to public safety if released from prison.  The

13  offense was carried out in a cruel and callous manner

14  with disregard for life and suffering of another in a

15  dispassionate and calculated manner.  These

16  conclusions are drawn from the Statement of Facts

17  where the prisoner during the commissions of an armed

18  robbery shot and killed the victim.  The prisoner had

19  an escalating pattern of criminal conduct, he was on

20  probation at the time also.  He had used PCP,

21  marijuana, and alcohol, dropped out of school in the

22  ninth grade, had been arrested for out of control,

23  loitering, failure to disperse, possession of

24  marijuana, driving under the influences, traffic

25  offenses, resisting arrest, two counts of batter on a

26  police officer, malicious mischief.  The prison- has

27  **NOEL VALDIVIA   C-29917   DECISION PAGE 1      /31/98**

43

1    not sufficiently participated in self-help and therapy
2    programming.  The Panel makes the following findings:
3    That the prisoner could use continued therapy so that
4    he might delve into the causative factors related to
5    the life offense.  The prisoner should be commended
6    for being disciplinary-free, participating in AA,
7    getting his GED, participating in drafting, being a
8    teacher's assistant, participation in such things as
9    Prison Ministries, Amer-I-Can, Prison Fellowship, data
10   processing, he's got several laudatory chronos.
11   However, these positive aspects of his behavior do
12   not outweigh the factors of unsuitability.  It's a one
13   year denial.  And we want you to remain
14   disciplinary-free, it's not going to hurt you to
15   upgrade educationally, and participate in available
16   self-help and therapy programming.  The Panel was
17   impressed with you as an individual.  (Inaudible) get
18   around the crime, at least point, you know you've got
19   time to do in here.  Even of you were to get a date
20   today, you still have a lot of time to serve.  But
21   that's not the reason necessarily for denying you
22   parole, I'm just telling you that.  So, I guess what
23   I'm trying to tell you is to get to encourage you to
24   stay on the path that you're on because (inaudible) it
25   appears, at least on the surface, that you might have
26   some good prospects for eventually getting paroled.
27   **NOEL VALDIVIA   C-29917   DECISION PAGE 2      3/31/98**

44

1    The fact that you were denied parole again for another
2    year should not deter you from the path that you're
3    on.   I know that it's depressing, I know that you get
4    your hopes up and you come in here and you go out
5    feeling depressed.   It's something that you've got to
6    just keep in check, keep your emotions in check and
7    stay on the path that you're on.   Tell those people
8    that, those people that write letters, to say, I'm
9    writing this letter on behalf of my niece and she is
10   going to sign it but these are her words.   Just tell
11   them that.   Okay.   The other stuff you have lined up
12   pretty good.   Your parole plans (inaudible).   Let's
13   see, what else, Ms. Bentley?

14          COMMISSIONER BENTLEY:   Police reports..

15          PRESIDING COMMISSIONER GIAQUINTO:   We want to
16   ask the DA to give us the police reports because, you
17   know, I struggled with to go through these reports to
18   look for anything that described (inaudible) taking
19   place between you and the victim, but I see your crime
20   partners, and I (inaudible) over the years in prison.
21   And I recall the description of the events, a wallet
22   was thrown down, your crime partner over and shot this
23   (inaudible), but never any description of a struggle
24   taking place except from you, where you've repeatedly
25   said that there was a struggle.

26          INMATE VALDIVIA:   (Inaudible).   Are you
27   **NOEL VALDIVIA   C-29917   DECISION PAGE 3   3/31/98**

46

1    (inaudible).  But I didn't want to say mouthing, I
2    didn't want to speak.  I just kind of got (inaudible).
3    So he was always asking me what kind of special
4    circumstance.  He says, come on you have to tell the
5    truth.  The cops are wondering why there was money in
6    his pocket.

7              PRESIDING COMMISSIONER GIAQUINTO:  (Inaudible).
8              INMATE VALDIVIA:  No, I understand that.
9              PRESIDING COMMISSIONER GIAQUINTO:  But I'm
10   telling you I can't necessarily believe anything that
11   you're saying.  You might telling the absolute truth,
12   but (inaudible).  We might even come back and say, you
13   know what you're absolutely correct what you're
14   telling us tends to support what (inaudible).  So I'm
15   not disputing what you're saying (inaudible) one page
16   report.  We want to read those reports or whatever is
17   provided to us, because if you are granted a date
18   (inaudible).  We don't take this much time sitting
19   around talking to a prisoner.  You know, (inaudible).
20   We're taking time today to make you also understand
21   that before you can get a date and before this thing
22   is going to fly with any decision, you have got to
23   explain.  Everything that we perceive as a potential
24   concern is going to have to be properly addressed,
25   thoroughly addressed.  So, keep that in mind, because
26   you don't want to get a date and then that date
27   **NOEL VALDIVIA   C-29917   DECISION PAGE 5     3/31/98**

47

1   rescinded two weeks later from (inaudible) decision.

2   You want to get a date (inaudible).  Good luck to you.

3          DEPUTY COMMISSIONER DOUGLAS:   Good luck.

4          ATTORNEY MONTGOMERY:   Thank you.

5                      --o0o--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   PAROLE DENIED ONE YEAR

26   EFFECTIVE DATE OF THIS DECISION_____MAY 1 8 1998_____

27   NOEL VALDIVIA   C-29917   DECISION PAGE 6       3/31/98

EXHIBIT "B-5"

40

1    CALIFORNIA BOARD OF PRISON TERMS

2    D E C I S I O N

3    PRESIDING COMMISSIONER BAKER:    We're back on

4    the record in the matter of Noel Valdivia, ID-number

5    is C-29917.  The panel reviewed all the information

6    received from the public and relied on the following

7    circumstances in concluding that the Prisoner is not

8    suitable for parole and would pose an unreasonable

9    risk of danger to society and a threat to public

10   safety if released from prison.  The offense itself

11   was carried out in a manner which exhibits a callous

12   disregard for the life and suffering of another.  The

13   Prisoner has an escalating pattern of criminal conduct

14   and an unstable social history.  He's failed previous

15   grants of probation and cannot be counted upon to

16   avoid criminality.  The panel makes the following

17   findings.  That the Prisoner needs more therapy in

18   order to face, discuss, understand and cope with

19   stress in a non-destructive manner.  Until more

20   progress is made, the Prisoner continues to be

21   unpredictable and a threat to others.  The Prisoner

22   should be commended for his disciplinary free behavior

23   and the programming that he has been able to

24   accomplish.  However, this positive aspect of this

25   behavior does not outweigh the factors of

26   unsuitability.  This is a one-year denial,

27   **NOEL VALDIVIA    C-29917    DECISION PAGE 1    (3/18/97)**

**41**

1    Mr. Valdivia.  It's not something we gave to you.

2    That's something you (inaudible).  Okay?

3            **INMATE VALDIVIA:**   Thank you, sir.

4            **PRESIDING COMMISSIONER BAKER:**   During the next

5    year, we want you to remain disciplinary free.  And

6    I've already talked to you last time about discipline

7    and it looks like you're doing a much better job than

8    that.  That you continue to upgrade vocationally and

9    educationally as the opportunity presents itself and

0    that you participate in self-help and therapy

1    programming.  And that means whatever is available.

2    And if there's nothing available, (inaudible) start.

3    Okay, that concludes the hearing.  I'll ask the other

4    panel members if they have any comments.  Mr. Nielsen?

5            **COMMISSIONER NIELSEN:**   Mr. Valdivia, you did

6    get yourself into a pretty sorry situation, escalating

7    behavior and the victim died a horrible death.  I

8    mean, having that kind of pain inflicted upon you,

9    probably he died quickly, but it's not a pretty sight.

0    You know it.  You saw it.  And that does argue for

1    time to be served here.  But I will say this.  That

2    with the support that you have out there and the

3    attitude that you are evincing here today and, in

4    fact, in the previous hearing, you are a man with a

5    lot of promise and I do think that, sir, you're going

6    to be a productive member of society one day.

7    **NOEL VALDIVIA   C-29917   DECISION PAGE 2   (3/18/97)**

42

1          INMATE VALDIVIA:    Thank you, sir.

2          PRESIDING COMMISSIONER BAKER:    Mr. Douglas?

3          DEPUTY COMMISSIONER DOUGLAS:    Just to remind

4    you that the longest journey starts with the first

5    step, Mr. Valdivia.   You've taken that first step.

6          INMATE VALDIVIA:    Thank you, sir.

7          PRESIDING COMMISSIONER BAKER:    That concludes

8    the hearing.  The time is 12 o'clock.

9                         --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    PAROLE DENIED ONE YEAR

26    EFFECTIVE DATE OF THIS DECISION _____   JUN 0 2 1997

27    NOEL VALDIVIA    C-29917    DECISION PAGE 3    (3/18/97)

EXHIBIT "B-6"

1   | CALIFORNIA BOARD OF PRISON TERMS

2   | D E C I S I O N

3   | PRESIDING COMMISSIONER BAKER: Okay. We're back

4   on the record in the matter of Valdivia, I.D. Number C-

5   29917. The Panel reviewed all the information received

6   from the public, relied on the following circumstances in

7   concluding that the prisoner is not suitable for parole

8   and would pose an unreasonable risk of danger to society

9   and a threat to public safety if released from prison.

10          This offense was carried out in an especially

11  atrocious, cruel manner. The offense was carried out in

12  a manner which exhibits a calloused disregard for the

13  life and suffering of another.

14          Prisoner has a record of violence and

15  assaultive behavior. An escalating pattern of criminal

16  conduct. Failed previous grants of probation and cannot

17  be relied upon to avoid criminality.

18          Prisoner has failed to demonstrate evidence

19  of positive change. Misconduct while incarcerated

20  includes a recent 115 for participating in a work

21  stoppage.

22          Psychiatric report dated 6-27-94, authored by

23  Dr. VanCleve is not totally supportive of release.

24          The Panel Makes the Following Findings:

25  Prisoner needs more therapy in order to face, discuss,

26  understand, and cope with stress in a non-destructive

27  NOEL VALDIVIA    C-29917    DECISION PAGE 1    1-24-95

1    manner.   And until more progress is made, the prisoner
2    continues to be unpredictable and a threat to others.

3         Prison is denied parole for two years.   The
4    Hearing Panel finds it is not reasonable to expect that
5    parole would be granted at a hearing during the following
6    two years.   Specific reasons for this finding are as
7    follows::

8         Prisoner committed this offense in an
9    especially atrocious and cruel manner.   Specifically, he
10   shot and killed the victim during a robbery for no
11   apparent reason.   As a result, a longer period of
12   observation and evaluation is required before the Board
13   should set a parole date.

14        Prisoner recently committed a serious
15   disciplinary violation by participating in a work
16   stoppage.

17        And a recent psychiatric report dated 6-27-
18   94, authored by Dr. VanCleve indicates a need for a
19   longer period of observation and evaluation or treatment.

20        The Panel recommends that the prisoner become
21   and remain disciplinary free; continue to upgrade
22   vocationally, as the opportunity presents itself; and
23   participate in self-help and therapy programming.

24        Mr. Valdivia, this Panel, I think is very
25   impressed with the progress that you've made from the
26   time you came in to where you're at right now.   I mean,
27   NOEL VALDIVIA     C-29917     DECISION PAGE 2     1-24-95

1    it would be almost unheard of for anybody to get a date
2    when they come here for their Initial Parole Hearing,
3    especially when you're in here for first degree murder.
4    You have made some progress. We are impressed with that
5    progress. We want you to continue, and this is a
6    terrible crime, you're going to have to do some time
7    behind that charge. In the meantime, forget about this
8    work stoppage business and when you start making your
9    decision, and you start thinking about who you got to
0    protect, you got to protect you, look out for number one.
1    If there's anyway to stay away form those 115's, they're
2    going to come back and bite you later on. Stay away from
3    'em completely. There is no reason for somebody your age
4    and your -- your intelligence level to be be getting any
5    115's. You're too sharp for that.

6    Continue in your AA, that's something you're
7    going to have to, I think, dedicate yourself the rest of
8    your life. You're going to have to stay in AA. And, you
9    know, any therapy that can come along that you can get
0    into, don't hesitate to get into it. Anything like that
1    that you can do to enhance or further, you know, yourself
2    along, jump right in it. You're doing -- you're on the
3    right track, you know you're on the right track, I just
4    don't want you to be discouraged or get off that trace.

5    INMATE VALDIVIA: Yeah.

6    PRESIDING COMMISSIONER BAKER: Mr. Koenig, do you

7    NOEL VALDIVIA    C-29917    DECISION PAGE 3    1-24-95

1    have any comments?

2          COMMISSIONER KOENIG:  No.  Good luck to you.

3          PRESIDING COMMISSIONER BAKER:  Mr. McNair?

4          DEPUTY COMMISSIONER McNAIR:  No, sir.  Good luck

5    to you.

6          PRESIDING COMMISSIONER BAKER:  Good luck to you,

7    sir.

8          ATTORNEY CASSADY:  Thank you.

9          PRESIDING COMMISSIONER BAKER:  That concludes the

10   hearing.  The time is 1:25.

11                        ---oOo---

12

13

14

15

16

17

18

19

20

21

22

23

24

25   PAROLE DENIED TWO YEARS

26   EFFECTIVE DATE OF DECISION _____

27   NOEL VALDIVIA      C-29917      DECISION PAGE 4      1-24-95

EXHIBIT "C"

VALDIVIA, Noel  C-299₁,                                                    March 20, 2006

# MENTAL HEALTH EVALUATION
# FOR THE BOARD OF PRISON TERMS
# MAY 2006 LIFER HEARING
# SAN QUENTIN STATE PRISON

# PSYCHOSOCIAL EVALUATION

I.      Identifying Information:  Mr. Valdivia is a 44-year-old, Hispanic male who is
        serving a 25 year to life sentence, for P187 first degree murder.  This report is
        based on a review of the inmate's central files, medical record and two face-to-
        face interviews conducted in mental health interviewing areas at San Quentin
        State Prison.  Only Mr. Valdivia and the examiner were present at the time of the
        interviews.  Mr. Valdivia was informed that the information obtained during the
        interview was not confidential in that it would be included in a report to the Board
        of Prison Terms.    He stated that he understood this and was voluntarily
        participating in the interview.  Mr. Valdivia denied that he needed any assistance
        to participate in the interview and he appeared to understand the purpose of the
        interview and the limits of confidentiality.    For reasons not limited to the
        possibility that an inmate may have a mental disability or other mentally
        handicapping condition, a licensed psychologist conducted the interview.  It was
        the conclusion of the examiner that Mr. Valdivia did not require auxiliary aids or
        assistance to achieve effective communication.

Mr.  Valdivia's  Developmental  History,  Educational  History,  Family  History,
Psychosocial Development and Sexual Orientation, Marital History, Military History,
Employment and Income History, and Substance Abuse History have been thoroughly
reviewed and presented in previous evaluations and will not be repeated here.  The reader
is referred to previous reports, especially the 1999 report by Dr. Macomber for this
information.

## II. Psychiatric, Medical History:

Mr. Valdivia has a history of complaints of chest pain and tightness following surgery in
1987 to correct a heart murmur.  He reported that he has no current symptoms other than
some occasional extra heartbeats for which he does not need treatment.  He takes
medication for hypertension, but has no other medical complaints at the present time.  His
mental health history is in relation to his commitment offense.  He attended therapy
programming at DVI to address his understanding of his offense as well as stress and
anger management.

## CLINICAL ASSESSMENT

### III. Current Mental Status/Treatment Needs:

Mr. Valdivia appeared to be his stated age.  He was well groomed and dressed in standard
CDC inmate clothing.  He greeted a number of inmates on the way to the appointment in
a friendly manner, and appeared to be a very sociable person.  He appeared to be fully

VALDIVIA, Noel  C-2991,                                        March 20, 2006

alert, and energetic and was oriented in all spheres. His manner was relaxed, enthusiastic and confident. His thought was coherent, linear and logical with no evidence of thought disorder. His intellectual functioning appeared to be in the average range.  Speech was fluent and articulate.  Flow of thought and affect were within normal range.  There was no evidence of mood instability or depressed mood.  Mr. Valdivia stated that he slept and at well.  He denied any experience of auditory or visual hallucinations.  His judgement appeared to be adequate for most situations.  He demonstrated capacity for insight into his crime.

## CURRENT DIAGNOSTIC IMPRESSIONS:

| | |
|---|---|
| AXIS I: | V71.01 Adult Antisocial Behavior (by history) |
| | (303.90 Alcohol Dependence (sustained full remission) |
| AXIS II: | V 71.09 No Diagnosis |
| AXIS III: | Hypertension |
| AXIS IV: | Stressors: Life Sentence |
| AXIS V: | GAF  90 |

## IV. Valdivia Review of Life Crime

According to the (POR), Mr. Valdivia and a companion were drinking in a park and needed money to buy more alcohol.  They attempted to rob 2 men at gunpoint, ordering them to hand over their money.  One of the victims threw his wallet on the ground.  As his crime partner bend over to pick up the wallet, Mr. Valdivia shot the other man in the face.

Mr. Valdivia acknowledges that he was gang affiliated and involved in a criminal lifestyle when he committed his offense.  He stated that he was motivated by a need for cash that he admits was to be used for the purchase of beer.  Mr. Valdivia states that he is deeply ashamed of his actions and remorseful for taking the life of an innocent man.

Mr. Valdivia sees his criminal actions as part of a criminal lifestyle that he adopted as a teen.  This included gang membership, violations of the rights of others, criminal acts, and the sale and use of illegal substances.  The initial motivation was a desire to fit in with the guys in the neighborhood.  This included the ability to defend oneself.  Mr. Valdivia stated that "others want to test you, so you come to believe that you have to fight in order to be on the streets."  He now looks on many others he knew from the same community who did not get into trouble as examples of what he could have done.  He described a process of increased use of violence in order to gain authority and status with his peers.  He stated that the process began with fighting.  That brought popularity if you won.  This type of attention for being tough was attractive to Mr. Valdivia, as it brought respect and recognition with it.  He denies that he intended to kill the victim.

Mr. Valdivia admits that he instigated the crime for which he is incarcerated.  He intended to commit the robbery and sought out a victim.  He expected the crime to be a simple robbery.  Mr. Valdivia was unprepared for the victim to move in the direction of

VALDIVIA, Noel  C-299₁,                                              March 20, 2006

the gun.  He stated that his finger was on the trigger and he shot the victim.   Mr. Valdivia
and his partner fled the scene immediately.

## VI. Assessment of Dangerousness:
### A. In a Controlled Environment:
Mr. Valdivia has been disciplinary-free since May of 2000. His most recent rules
violation was for disobeying a medical lay-in order.  He has a total of 5 CDC-115's
during his period of incarceration.  Only one is for a violent offense.  This was for an
altercation with his "cellie," that occurred more than 20 years ago.  The others involved
conflicts with authority.   The most consistent limiting factor in Mr. Valdivia's
rehabilitation has been a history of problems with authority.   This has resulted in a
number of rules violations for attempting to circumvent institutional rules.

While not openly hostile toward authority, the record suggests that Mr. Valdivia likes to
argue and win.  This seems to be more a competitive attitude, than an antisocial one and
does not require therapy as long as Mr. Valdivia is able to avoid violating the rules.

Mr. Valdivia is an individual who is very comfortable with who he is, and does not seek
to please others.  He has used his time in prison well and appears to be a happy, relatively
well-adjusted individual who has prepared himself to react constructively to whatever
challenges he faces whether incarcerated or in the community.  His religious faith is a
strong factor in this.

It would be possible to be cynical about Mr. Valdivia's "jailhouse conversion" to a
Christian life following his arrest.  He acknowledges that he was possibly facing the
death penalty when he decided to change his life and become a born-again Christian.
Since that time, however, Mr. Valdivia has consistently professed and lived his Christian
faith.  This does not seem to have diminished over time.  His record contains many
statements by individuals who attest to his willingness to live his faith, and be an example
to others.

### B. If Released to the Community:

Mr. Valdivia had a juvenile record and previous criminal history.   He had arrests for
possession of marijuana, drunk driving, loitering, battery on a police officer.  His arrest
record also indicates that he was involved in an incident in which several persons had
been shot during a gang confrontation.  As an adult, he was named as a defendant in a
murder case that was dismissed in the interest of justice.

He also failed on community supervision.  Mr. Valdivia was on probation for a gun-
related offense at the time the crime was committed.  He has a past problem with alcohol
abuse and was under the influence at the time of his offense.  Mr. Valdivia acknowledges
a pattern of escalating violence and criminal conduct that he believes would eventually
have resulted in homicide or his own death through violence.

Mr. Valdivia has consistently shown a willingness to live his life differently and shows much evidence of positive change. The present examiner feels that Mr. Valdivia's conduct is no longer unpredictable or a threat to others. He has gained work skills that would allow him to be self-supporting. He has participated in therapy and self-help programming. In the past it was recommended that Mr. Valdivia needed additional therapy in order to cope with stress in a non-destructive manner.

While it would be possible for Mr. Valdivia to participate in additional interventions or therapy programs, his present level of functioning does not indicate a need for any specific programming. He is happy with himself and his life. He has a strong sense of purpose and enthusiasm for his life and his work. His overall success does not seem to be dependent on any one factor. For example, Mr. Valdivia is no longer married. It does not seem that the loss of this long-term marriage has destabilized him. He also has not sought to pursue another union while incarcerated.

Others have also consistently commented on his sincerity and authenticity. There is a wide-spread perception is that he is a man who has genuinely adopted new values and sense of purpose. It is also apparent that Mr. Valdivia would have little or nothing to gain from returning to his previous lifestyle. The antisocial and irresponsible acts that brought him to prison are relatively common in adolescents, but relatively rare in mature males. Mr. Valdivia does not possess an antisocial or criminal mentality that would support the continuance of those lifestyle choices into middle age.

It is still possible that Mr. Valdivia would be capable of errors in judgement. He is assertive, likes to think for himself, and to stand up for himself. He trusts his own judgement on matters.. This is both a personality strength and weakness, as no one's judgement is infallible. It does not seem to be part of a more serious personality disorder, or necessarily maladaptive, as long as Mr. Valdivia remains open to input from others.

Clinician Summary and Recommendations:

Mr. Valdivia committed a callous crime in that he took the life of another man who posed no threat to him. Mr. Valdivia and his crime partner approached the victim with criminal intent. Mr. Valdivia's explanation that he was caught off guard by the victim's actions is plausible. He did not claim that the shooting was accidental, but denies that he intended to harm the victim. While he had been drinking prior to the incident, he does not feel that alcohol was responsible for his criminal intent. Mr. Valdivia takes responsibility for his crime, for voluntarily participating in a violent lifestyle, and for the shooting. that resulted in the victim's death.

While one cannot predict the future, there seems to be little incentive for Mr. Valdivia to return to the life that brought him to prison. He has gone in another, more positive direction. He is to be commended for his personal change and for his guidance to others. It would seem that he has done every thing possible to insure that he does not return to the destructive life he led in the community. He has improved himself on many fronts while incarcerated. He has made a public declaration of his faith and his intention to live a clean and sober, Christian life. He has a realistic plan for the future and has the energy

VALDIVIA, Noel C-2991 ,                                                                    March 20, 2006

and commitment necessary to make it happen. He also seems to have sufficient social
support.

While Mr. Valdivia denies that alcohol was the primary reason for his crime, it is clear
that alcohol abuse was a related problem. Provided he continues his participation in AA,
he would not face unreasonable risk of relapse were he to be released to the community.
The only additional intervention that might be important for Mr. Valdivia would be for
Mr. Valdivia to obtain a sponsor.

His overall successful adjustment is likely to continue as long as he maintains his
sobriety. His potential for violent recidivism in the community would be considered to
be low. The present examiner concurs with the findings of previous examiners that Mr.
Valdivia would be expected to do very well if parole is granted.

It is noteworthy that Mr. Valdivia has consistently received psychological evaluations
that are supportive of his ability to parole successfully. In reviewing the reports of
previous examiners, the present examiner was not able to find any result that was not
supportive of Mr. Valdivia's suitability for parole consideration.

It would seem that with his consistent record of growth and improvement, Mr. Valdivia
would pose a low risk of violent recidivism in the free community. This conclusion is
predicated on Mr. Valdivia's continuous abstinence from the use of drugs or alcohol as
the use of an intoxicant played a role in the commission of his offense. Given his
participation in AA and his strong Christian values, he has supports for refraining from
their use in the future.

There is no indication of a need for further therapy while incarcerated.


_Michel L. Inaba_                    _Ph.D_        3-21-06
Michel Lynn Inaba, Ph.D.                              Date
Contract Psychologist

EXHIBIT "C-1"

## FOLSOM STATE PRISON
BOARD OF PRISON TERMS
LIFE-TERM MENTAL HEALTH EVALUATION

*For the Calendar Month of July, 2001*

## INTERVAL MENTAL HEALTH ASSESSMENT

IDENTIFICATION: This is the ninth psychiatric evaluation for the Board of Prison Terms concerning Mr. Valdivia is a 39-year-old divorced, Mexican-American, first-term inmate serving a 25-years-to-life sentence for PC 187, First-Degree Murder. He entered CDC custody on 5/5/1981. He was last seen by the Board in 1999 and given a two-year denial. For this interval report his C-file and Unit Health Record were reviewed. In addition, special note was taken of the comprehensive mental health assessment by Dr. Macomber dated 2/18/1999. Finally, I interviewed Mr. Valdivia for approximately 45 minutes on 5/29/2001.

CURRENT PROGRAMMING: Mr. Valdivia continues in essentially the same program he has had for several years. He is working as a sheet metal fabricator and is very proud of the quality of his work in this area. In addition, he has continued to attend AA meetings on a regular basis. He also has attended an Anger Management course and the Breaking Barriers course since the last BPT hearing. Significantly, he continues as a devout Christian who attends and leads religious services thrice weekly – both on the Main Yard and on Saturday evenings in the Greystone Chapel.

PLANS FOR PAROLE: When paroled Mr. Valdivia will return to the Stockton area where he will reside with family. He has had several job offers from firms in the area and these remain open. He also has the support of his family (although he and his wife have divorced since the last hearing) and continues to enjoy weekly contact with his children. When paroled he also intends to continue his religious study and practice in one of several churches that have helped to sponsor his "ministry" here at Folsom. He continues to have realistic and viable plans for parole. The prognosis for adjustment in the community is excellent.

CURRENT MENTAL STATUS/TREATMENT NEEDS: Mr. Valdivia was neatly dressed in prison garb and wearing glasses. His hygiene and grooming was excellent. He was serious, forthright, and cooperative. He appeared to answer to the best of his ability. His affect was euthymic with broad range and reactivity. His speech was spontaneous, fluent, and of normal rate and rhythm. His thinking was clear, logical and goal-directed. Content of thought was appropriate to context and affect. He was not suicidal or homicidal. He was alert and oriented x3. His reasoning and memory were intact. His insight and judgment was good.

In the period since the last review, there has been no change in Mr. Valdivia's mental health. He maintains a prosocial and positive attitude. Although he has had diagnoses of

Valdivia, Noel                    CDC No. C-29917                    May 31, 2001

substance abuse and antisocial behavior in the past, he continues to be free of any psychopathology at this time. His adjustment is quite mature and positive. As noted in previous reports, Mr. Valdivia has experienced significant improvement in his personality and coping during his incarceration.

DIAGNOSTIC IMPRESSION:

Axis I:        No mental disorder

Axis II:       No mental disorder

Axis III:      None noted

Axis IV:       Incarceration

Axis V:        GAF = 90

REVIEW OF LIFE CRIME: Mr. Valdivia's account of the instant crime is similar to his previous accounts. He continues to express great remorse and guilt over the death of his victim. He appears to sincerely accept responsibility for the crime. He speaks of the suffering of the victim's family and friends and the effects the crime has had on them. He appears to have been able to transform his previous attitudes into positive and prosocial attitudes that now motivate him to work with others to improve their lives.

ASSESSMENT OF DANGEROUSNESS: Consistently accurate predictions of future instances of dangerous acts cannot be made by mental health professionals; whether a person will behave aggressively is a function of a number of factors that include history, personal disposition, and situational variables (e.g. provocation) that cannot be known in advance. However, it is possible to consider the available historical data and the anticipated placement/situational factors to estimate relative risk. This is the basis for the current risk assessment.

Mr. Valdivia's potential for dangerous behavior remains unchanged since his last evaluation in 1999. In a controlled setting his potential is very below average as compared to other inmates. It could also be expected that his potential for violence or dangerous behavior in the general community is also very below average compared to other paroled inmates.

CLINICAL OBSERVATION/COMMENTS/RECOMMENDATIONS: Mr. Valdivia presents with no significant psychopathology at this time. Of note is his divorce from his wife of almost twenty years soon after his last BPT hearing. He accounts for this due to her inability to tolerate the repeated cycle of increased hope of parole followed by intense disappointment when no date is set. He is somewhat philosophical regarding his divorce and states that he understands her situation. He also notes that he remains close to his children who he continues to be in close contact with.

Overall, it is my professional opinion that Mr. Valdivia presents little danger of repeated violence in the community if paroled. He has a practical, viable and solid plan for parole. He has prepared himself spiritually and psychologically to be successful in the community. If parole is granted, I believe Mr. Valdivia should do very well. There are no further program needs at this time.

Robert D. Canning, Ph.D.

Licensed Psychologist

Folsom State Prison, Reseda, CA

EXHIBIT "C-2"

## *FOLSOM STATE PRISON*
## BOARD OF PRISON TERMS
## LIFE-TERM MENTAL HEALTH EVALUATION (Revised 1998)

### *FOR THE CALENDAR MONTH OF MARCH, 1999*

### PSYCHOSOCIAL ASSESSMENT

IDENTIFYING INFORMATION: Mr. Noel Valdivia is a 37-year-old, Mexican-American, (DOB 09/10/66), single, married, first-term, male inmate that is serving a Twenty Five Years to Life Sentence from Los Angeles County for the offense of P.C. 187 Murder First Degree which occurred on 07/10/80. His MEPD is 10/11/95.

SOURCES OF INFORMATION: The following report is based on a review of the inmate's Central File, Unit Health Record, and a 120-minute Clinical Assessment Interview conducted on 02/18/99.

DEVELOPMENTAL HISTORY: When questioned about prenatal and perinatal concerns, he stated that his birth was normal without any complications. He stated that as a child his health was good with the exception of a heart murmur which was corrected with heart surgery. He did not have any problems as a child with enuresis, arson, or cruelty to animals. He denied a history of being abused in any way as a child, including sexually, physically, or emotionally.

EDUCATION: He stated that he attended school in Stockton up to the 12th grade and then dropped out just prior to graduating. He stated that at the time his behavior was out of control and he was not doing well in school. He later completed his GED on 06/02/86 at DVI. His TABE Scores indicate a 12.9 Achievement Level academically.

FAMILY HISTORY: He stated that he was born in Ohio. He stated that as his parents were both immigrant farm laborers the family traveled a great deal across the United States. At the age of five they came to California, and at the age of seven they settled in Stockton where the family continues to reside. Both parents are living. His father is 74 and his mother is 70. They are married and have never separated. He stated there is no history of drug abuse, alcohol abuse, criminal behavior, or mental health problems in the family. He is the tenth of eleven children. Two of his siblings have died. His oldest brother, Juan, age 50, lived in Texas and is involved in a paralegal career working for an attorney. Alicia is 46 and lives in San Diego. Etimenio is 44, works as a mechanic, and lives in Stockton. Graciella is 44, Maria is 42, Amelia is 41, Mario is 40, and Alberto is 38. These siblings all live in the Stockton area, are working regularly, or have children. He stated that he gets regular visits

from all of his family members including his parents, siblings, as well as his wife and children. He indicated that his home life was normal and happy. He stated that his parents always treated the children very good. He never ran away as a child. He did get in trouble for stealing at the age of nine and was disciplined by being grounded for two weeks. He remained at home until he was arrested. He feels very close to his family members at this time.

**PSYCHOSOCIAL DEVELOPMENT & SEXUAL ORIENTATION:** When questioned in this area, he stated that his sexual orientation is heterosexual. He stated that there was no history of sexual behavioral problems. His first sexual relationship with a girlfriend was at the age of fourteen, and he believed he had a total of seven different sexual partners in his lifetime.

**MARITAL HISTORY:** Inmate Valdivia has been married and never divorced. His wife, Celeste, lives in Stockton with their two children. They were married on 08/17/81, and their marriage remains intact. He stated that his wife is suffering a great deal from disappointment and discouragement due to his repeated inability to obtain a parole date. He is anxious regarding her health. There are two children, Raquel, age 19, and Noel Jr., age 15. He sees his family on a regular basis.

**MILITARY HISTORY:** Mr. Valdivia has no Military History.

**EMPLOYMENT/INCOME HISTORY:** He was arrested at the age of 18. Prior to that time he had worked during the summer time for a lumbar company making pallets and cutting wood. In the institution he has successfully completed three vocational trades. He has completed Electronic Data Processing and Computers, Vocational Mechanical Drafting, and Vocational Sheet Metal, plus, he has a two-year apprenticeship in Sheet Metal. He is currently employed at Folsom in the Sheet Metal Shop. He is very interested in continuing his skills in sheet metal and he stated he has job offers from sheet metal companies in the community when he is released.

This man does have excellent work skills that should enable him to obtain employment in the community quite easily.

**SUBSTANCE ABUSE HISTORY:** He stated that he used alcohol very heavily starting at the age of thirteen and he used it for five years until he was arrested. He considers himself to be an alcoholic. He also used Marijuana occasionally but did not feel addicted. He did not have a problem with Cocaine, amphetamines, or Heroin. He currently attends Alcoholics Anonymous on a regular basis and finds it quite helpful.

**VALDIVIA, NOEL   C-29917**                     **02/18/99   MAC:cdh**
**BOARD OF PRISON TERMS EVALUATION**
Page 2

**PSYCHIATRIC AND MEDICAL HISTORY:** When questioned about his current health, he stated that his health is quite good at this time and he has no health problems. He did have heart surgery in 1987, but he is doing well at this time. There is no history of serious accidents or injuries. He is not depressed or suicidal. He does not have seizures or other neurological problems. He is not taking medication.

There are seven prior psychological evaluations in the file prepared for the BPT. These will be briefly summarized below:

On 02/16/84, he was seen at San Quentin by M. E. Roudebush, M. D., Psychiatrist, who indicated a diagnosis of No Mental Disorder with Antisocial Personality Disorder, Improving. He appeared to be sincere in his remorse and in the changes that he was making. He was interested in following the Christian life and staying away from his prior lifestyle.

On 03/16/87, he was seen at CMF by F. H. Ernst, Jr., M. D., Psychiatrist, who indicated a diagnostic impression of Antisocial Personality Disorder with History of Episodic Alcohol Excesses.

On 05/31/90, he was seen at DVI by Roger Kotila, Ph.D., Psychologist, who indicated a diagnosis of Alcohol Dependency, Episodic, by History, and Passive Aggressive Personality with Some Antisocial Personality Features by History, Showing Significant Improvement. Violence potential was seen as below average both in prison and if paroled, in comparison to other inmates.

On 03/31/93, he was seen at DVI by Richard Obrochta, Ph.D., Psychologist, who indicated the diagnostic impression of Alcohol Dependence by History, PCP Dependency by History, LSD Dependence by History, Antisocial Personality Disorder, Improving. Conclusions were that his greatest inner strength stemmed from his religious beliefs. He has demonstrated improvement and adjustment while incarcerated. His marriage was still intact. Violence potential was seen as average in comparison to other inmates.

On 06/27/94, he was at DVI by Brunla Van Cleve, Ph.D., Psychologist, who indicated a diagnostic impression of No Mental Disorder at this time. The various Substance Dependence and Antisocial Personality Disorder was only by history. It was noted that Inmate Valdivia attended a therapy program while at DVI dealing with Stress Management and Anger Control. He was participating in an ongoing Lifer Therapy Group. He was active in Alcoholics Anonymous and was enthusiastic about their 12-Step Program. He was seen as being improved greatly during the observation in the institution. Violence potential was seen as being below average in comparison to other inmates.

On 12/03/96, he was seen at Folsom by Jerre Lender, Ph.D., Supervising Senior Psychologist, who indicated Polysubstance Dependence by History in Remission, and No Personality Disorder. GAF was listed as 90. Mental Status was completely normal. A continuous, consistent, and strong pattern of continuous growth and improvement was seen in all areas. He continued in a marriage which was positive since he was 17 years of age. He was actively involved in Bible Study Groups and Alcoholics Anonymous. There was no evidence of a mental disorder seen at the time. Violence potential if released to the community was seen as far below average. Removal from the Psychiatric Calendar was recommended.

On 12/05/97, he was seen at Folsom by H. R. Kormos, M. D., Psychiatrist, who indicated that the mental status examination was normal. A great deal of support was seen from friends and relatives in favor of the inmate's release. The inmate continues to send money home to his family. There was no evidence of an concern for risk of violence.

On 1/27/98, he was seen at Folsom by Albert Shnaider, M. D., Psychiatrist, who indicated No Mental Disorder at the current time. Diagnostic impression was Alcohol Abuse and Polysubstance Abuse in Remission, and Antisocial Behavior in Remission. GAF was listed as 90. It was noted that he began getting in trouble as an adolescent and became involved with alcohol and became involved in violence having to protect himself growing up in a touch neighborhood after he had joined a gang. This was not seen as a core deficit in his personality structure, but represented a period of life when the inmate was involved in antisocial behavior which is currently in remission. It was concluded that he has improved substantially since his incarceration in 1981. There is no evidence of a mental disorder. Violence potential was seen as well below average in comparison to other inmates.

PLANS IF GRANTED RELEASE: The county of commitment is San Joaquin County. His wife and children live in San Joaquin County. If released he will be living with his wife and children. He also has job offers in his vocational trade of sheet metal work. He has a great deal of support from friends and relatives in the community. It is expected that he will do very well on parole. He has very realistic and viable parole plans. Prognosis for successful community adjustment in this case is excellent.

# CLINICAL ASSESSMENT

**CURRENT MENTAL STATUS/TREATMENT NEEDS:** Mr. Valdivia related in a serious, open, communicative, and sincere manner. He was alert and well-oriented. His thinking was rational, logical, and coherent. Hygiene and grooming were appropriate. There was no evidence of a thought disorder. Intelligently he is functioning in the average to high-average range. Affect was appropriate. There is no evidence of depression or anxiety. He is not at all suicidal. He impresses as being a very honest and open individual who was able to openly discuss in great detail his childhood, past, criminal activities, and adjustment problems. He is not at all hostile or defensive. It is evident that he has made significant changes over the years since his initial incarceration. There is absolutely no psychopathology evident in this case at this time.

I agree to the previous evaluators that at the time of the offense there was Polysubstance Abuse that was related to the commitment offense. There was also evidence of Antisocial Behavior at the time. At this point in his life, 18 years later, it would not be appropriate to list Alcohol Abuse, or Polysubstance Abuse in this case after he has shown no evidence of any substance abuse while incarcerated. It is apparent that this is no longer a problem in his life. He has developed very strong pro-social thinking and values and his commitment to remain clean and sober is obviously very strong. There is no evidence of an Antisocial Personality Disorder or any other personality disorder at this time in this case. Therefore, the appropriate diagnostic label would be No Mental Disorder.

This inmate is deeply involved in Biblical Studies and Church Ministries. He also has completed numerous Inmate Self-Help Programs as well as participated in several Staff-led Therapy Programs. At this point in his life he is very much interested in reaching out to other inmates who are struggling and suffering with their own negative life patterns. I agree with the previous evaluators who have noted that Mr. Valdivia has experienced significant changes in his personality and attitude over the years in a positive direction.

**DIAGNOSTIC IMPRESSIONS:**

| | |
|---|---|
| Axis I: | No Mental Disorder |
| Axis II: | No Mental Disorder. |
| Axis III: | No Disorder. |
| Axis IV: | Incarceration. |
| Axis V: | Current GAF = 93. |

**VALDIVIA, NOEL  C-29917**                    **02/18/99    MAC:cdh**
**BOARD OF PRISON TERMS EVALUATION**
Page 5

**REVIEW OF LIFE CRIME:** In summation, the details of the commitment offense are that on 07/10/80, in Stockton, California, Charles Decker and Charles Thomas were in front of the Resso Apartments when they were approached by two males and were told to hand over their money. On of the suspects pointed what appeared to be a sawed-off .22 caliber rifle at Decker. Thomas took out his wallet and threw it on the ground. A crime partner, Eddie Ruiz, reached down for the wallet while Noel Valdivia shot Decker in the face. Decker died shortly after the shooting. The suspects ran and fled the area in an automobile. Glasses were left behind, and when examined for fingerprints, Noel Valdivia was identified.

When questioned about this offense by this writer, Inmate Valdivia stated that he and Ruiz had been drinking. They decided to rob someone in order to get more money to buy alcohol. He and Ruiz did attempt to rob the two men. He stated that he pointed the gun at Decker and then Decker, only trying to defend himself, grabbed the gun and pulled it while Valdivia had his finger on the trigger. The gun went off, shooting the victim. He stated that he had never previously robbed anyone and this was not an intentional offense. He stated that the victim, Mr. Decker, had every right to try to protect himself and he stated that he is extremely sorry that the victim was shot. He indicated that he accepts full responsibility for the victim's death. He knows that he was completely wrong to be engaged in an Armed Robbery and he accepts responsibility for the victim's death. He stated "I caused this crime by my selfish, irresponsible, and careless behavior." He indicated that he feels great remorse, and even when he thinks about it he gets deep feelings of sorrow. He stated that he plans to pursue a life of helping others with as much zeal as he pursued a negative destructive life as an adolescent. It was felt that this man's statements of remorse are very sincere and genuine.

**ASSESSMENT OF DANGEROUSNESS:** At the time of the offense, there were high risk factors that have been identified by research that were related to the offense and criminal behavior. These included the history of involvement in juvenile delinquency, alcohol use, and polysubstance use. At this point in time, there are several factors that would indicate a low risk for re-offense. These factors include the evidence gains in maturity and development of prosocial values over the years, the absence of any personality disorder that would suggest a potential for violent behavior, the absence of any evidence of an Antisocial Personality Disorder, very strong family support, a marriage that has weathered the storms of time, and incarceration and is still intact, and the inmate's good institutional adjustment. It is noted that he recently obtained a CDC 115 which is seen as minor and appears to be inconsistent in nature and should not be considered a negative factor in the inmate's adjustment.

I agree with previous evaluators that have consistently indicated that this inmate's violence potential is significantly below average in comparison to other inmates. Assessment of dangerousness within the controlled setting of the institution is significantly below average

in comparison to other inmates. Assessment of dangerousness if released to the community at this time is also seen as being significantly below average in comparison to other inmates. There are no significant risk factors in this case.

CLINICIAN OBSERVATION/COMMENTS/RECOMMENDATIONS: There is no evidence of mental or emotional problems that would preclude routine release planning in this case. There is no evidence of mental problems that would require further diagnosis or participation in psychotherapy. This inmate has a very strong and viable release program. It is expected that he should do very well on parole. There are no further program needs in this case.


Melvin Macomber, Ph.D.
Licensed Psychologist
Folsom State Prison

EXHIBIT "C-3"

# PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
## MARCH 1998 CALENDAR
### LIFER HEARING
### FOLSOM STATE PRISON

**VALDIVIA, Noel    C-29917**

This is the seventh psychiatric evaluation for the Board of Prison Terms concerning Mr. Valdivia a thirty-six-year old first Life Termer who entered CDC on May 5, 1981 to serve a Twenty-Five Years To Life Sentence for First Degree Murder. He was read the Statement of Nonconfidentiality and seemed to understand and agree. The inmate is incarcerated for killing a victim during a robbery. Please see documentation for a complete description of the Instant Offense. The inmate's version of the Offense has remained consistent from previous reports.

SOURCES OF INFORMATION: This evaluation is based on reviews of the Central File, the mental health section of the Unit Health Record, and a single-structured sixty-minute interview conducted on January 27, 1998.

SUBSTANCE ABUSE HISTORY: Mr. Valdivia states that he began drinking alcohol when he was fourteen-years old. He drank approximately every weekend and when he did drink he became very intoxicated. He stated that this progressed to harder drugs including using Marijuana, LSD, and PCP which he would use "whenever they were available" which averaged out to be about two times per week. Mr. Valdivia continued to use these drugs and alcohol until his incarceration. He reports that he has remained completely sober since he has been incarcerated.

PRIOR PSYCHOLOGICAL AND PSYCHIATRIC CONCLUSIONS AND DIAGNOSES: Please refer to the previous Board of Prison Terms reports for this information.

In summary the inmate has not had any significant psychiatric diagnoses or psychiatric treatment since he has been incarcerated. There is no significant evidence of any previous psychiatric diagnoses except for alcohol and drug abuse which is currently in remission.

MENTAL STATUS EXAMINATION: The inmate is a well-groomed, Hispanic male who appeared his stated age. There were no significant findings in the Mental Status Examination. The inmate was alert and oriented in all four spheres. His mood was euythmic. His affect was bright and appropriate. He denied any psychotic symptoms such as delusions, paranoia, or hallucinations. He denied any homicidal or suicidal ideation. His condition was intact. He was able to handle proverbs, abstractions, and calculations appropriately.

DIAGNOSTIC IMPRESSION:

Axis I:                            Alcohol Abuse in Remission.

|         |           | Polysubstance Drug Abuse in Remission. |
|---------|-----------|----------------------------------------|
|         | V71.01    | Antisocial Behavior in Remission.      |

Axis II:                        None.

Axis III:                       None.

Axis IV:                        Mild.

Axis V:         GAF = 90.

INTERVIEW AND DISCUSSION: There has been no significant change since the last Board of Prison Terms report by Dr. Lender from December 1996. The inmate has continued to program above average receiving a laudatory chrono in October 1997, for administering the Heimlich maneuver to another inmate thereby helping to save his life. He continues to be an active participant in Alcoholics Anonymous and he continues to lead and teach a Bible study group. He has also recently participated in a Life Skills Management Group.

The inmate continues to express remorse and regret for having killed a human being. He appears to have a genuine understanding of his personality defects which have led him to commit the offense. For example he is able to identify peer pressure and volitional factors in committing his offense. Thereby he does not blame others for his conduct rather he accepts full responsibility and understands that his current situation, i.e., his incarceration, is secondary to his own volition actions. The inmate does feel that he is a different person at the present time. He states that this began shortly after he was incarcerated and "found Christ." Finding Christ has helped him understand the waste and the impropriety of his previous conduct. His current goal is to be a good Christian and to lead a normal life. By that he means that he wants to be of help to others. He wants to continue working with underprivileged groups when paroled, such as he is doing now with his Bible course. He further describes that he wants to be a good family man and take care and be there to help his children and his wife. While becoming more religious has only questionable effects on recidivism, the inmate's sobriety is a positive sign that he is less likely to reoffend.

The inmate does not consider himself to be a violent person. He describes himself as a "soft child." He states that he began getting into trouble with alcohol and violence only after he had to fight to protect himself growing up in his tough neighborhood and only after he had joined a gang. The inmate states that he is able to resist any type of violence or gang activity now through his strong, moral beliefs and through his religious conviction. This is consistent with the inmate's behavior while incarcerated, his active participation in Alcoholics Anonymous, and in Bible studies, and given the fact that he has not had any 115's in many years. The inmate has a realistic plan for employment as a sheet metal worker, a trade that he learned while incarcerated. In my impression the inmate's history of criminal activity does not represent a core deficit in the social/personality structure rather it represents a period of life when the inmate was involved in antisocial behavior which is currently in remission.

CONCLUSION: The inmate has improved substantially since his incarceration in 1981. He has also continued to improve moderately since the last Board of Prison Terms report from 1996. The inmate has no major mental illness that was related to the offense either directly or indirectly. His use of drugs and alcohol may have facilitated but did not cause him to commit his offense.

In a less controlled setting such as return to the community the inmate is likely to continue to hold on to his present gains and may even continue further improvement as he appears to be genuine in his wish for self-improvement. His current level of dangerousness as compared to that of other incarcerated felons in CDC is estimated to be well below average.

RECOMMENDATIONS: The inmate has programmed well through CDC and there are no specific recommendations to be made at this point.


Albert Shnaider, M.D.
Consulting Psychiatrist
Folsom State Prison

EXHIBIT "C-4"

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
MARCH 1998 CALENDAR
LIFER HEARING
FOLSOM STATE PRISON

VALDIVIA, Noel    C-29917

This report is based on review of the Unit Health Record as well as the Central File of the inmate and also a clinical interview of approximately forty-five minutes duration.

The inmate is a balding, soft-spoken, bespectacled, Mexican who speaks English without an accent. It is noted that the inmate is mildly depressed and that he also denies that this is the case.

MENTAL STATUS EXAMINATION: This indicates the inmate is correctly oriented, alert, and cooperative. Content of thought does not show any bizarre features but there is unrelenting emphasis on the statement, "I am ready to go home." The inmate feels strongly that he has made very big changes in his life and that he is now active with Pentecostal denomination to an extent such as to guarantee a abstinence from substances and/or criminal behavior. In fact the degree to which the inmate insists this aspect of his life would justify the use of the term "preoccupation." Intelligence is estimated to be not below average and vocabulary is quite good. Recall and memory appear to be intact as is concentration. There are no prominent mannerisms or tics. It is to be noted that the patient has undergone open heart surgery some ten years ago with apparently success, full results, and he doesn't offer any complaints at this time. Affect seems down as noted above but the inmate denies feeling hopeless and there is no current suicidal concern.

A perusal of the Central File shows that there is an unusually large number of letters written by both relatives and friends in favor of the inmate's release. There is also abundant acknowledgment of the inmate's theological activity. Likewise the inmate has apparently resolved some earlier ambivalence concerning his participation with Alcoholics Anonymous and he is now quite active in this field. Other features of his current behavior that are noteworthy is that he is apparently regularly sending money home to his family. Likewise the file indicates that he has been able to maintain unusually strong family ties in spite of his incarceration. The interview also afforded an opportunity to observe interaction between the inmate and one of the Correctional Officers he was particularly acquainted with and this encounter yielded a very positive impression. At this time the available data do not indicate the need for concern for unusually large risk of violence.

H. R. Kormos, M.D.
Consulting Psychiatrist
Folsom State Prison

VALDIVIA    C-29917        FOLSOM STATE PRISON        12/05/97        HRK:ml
Page 1

EXHIBIT "C-5"

# PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
## JANUARY 1997 CALENDAR
## LIFER HEARING
## FOLSOM STATE PRISON

**VALDIVIA, Noel    C-29917**

This is the second appearance and sixth report to the Board of Prison Terms for this thirty-five-year old Mexican-American male now within the CDC for fifteen and one-half years for the crime of First Degree Murder. The sentence is Twenty-Five Years to Life. This evaluation consisted of a one hour and forty-five minute clinical interview, administration and interpretation of the MMPI-2, and a review of the Central File and Medical Chart.

BACKGROUND: The pertinent facts of Mr. Valdivia's psychological and social development have been noted in previous reports, as have descriptions of the Instant Offense, and the reader is referred to those documents for details. All contacts with Mental Health professionals since the psychological report of June 27, 1994, reflect only positive growth, increased insight, understanding of self, and socially appropriate coping abilities.

My Mental Status Examination finds him to be neatly groomed, pleasant, verbal and articulate, and cooperative. Speech and language are within normal limits. Mood is "peaceful--calm." Affect is of appropriate and variable range. There are no auditory or visual hallucinations nor suicidal or homicidal ideation. He is properly oriented to person, place, and time. Short and long-term memory functions are intact. Intellectual functioning appears to be average to above average. Judgment is quite good as is insight.

DIAGNOSTIC IMPRESSIONS:

| | | |
|---|---|---|
| Axis I: | 305.00 | Alcohol Dependence, by History, in Remission. |
| | 305.90 | Phencyclidine Abuse, by History, in Remission. |
| | 305.30 | Hallucinogen Abuse, by History, in Remission. |
| Axis II: | V71.09 | No diagnosis or condition. |
| Axis III: | | Medical Condition: Previous Open Heart Surgery. |
| Axis IV: | | Psychosocial Stressor is Incarceration. |
| Axis V: | GAF = 90. | |

# PSYCHOLOGICAL EVALUATION FFOR THE BOARD OF PRISON TERMS
## JANUARY 19997 CALENDAR
### LIFER HEARING
### FOLSOM STATE PRISON

**VALDIVIA, Noel    C-29917**

SUMMARY: Since incarceration records indicate Mr. Valdivia has demonstrated, consistently, a strong pattern of continuous growth and improvement in virtually all areas. He continues in a marriage which is actually a positive, steady relationship begun when he was seventeen-years-old. He has acquired trades and a socially appropriate attitude which serve well for future employability. Intellectually and spiritually he has become a bit philosophical about life. He teaches Bible studies on the yard. Work reports, consistently, are above average to exceptional. He continues active participation in self-help groups and Alcoholics Anonymous. Psychiatrically he has improved significantly—to the point of virtually no true psychiatric diagnosis on Axis I. Violence Potential is much below average and if in a less structured setting, such as return to the community, Violence Potential would remain far below average.

RECOMMENDATIONS:    There are no specific psychological recommendations at this time and Mr. Valdivia can be considered for removal from the psychiatric calendar.

*Jerre L. Lender, Ph.D.*

Jerre L. Lender, Ph.D.
Supervising Senior Psychologist

VALDIVIA    C-29917    **FOLSOM STATE PRISON**    12/03/96    JLL:ml

EXHIBIT "C-6"

## PSYCHOLOGICAL REPORT TO THE BOARD OF PRISON TERMS
### SEPTEMBER, 1994, CALENDAR
### DEUEL VOCATIONAL INSTITUTION

This is the fifth report to the Board of Prison Terms on Noel Valdivia, age 29, who is serving a 25 years to Life term for First Degree Murder. The report is based on a review of the Central file, medical/psychiatric records, subject's participation in a weekly therapy group (15 sessions to date) and a clinical assessment interview conducted for evaluation purposes.

Subject's developmental history and the details of the committing offense have been discussed in various previous documents. Psychological evaluations have shown considerable progress over the years. The most recent report, by Dr. Obrochta on 3/31/93, was predominantly favorable, citing only one area of concern which will be addressed below. This report will deal largely with recent performance.

Mr. Valdivia has maintained his disciplinary free record, with no violations in many years. He made a job change during the past year and is working now as a Procurement clerk. He says this position entails considerably more responsibility, which he enjoys. In terms of release planning, Mr. Valdivia hopes eventually to transfer back to San Quentin in order to complete the sheet metal training that he began there. He feels that this trade, combined with his drafting, clerical and computer skills should position well for employment. He has a preliminary job offer from a sheet metal firm where his recently deceased brother was employed. Also, he says there are letters in process from two construction firms and that his wife's pastor is actively seeking employment offers for him.

Mr. Valdivia's marriage continues strong and happy. He is especially proud that his 14 year-old daughter was selected to participate in a Summer Youth Employment Program this year.

Mr. Valdivia has overcome his one-time antipathy towards Alcoholics Anonymous and has become an enthusiastic participant in the AA 12 by 12 program. He says he has found this program to be "an eye opener" not conflicting in any with his commitment to Christianity. He noted he has developed considerably more tolerance for others as a result of this program.

Also during the past year, Mr. Valdivia completed a DVI therapy program offered by Dr. Morris which emphasized stress management and anger control. Currently, he is participating in an ongoing lifer therapy group (noted above). He has received considerable helpful feedback from group members and it appears that his participation has been positive. The rationalization and insight deficit noted by Dr. Obrochta is not apparent. Rather, Mr. Valdivia's tendency to refer frequently to his troubled childhood and the shortcomings of family and community resources appears to reflect great concern that others learn from his mistakes. This concern does tend to manifest in excessive verbiage and inordinate repetition and variation on his theme. But it does not appear so much that he is seeking to justify himself as to communicate his concern for others and that what he actually has is a communication problem. To sum up, when asked what he was most proud of, Mr. Valdivia replied "the change I've made . . . from an unlawful person to a law abiding person."

PSYCHIATRIC DIAGNOSIS: There is no indication of significant mental disorder at this time. However, Dr. Obrochta's impression of various substance dependencies and antisocial personality disorder appears correct, historically.

CONCLUSIONS: The psychopathology at the time of the committing offense, directly and clearly predisposed to it but did not determine it. During observation in the institution, inmate has psychiatrically improved greatly. In a less controlled setting such as a return to the community, subject is considered likely to continue improvement.

Page 2

PAROLE CONSIDERATIONS: Present mental status is not significantly related to future criminal behavior and further psychiatric opinion will not likely contribute to release decision.

Violence potential outside a controlled setting in the past is considered to have been serious, due to drug use and at present is estimated to be below average.

Any psychological difficulties upon release would relate to possible assistance needed to expedite the transition from a closed to an open society.

*Brunla Van Cleve*

BRUNLA VAN CLEVE, Ph.D.
Staff Psychologist

VALDIVIA, NOEL          C-29917          DVI          lr          June 27, 1994

EXHIBIT   "D"



## DECLARATION OF ALBERT M. LEDDY

I, ALBERT M. LEDDY, hereby declare:

1) I was an attorney at law, currently retired. After graduating from Boalt Hall, University of California at Berkeley, I practiced law until 1983 including serving as Deputy District Attorney and then District Attorney of Kern County, California, from 1952 to 1965 and again from 1970 to 1983.

2) Between 1983 and 1992 I served as a Commissioner and then as Chairman of the Board of Prison Terms (BPT) pursuant to my appointment and re-appointments to those positions by Governor George Deukmejian.

3) During approximately 9 years of service as BPT Chairman and Commissioner, parole hearings were conducted as now for "life" prisoners (with a *maximum* prison term of life and a minimum of between 7 and 25 years, reduced for work and good behavior), by 3-member BPT panels at intervals prescribed by the California Penal Code statutes and the parole regulations in the Code of Regulations, Title 15, Division 2, Board of Prison Terms §§ 2000 et. seq.

4) From 1983 to 1990 BPT panels became more reluctant to grant paroles in accordance with Penal Code § 3041(a) (which requires that at the initial hearing a parole date "shall normally" be set), resulting in a substantial, steady decline in the percentage of parole dates granted at hearings. This decline was caused by increasing political pressure and new BPT Commissioner appointees who disfavored paroling life prisoners.

5) After Governor Wilson's election in 1990, he substantially intervened to reduce parole grants; in actual effect his policy practically eliminated paroles. He accomplished this, first, by appointing and re-appointing BPT Commissioners known to disfavor parole or to

favor a "no-parole" policy. These appointees were all crime victims, former law enforcement personnel or Republican legislators who had been defeated in elections and who needed a job.

6) Governor Wilson made his "no-parole" policy known in several ways including, I believe, through statements quoted by the media and possibly through the Youth and Adult Correctional Agency Secretary, although I can't say I know this to be fact. I am aware that he wanted previously set parole dates rescinded.

7) The new BPT appointments by Governor Wilson violated Penal Code § 5075 which required that "(t)he selection of persons and their appointment by the Governor and confirmation by the Senate shall reflect as nearly as possible a cross-section of the racial, sexual, economic, and geographical features of the population of the state." Governor Wilson's appointments were mostly from his home area of San Diego. Most are not qualified by training or experience for the position of BPT Commissioner, and they do not fulfill the statutory cross-section requirements of racial, sexual, economic or geographical proportion.

8) My knowledge of these facts is based on publication and my awareness of said appointments, my daily dealings with them as panel members at BPT hearings at which paroles were denied contrary to the laws and regulations, and Mr. Wilson's public statements disavowing parole policy as set forth in the statutes and regulations, and proclaiming during his campaigns that he would not have "another Willie Horton episode." On one occasion Joe Sandoval, former Secretary of YACA (a cabinet level appointment) personally warned the Commissioners to be careful about granting paroles. Chairman John Gillis told two Commissioners, "Stop giving these dates."

9) Governor Wilson also accomplished his "no-parole" policy by having the BPT use a previously unused law to void practically all grants of parole by BPT's panels, while not using it to overturn any decision denying parole. This law was Penal Code § 3041.2

10) Governor Wilson also had the BPT use a seldom-used regulation, 15 CCR § 2451 (c), to rescind nearly all of its previous grants of parole to prisoners awaiting their release. This regulation, known as the "improvident grant" clause, became routinely used to rescind those previously set dates. On one occasion, after I refused to recommend rescission on a panel, I was told by Ted Rich, BPT's Executive Officer, to recommend rescission when it is the Governor's desire. It was obvious to myself and other Commissioners that we would not be re-appointed if we did not comply.

11) At one point I became concerned enough about the "no-parole" policy that I wrote a 9-page brief about how we were not complying with the laws. I gave a copy to each Board member, pointing out that we could be sued. I asked that this brief be a topic on the Board's agenda. Ted Rich, as Executive Officer, said, "That's not going to be on the agenda. You can't have it on the agenda." Inasmuch as I expressed my dissatisfaction verbally and in my brief, I'm sure that my objections helped me not to get re-appointed.

12) Accordingly, the effect that Governor Wilson has exerted upon BPT personally, through his politically-based policy, by his BPT appointments, and by his intervention to rescind and reverse parole grants, has been to remove any reasonable possibility of parole for practically all of the thousands of California prisoners serving terms of life *with* the possibility of parole.

13) Such a "no-parole" policy is contrary to Penal Code § 3041 which requires that BPT "shall normally" set a parole date *in most cases*, i.e. *unless* the prisoner is shown to pose a

Declaration of Albert M. Leddy                                        Page 4 of 6

threat to public safety, and that BPT panels shall declare prisoners "suitable" for a future
release date and set that release date unless a preponderance of the evidence presented at
the hearing demonstrates that the prisoner "will pose an unreasonable risk of danger to
society if released from prison." I have heard of an instance where a representative from
the District Attorney's Office attended hearings and supported parole, admitting doubt in
the veracity of the conviction and asserting possible innocence, and still the BPT did not
give a parole date. Although I do not have first hand knowledge of this instance, I do
know the law states that without a statement by the District Attorney's Office that a
prisoner appearing before the BPT remains a present danger, the BPT shall set a parole
date and that this law was not followed.

14) Although the reluctance to grant parole began in the early 80's, under Governor
Wilson's regime, BPT panels denied parole in over 99% of cases by employing
procedures that violate the parole statutes and regulations. Primarily used are offense
factors. BPT panels find prisoners "unsuitable" for parole based mainly or entirely on the
facts and circumstances of their offense instead of their level of dangerousness, as
reflected by performance, rehabilitation and expert evaluation in their prison records.
Because the facts and circumstances of crimes do not change, the procedure effectively
increases all such sentences from life with possibility of parole to life without any
possibility of parole. Despite contrary regulations and statutes, BPT's chief counsel and
Executive Officer urged me and the other Commissioners to deny paroles based on the
prisoners' offenses.

15) The procedure also eliminates BPT's duty to set parole dates because parole can't be
granted for those found "unsuitable." This renders illusory BPT's term-setting obligation
and lifers' opportunity to parole. Even the most deserving prisoners shown
overwhelmingly not to pose an unreasonable (or any) risk of danger to the public if
released have not, cannot and will never receive parole under such a policy.

16) After 1992, when my final term as BPT Commissioner expired, I re-entered the private practice of law. I represented an inmate at his BPT hearing. Although the inmate had a statutory right to call witnesses, who could have refuted the allegations the panel used to deny parole, the BPT denied the witness. Additionally, the BPT substituted Commissioner Carol Bentley, a former Assemblyperson who was appointed after she was not re-elected. I had never known Ms. Bentley to grant parole to any lifer. She was the panel chairperson. She was rude. Her hostility was obvious and it was evident she was pre-determined to oppose parole.

17) Prior to the commencement of his parole hearing, I personally heard Ron Koenig, a Commissioner on the hearing panel and former BPT Chairman, inform Rick Erwood, the Riverside County District Attorney attending the hearing, "Don't worry" because "we won't parole this guy," in those approximate words. This is consistent with my experience described above in which BPT's hearing panels often made decisions to deny parole prior to the hearings.

18) It has been clear to me that there is a general conspiracy to prevent life prisoners' from paroling, especially those whose offenses include murder. Obviously, such a "no-parole" policy means that no murder offender can get a fair hearing as the law requires. If you can deny a prisoner "suitability" solely on the basis of the crime, you can deny him forever. The crime won't change. The parole law is based on the idea that prisoners do change, and become no danger to public safety. Statistically the murder offender rarely repeats a crime once released.

19) As a taxpayer, I believe it is a waste of perhaps millions of dollars each year to incarcerate those life prisoners whose prison records adequately demonstrate they are no longer a threat to public safety. The correctional system spends millions on programs to teach them trades and marketable skills, to give them a general education, and until its discontinuation, psychological therapy to help them change their lives. I believe the law

Albert M. Leddy.                                                        Page 6 of 6

must be followed, that the Governor cannot create his own set of punishments in defiance of the clear legislative intent. Every man is entitled to a fair hearing where the burden of proof is set and adhered to, and the results are not just what is politically expedient for one person, the sitting governor.

20) I am informed that Governor Gray Davis has expressed his policy that no murder offender will be paroled on his watch. As a former Commissioner and as a lawyer, such a policy is clearly contrary to the statutes and regulations governing the parole process. Such a policy will exacerbate an already unacceptable situation which is backlogging hundreds, perhaps more, of life prisoners who are already beyond the term they would normally have served but for the "no-parole" policy.

I declare, under penalty of perjury, that the facts I have stated are true and correct. My expressions of belief as to each specified fact are based on the reasons I have given as to each such fact. I would be willing to testify to same in a court of law. I so swear, this _1_ day of _July_ 2000, at Los Osos, California.


Albert M. Leddy
Declarant

EXHIBIT  "E"

| | User Name | User Name | ☐ Remember Me? |
| | Password | | Log in |

| Register | FAQ | Members List | Calendar | Arcade | Chat Room [5] |

**California News & Events** Do you have news relating to California's Prison System and related efforts? Post them here!

**Post Reply**

Page 1 of 3   **1**   2   3   >

Thread Tools   Display Modes

☐ 03-05-2007, 10:56 PM                                                          #1

**Morris1** ◉
Registered User

Join Date: Jul 2006
Location: Lake Elsinore, CA
Posts: 1,297

**How Bad our Parole Board Really is.**

*This is a letter sent to the Senate by an actual ex-commissioner Belinda Harris Ritter regarding the corrupt state of the parole board. TIPs was given the letter to put up on their site. I hope it's ok to let everyone read it. We are in serious trouble in this state. This letter is long, but worth reading. The frustrations this woman had in trying to do her job and being stopped at every turn finally caused her to step down.*

**PAROLE BOARD POLITICS AND DEEP-SEEDED PROBLEMS**

**DETAILED BY FORMER BPH COMMISSIONER**
On June 5th, former BPH Commissioner Belinda Harris-Ritter wrote a detailed 5-page letter to the Senate Rules Committee, and "To Whom it May Concern," to enlighten interested parties on some of the serious problems at the heard of the Board's ineptitude. Ms. Ritter-Harris, who resigned six months earlier in January, 2007, after chairing lifer suitability hearings for six months, graciously gave her permission to publish her exposé in full:

**DO NOT BLAME THE COMMISSIONERS FOR PAROLE BOARD PROBLEMS**
Last July I began my term as a Commissioner on the Board of Parole Hearings, an appointee of Governor Schwarzenegger. I was naive in thinking that the Board would be allowed to do its job. I left the Board in January of this year frustrated by the inability of the Board to function, exhausted from the out of control travel schedule and still weak from the flu and norovirus picked up in prison facilities crawling with disease. I left, not because I had given up, but because I received a telephone call from Alberto Roldan, a deputy appointment's secretary, in which he told me I was being given the opportunity to resign because the Governor wanted to go in another direction and appoint someone else in my place. I was told that I was forbidden to tell anyone of the call, forbidden to attend the upcoming Board meeting and if I did not do what I was told, I would be terminated. If I asked what I had done to cause this to occur and was told I had done nothing wrong. I knew that if the Governor wanted to put someone new on the Board there was an open seat so clearly I was told there was no opposition to me on record and I was often told by victim advocates/relatives and inmate counsel alike that I did an excellent job. I had been unaware that there was opposition to me from the people responsible for my being there in the first place.I am not the only Commissioner to have met that fate. Recently, another excellent Commissioner was confirmed by the Senate but only after an attack on her by people in the Governor's office, the District Attorney's Association and spearheaded by Senator Jeff Denham. Senator Denham sent out press releases saying he was appalled by early releases due to grants. A grant of parole is not an early release. The penal code specifically states that Parole shall be granted unless there is a public safety reason not to grant it. They forget not only the actual law that controls what Commissioners must do but also that the Commissioner does not make the Decision alone. A civil service Deputy Commissioner is involved in every case and must agree with the Commissioner to grant parole or it is a split vote that goes to the full Board sitting en banc. The Commissioner has no say in who the deputy Commissioner will be or what prison he or she is assigned to each week. That is all manipulated by the Executive Officer who answers to the Governor and /or CDCR.When the Governor and legislature reorganized the Department of Corrections effective July, 2005, they destroyed any independence of the Board of Parole Hearings. The Board was no longer free-standing but was stuffed into the newly named California Department of Corrections and Rehabilitation (CDCR). The Board itself has no control over the hiring of the civil service staff. The legal counsel will tell you they work for CDCR and the Executive Officer is appointed by the Governor, not the Board. He, like the Board, is part of CDCR. Although he is not appointed by the Board the role of the administrator should still be to take direction from the Board he or she serves, not to dictate what is done. This is because the Executive Officer is not a member of the Board. That reality was lost in the transition. He acts on direction from somewhere other than the Board, unknown to the Commissioners. Commissioners are assigned to various prisons weeks in advance then at the last minute-without explanation, the Executive Officer tells scheduling to change the schedule and inform the Commissioners of the switch. That is just one example.Add to the reorganization problems the fact that the legal staff considers itself to work for CDCR, apparently not understanding who the client is (the Board) regardless of who pays their salaries (CDCR) and that the legal staff has, in my opinion, absolutely no understanding of the Bagley –Keene Open Meeting Act and have a recipe for disaster.Regulations are presented for approval by the Board when the Board has not considered or voted on whether regulations are needed. Although there is an item on each agenda for the legal report and the Executive Officer report those have at times consisted of announcing the number of cases in the backlog for the legal staff and introducing the new deputy commissioners by the Executive Officer.Never, during my time on the Board, did either present any report of substance. The Board members are never told how the number in the backlog is calculated and there is no acknowledgement of cases that are on appeal or problems that come up in panel decisions except in illegal closed sessions allegedly to consider litigation. However, the Bagley- Keene Act is very clear that to be considered under this litigation exception there must be "...an adjudicatory proceeding before a court, administrative body, hearing officer or arbitrator. Litigation is considered to be pending if **\*\***1) it has been initiated formally (e.g. a complaint, claim or petition has been filed) or (2) based on existing facts and circumstances and on the advice of its legal counsel, the state body believes there is significant exposure to litigation against it, or it is meeting to decide whether a closed session is authorized because of significant exposure to litigation or (3) based on existing facts and circumstances the state body has decided or is deciding whether to initiate legislation. (Bagley –Keene Act section 11126). Further, a memo

Green Tea Weight Loss...
Get A Free Trial To The Amazing Green Tea Weight Loss System!
pebacktheink.com

speed reading
Phenomenal Memory is not a gift. It's a skill! Learn anything.
pMemory.com/see-Smart

Check Your Speed
Award Winning PC Repair Tool. Free Download. 100% Guaranteed.
Guaranteed result...

Speed Reading Training
Move your career forward with an accredited online degree!
www.CourseAdviser.com

must be sent to the Board members by the staff and after the litigation is resolved that memo becomes a publicly accessible document. Under the Act, "the agency's legal counsel must submit a memorandum which complies with the requirements of Section 11126(e)(2)(C)(ii) prior to the closed session. This document is confidential until the pending litigation has been finally adjudicated or otherwise settled There was never any discussion of the Board budget nor was a budget ever approved while I was on the Board. I was told by the Executive Officer in December that "the Board is working on the budget" apparently meaning his civil service staff. Also in December I was told by him that the names of three potential deputy commissioners (civil service employees) were run through the Governor's office prior to any hiring decision being made. I am not mentioning their names out of respect for the three individuals involved. Two were hired and one was not. Why is the Governor's office involved in civil service hiring outside his office? The scheduling of the Commissioners at the various institutions is a process without input from the individuals involved and appears to me to benefit certain Commissioners while punishing others. In a semi-mutiny all the Board members agreed that the scheduling needed to be addressed along with some other housekeeping issues. This was presented to the Board Chair following a closed session in December. He tried to say the issues could not be discussed because of the Bagley-Keene Act. This made it clear to me that he had, just like the legal staff, no understanding of the Act or its purpose. Needless to say the scheduling was not improved. I was told I could not be scheduled at the prisons near my home because it was not fair to the Commissioners who lived far away from prisons. Repeatedly I was told that everyone had to travel three to four hours. Other Commissioners were, however, routinely scheduled at prisons near their homes.Many times hearings had to be canceled because of disease at the institutions. These diseases included norovirus, tuberculosis, chicken pox and the flu. I am not the only Commissioner to have contracted the flu and norovirus. I have canceled hearings of prisoners who were vomiting in the holding cells while waiting to have their hearings and taken flak for the postponements.At one facility the Commissioner was told by CDCR staff that even though six of the inmates were in quarantine the hearings should go forward and the Commissioner and Deputy Commissioner could wear masks. The Commissioner and Deputy Commissioner refused to hold the hearings under those circumstances. Clearly if the inmate is too ill to stand up there are due process considerations being violated.Another problem related to this is that under Penal Code section 5080.the Board can ask CDCR to move a prisoner because of health reasons. I had a case where the inmate absolutely needed to be moved to a facility where he could have mental health treatment and medical intervention. I cited this section in the postponement of his hearing. Under that code section CDCR must report to BPH within 30 days why he cannot be moved for the medical treatment or move him. In this particular case he was not moved and did not receive the medical attention and CDCR gave no reason.The Commissioner who followed me ignored these serious considerations and denied the parole for 5 years without addressing the medical issues.At an open- to-the-public training session in December, I asked our legal staff about the application of this code section. The reply from the attorney training us was that she was still getting up to speed and would get back to me. She never did. In that same training we were repeatedly told "the Board wants it done this way" or the Board wants you to do this". I finally raised the point that we were the Board and we had given no such direction and I questioned who had. There was no answer. The Chair, however, did go to two other Commissioners (both women) and tell them to please let me know to stop asking questions in open session. I find it incredible first, that he would say that and second, that he could not he could not talk to me himself.All the Commissioners have many similar stories about problems with CDCR but problems with CDCR are never addressed at the Board or at the Senate Rules Committee.The Commissioners have become merely hearing officers. At most state Boards the trial level is conducted by administrative law judges and/or hearing officers and appeals are taken by the Board itself. At the BPH the Commissioners are the hearing officers and while I was on the Board there was no appeals process. It had been removed following some court action indicating it was a problem because no appeal was ever granted. I understand the appeals process is being reinstituted. How do you do that after a court has told you to stop? This implementation of the appeals process was not done at the behest of the Board. The Board never discussed it nor voted on it. The agenda is put together by staff but the Board members are never asked if they have items for the agenda. Items on the agenda include cases where there was a split decision between the Deputy Commissioner and the Commissioner and referrals of non murder cases from the Governor for en banc review of a panel decision. These are the only Board meetings I have ever been to where no one on the Board says anything except the Chair who is running the meeting. Board business is rarely ever addressed by the members of the Board.The problem of untimely psychological evaluations was to end when the Board took over responsibility from CDCR for preparation of the reports. It has not changed. At some institutions it appears the union of psychologists has instigated a work slow down or stoppage by not preparing the reports timely. This causes legitimate reasons for inmates to request postponements and Commissioners are told by their legal staff to do the hearings anyway.Add to all of this the track record of CDCR in every other area. Across the Board headline after headline shows it is the same response as stated in a report from the State Bureau of Audits in follow-up to an audit done in 2005 to see if there had been any changes. In the March 27, 2007 letter from state auditor Elaine Howle to the Governor and legislative leaders it was stated that there was still a lack of validity in the projections of the prison population. This report, titled "Department of Corrections: It needs to better ensure against conflicts of interest and to improve its inmate population projections (2005-105)" was also copied to every member of the legislature.It seems that nearly every week we in Sacramento read about CDCR not cooperating with a court or a special master related to conditions at the prisons whether it is health, overcrowding or some other area. I believe it is time to look at how badly CDCR has compromised the Parole process as well.Let me be perfectly clear. I understand the need for public safety. It is paramount. I say that from the shoes of the victim's next of kin. My father and stepmother were murdered and I have worked for many years in the state where that occurred to ensure due process for victims and their families. I also believe that while protecting due process for victims we cannot throw out due process for the inmates. As an attorney, I understand the significance of due process and believe that it is the very foundation of our way of life in this country. Due process should not be tossed aside because there is a backlog of hearings. The Governor should appoint the twelfth member of the Board- this was not done the entire time I was on the Board. Prior Commissioners should be recruited to come back for a limited period to take care of the backlog, but hearings should not be crammed down the throats of inmates who are ill, have not had an opportunity to appeal a serious discipline accusation or who have a habeas case at the appellate level or need time to meet with counsel. Postponements and continuances should not be allowed for the purpose of choosing a specific Commissioner or manipulating the process but legitimate reasons should not be ignored. I would be fine with a law that stated convicted murderers shall never be released from prison. But that is not the law we have. The law states that when these life inmates come up for parole they are to be paroled unless it would be a public safety problem. The burden is on the state to show there is a public safety issue. Either follow this or change the law.The legal staff should be trained in the Bagley-Keene Act and should be responsive to questions from Commissioners and cite authority for their opinions, all the while understanding the Board is their client, not CDCR. CDCR should also understand that the Board is the client. The legal staff should also understand that they merely advise the Board and the Board makes the decisions. But most important, for the Board to actually function, there must be openness about who is doing what and at whose direction and if that cannot occur under the present structure the Board should be removed from CDCR and allowed to hire its own Executive Officer and legal staff.



Ads by Google

EXHIBIT "E-1"



hoo! · My Yahoo! · Mail · Tutorials · More    **Make Y! your home page**    Welcome, **moyeah1** Sign Out · All-New Mail · Help

**YAHOO! MAIL** Classic

Search: [        ]  Web Search

audible.com®  Download a **FREE** AUDIOBOOK today!  Learn More

| Mail | Addresses | Calendar | Notepad |    Mail For Mobile · Mail Upgrades · Options

Check Mail    Compose    Search Mail    Search the Web

Previous | Next | Back to Messages

Delete    Reply ▾    Forward ▾    Spam    Move ▾

This message is not flagged. [ Flag Message - Mark as Unread ]    Printable View

| To: | "KVSP Group" <kvsp-delano2@yahoogroups.com>, "Solano Group" <solano-prison@yahoogroups.com>, "Old Folsom Group" <Old_Folsom_Prison_Info@yahoogroups.com>, "HDSP Group" <HIGHDESERTFAMILIES@yahoogroups.com>, "MCSP Group" <j19rose@hotmail.com>, "IFC" <inmatefamilycouncil@yahoogroups.com> |
| From: | "TerryAnn@Reform3StrikesNow.org " <TerryAnn@Reform3StrikesNow.org>  📇 Add to Address Book  📱 Add Mobile Alert  Yahoo! DomainKeys has confirmed that this message was sent by yahoogroups.com. Learn more |
| Date: | Tue, 9 Oct 2007 10:37:26 -0700 (Pacific Daylight Time) |
| Subject: | [Old_Folsom_Prison_Info] Parole board members feel pressure |

Visit Your Group

# Parole board members feel pressure
## Those asked to resign deny that they're soft on crime

By JULIA REYNOLDS

Herald Staff Writer
Monterey County Herald          10/09/2007

"In 1981, my father and stepmother were murdered," Bilenda
Harris-Ritter said matter-of-factly. She took a break from work,
and was sitting in the noisy lobby of a Sacramento office building.
"It was an extraordinarily horrific thing to go through for my family,
and we will never truly be over it," she said.

That's why she was shocked to be labeled soft on criminals in
California.

Harris-Ritter said she feels she is a casualty in a battle over parole
that this year is playing out in the state's courts.

For years, she worked to protect victims' rights in her home state
of Arkansas before moving to Sacramento.

Last year, Gov. Arnold Schwarzenegger appointed her to the
state's Board of Parole Hearings. A lawyer and a member of the
California Bar Association, Harris-Ritter was thrilled. She said she
would bring a crime victim's sensitivity and an attorney's respect
for due process to the job.

But she'd only been a parole commissioner for a few months
before a governor's aide called. Alberto Roldan, deputy

Yahoo! 360°
Start Sharing
Your place online
Blog & photos

Yahoo! Groups
Find Green Groups
Share with others
Help the Planet.

Yahoo! Groups
Moderator Central
An online resource
for moderators.

**Folders** [Add - Edit]
- Inbox (1)
- Draft
- Sent
- Bulk [Empty]
- Trash [Empty]

**My Folders** [Hide]
- ACCESS
- Aaronya
- Abeka.org
- Ancestry
- Avenue
- BiblesOnDvd
- Barona
- Borders
- CA Prison Reports
- CDCR
- Carnival Cruises
- Casey Family Pr...
- Chase
- Circuit City
- Cottonwood
- DD COURT STUFF
- DD GRANDMOTHER
- Darryl Davis
- Dayspring
- Ethel Paper
- Exxon
- Family Visits
- FamilyVisting
- Fidelity
- GIFTS
- GeraldLee
- HOW TO DO YAHOO
- Hawaiian Bakery
- HighEnergyLaw

paroleinfo

photos

rentals

weightwatchers

Search Shortcuts

My Photos

My Attachments

 Save $.65 on
Frozen Veggies

 Online Degree
Programs

 Why refi is hot:
5.9% 30-yr.*

 How to become a
teacher, lawyer

said. "I am pro-due process. I believe that we need to follow and implement the laws that we have appropriately, and if we don't like the law, then we need to make concerted efforts to change it."

Mike Reynolds, known as the "godfather of Three Strikes" for the tougher sentencing law he pushed through in 1994, would agree on that last point.

At a rally last month outside the two state prisons in Soledad, he said life without parole or the death penalty for murderers would be far more fitting than expecting victims' families to endure the pain of attending parole hearings every two to five years, usually at their own expense.

Harriet Salarno, chairwoman of the advocacy group Crime Victims United of California, also attended the rally and criticized Schwarzenegger for allowing some convicted murderers to be paroled.

"It's shameful that victims and their families are re-victimized by his parole policies," Salarno said.

The rally was held to lend moral support to a mother who that afternoon attended the fourth parole hearing of her daughter's killer at the Correctional Training Facility.

While that man was once more denied, he is scheduled to come back before the board in four years.

### Others asked to leave

Harris-Ritter is not the only parole board member who was asked to leave her post. Tracey St. Julien, also of Sacramento, blames politics for her dismissal.

Appointed by Schwarzenegger in July 2005, St. Julien served on the board and was a few weeks away from her official Senate confirmation. But before that could happen, she was asked to step down.

The reason, she said, was that between hearings at the Correctional Training Facility in Soledad a conferencing microphone was accidentally left on.

Some district attorneys overheard her casually telling an inmate's lawyer she "loved" giving parole grants. Riverside County prosecutors complained about it in a letter to the board's executive director, while a state group of district attorneys wrote to the governor, St. Julien said.

St. Julien, who said she gave very few grants, defends her eavesdropped statement.

that truly represent a danger to public safety.

"The system is malfunctioning and must be repaired," she wrote in the Aug. 30 ruling. "The board must make efforts to comply with due process."

Harris-Ritter said she also had a hard time interpreting the board's criteria when she served as a commissioner.

"It is really a subjective thing whether the crime is horrible enough to fit the criteria," she said. "They're just saying every single case is horrific and that's not possible."

Gov. Schwarzenegger has used the same criteria when he overruled many of the rare board decisions in favor of parole, something he's done hundreds of times since he took office.

"It's my personal opinion that it's overused by the governor's office, but I also feel that if you're the victim, or your next of kin is the victim of a crime, it doesn't matter what the circumstances are. It's horrific to you," Harris-Ritter said. "That's a really tough place the court has put people in, making a decision about 'Well, this was a really horrible crime and this was just a regular murder.'"

An appeals court is reviewing Condron's order to the Board of Parole Hearings to come up with clearer definitions and better training within 90 days. The state Attorney General's Office is scheduled to present its opening brief Nov. 13.

If upheld, Condron's ruling could mean that many of the 3,000 lifers who come up for review each year might seek new hearings.

Meanwhile, the Senate Rules Committee, headed by Senate President Pro Tem Don Perata, D-Oakland, is looking into other complaints about parole board practices.

Harris-Ritter said she is not all that confident things will change soon â€" not as long as politicians are calling the shots.

"It appears," she said, "that there is a lot of pressure on the governor."

Julia Reynolds can be reached at 648-1187 or jreynolds@montereyh erald.com.

Share your thoughts To express your views about the state's Board of Parole Hearings, contact Governor Arnold Schwarzenegger: Phone: 916-445-2841 Fax: 916-445-4633 Address: State Capitol Building Sacramento 95814

http://www.monterey herald.com/ ci 7124743? source=email

EXHIBIT     "F"

FILED
SUPERIOR COURT-STOCKTON

08 MAR -6  AM 8: 05

ROSA JUNQUEIRO CLERK

BY _____
DEPUTY

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN JOAQUIN

In the Matter of the Petition of

NOEL VALDIVIA, SR.

For Writ of Habeas Corpus.

CASE NO.  SF 087642A

ORDER

TO: NOEL VALDIVIA, SR., Petitioner

Petitioner filed a petition for a Writ of Habeas Corpus with this Court on

December 17, 2007.  With good cause appearing therefor, IT IS HEREBY ORDERED

that the Petition for Writ of Habeas Corpus is **denied** for the reasons indicated:

**REASON**:  Petitioner was convicted of first degree murder and sentenced to serve 25 years to life.  According to Petitioner, he has appeared before the Board of Prison Terms (BPT) seven (7) times for parole consideration.  Each time, parole has been denied.  It is the latest of these hearings, conducted on August 1, 2007, which is the subject of this petition.

Petitioner asserts several grounds as the basis for this writ petition.  The main focus of the writ is Petitioner's argument that he has been denied parole each time on unchanging factors and because the Board is not following the criteria of Title 15 and considering all the factors, and considering the time passed since the offense, Petitioner has been denied due process.

As an additional ground, Petitioner contends that he received his sentence of 25 years to life with the possibility of parole as part of a plea bargain and the bargain implies that the District Attorney's office would not oppose his parole efforts.  More particularly, Petitioner argues that the District Attorney's opposition to his parole violates the plea agreement.

Petitioner goes on to argue that the Legislature established policies and procedures to grant parole and used mandatory language in that regard.  Thus, Petitioner submits that parole must be granted when the criteria for parole is met. Petitioner maintains that he has met all criteria and so, the BPT's denial is contrary to the Legislature's intent and violates the Board's own policies and procedures.

-1-

Petitioner urges that the criteria for parole is intolerably vague and therefore, subject to improper manipulation. Finally, Petitioner states he has a right to individualized consideration of his parole request, but the Board's decision was predetermined.

The judiciary's role in reviewing decisions by the BPT is limited. Our Supreme Court has provided guidance. See *In re Rosenkrantz* (2002) 29 C.4th 616. The Supreme Court stated:

> "... [W]e conclude that the judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation. If the decision's consideration of the specified facts is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." Ibid @ 657-658.

## **Whether the BPT's decision is supported by any evidence**

Title 15 of the California Code of Regulations, section 2402 provides the guidelines for parole consideration. Circumstances tending to show unsuitability are listed and include consideration of the commitment offense and whether the crime was committed in an especially cruel and callous manner and whether the motive for the crime was trivial in relation to the offense. The BPH is also authorized to consider the prisoner's previous record of violence and the prisoner's institutional behavior. The importance attached to any circumstance or combination of circumstances "is left to the judgment of the panel."

The record reflects that the BPT denied parole citing as one of its reasons "the especially cruel and callous manner" in which Petitioner murdered his victim in order to obtain money to buy alcohol. The BPT set forth the factual basis for this conclusion. The BPT noted that the motive for the crime was very trivial in relation to the offense.

The BPT also noted the Petitioner's escalating pattern of criminal conduct which led to the commitment offense. It was noted that Petitioner was involved in gang activity and had a lengthy juvenile record which included assault with a deadly weapon.

The Board further commented and seemed most concerned by Petitioner's institutional behavior; that is the 115's and 128's. These violations, the hearing officer, commented, tend to indicate that Petitioner may be a threat to society; that 'the forces ... that drew you into gangs may still be there."

Thus, there is "some" evidence which supports the BPT's decision.

## Whether the BPT's decision was arbitrary or capricious

It is well-settled that discretion in a parole matter must be exercised in good faith. The California Supreme Court recognizes that "a prisoner not only has a right to apply for parole, but is entitled to have his application 'duly considered' ...[and] due consideration means an examination of the inmate's institutional conduct, the nature of his offense, his age, his prior associations, his habits, inclinations and traits of character, the probability of his reformation, and the interest of public security. ... '[D]ue consideration' also entail[s] a periodic reconsideration of parole potential ...." More recently, the Supreme Court has decided that a statement of reasons for a parole decision is indispensable to due consideration. *In re Sturm* (1974) 11 C.3d 258, 268.

The record reflects that the BPT gave Petitioner's request for parole "due consideration" and as required, Petitioner was provided with a written statement of the BPT's reasons for the denial.

## Whether plea agreement was violated by District Attorney's opposition to parole

Petitioner must set forth the facts supporting the allegations in the petition with particularity. Vague or conclusionary allegations do not warrant habeas relief. The petition should include copies of "reasonably available documentary evidence in support of the claims, including relevant portions of trial transcript and affidavits or declarations. *People v. Duvall* (1995) 9 C.4th 464, 474.

Nothing has been submitted by Petitioner, nor is there anything in the record, to indicate that the negotiated plea included a promise by the District Attorney's office that it would not oppose parole.

## Conclusion

For the reasons set forth above, Petitioner has failed to set forth a prima facie case for habeas corpus relief. *In re Bower* (1985) 38 C.3d 865; *People v. Jackson* (1980) 28 C.3d 264. Accordingly, the petition is DENIED as to all issues raised.

Date:

JUDGE OF THE SUPERIOR COURT

TERRENCE R. VAN OSS



-3-

EXHIBIT "G"

Court of Appeal, Third Appellate District - No. C058382
**S162511**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re NOEL VALDIVIA, SR. on Habeas Corpus

The petition for review is denied.

George, C.J., was absent and did not participate.
Werdegar and Corrigan, JJ., were absent and did not participate.

SUPREME COURT
**FILED**

JUN 1 8 2008

Frederick K. Ohlrich Clerk

Deputy

**CHIN**

Acting Chief Justice